# Exhibit 1

1                  CAUSE NO. 2014-13621

2    SCHLUMBERGER LIMITED AND    )  IN THE DISTRICT COURT
     SCHLUMBERGER TECHNOLOGY     )
3    CORPORATION,                )
                                 )
4            PLAINTIFF(S),       )
                                 )
5    VS.                         )  HARRIS COUNTY, TEXAS
                                 )
6    CHARLOTTE RUTHERFORD,       )
                                 )
7            DEFENDANT(S).       )  127TH JUDICIAL DISTRICT

8    ********************************************************

9              ORAL AND VIDEOTAPED DEPOSITION OF

10                  CHARLOTTE RUTHERFORD

11                      MAY 29, 2014

12                     Volume 1 of 1

13   ********************************************************

14        ORAL AND VIDEOTAPED DEPOSITION of CHARLOTTE

15   RUTHERFORD, produced as a witness at the instance of the

16   Plaintiffs, and duly sworn, was taken in the above-styled

17   and numbered cause on May 29, 2014, from 9:07 a.m. to

18   5:38 p.m., before Tammy S. Brown, CSR in and for the State

19   of Texas, reported by machine shorthand, at the offices of

20   AHMAD, ZAVITSANOS, ANAIPAKOS, ALAVI & MENSING, P.C.,

21   One Houston Center, 1221 McKinney Street, Suite 3460,

22   Houston, Texas, pursuant to the Texas Rules of Civil

23   Procedure and the provisions stated on the record.

24

25

```
1                          INDEX

2                                              Page
    Appearances.................................   2
3   Stipulations................................   6

4   CHARLOTTE RUTHERFORD

5   By Mr. Grant................................   8
    By Mr. Ahmad................................ 273
6
    Changes and Signature....................... 275
7   Reporter's Certificate...................... 277

8                         EXHIBITS

9   No.           Description                    Page
    Exhibit 1     Defendant's Anti-SLAPP Motion
10                to Dismiss.....................  11
    Exhibit 2     Plaintiffs' Original
11                Petition, Ex Parte
                  Application for Temporary
12                Restraining Order, Temporary
                  Injunction, and Permanent
13                Injunction and Motion of
                  Expedited Discovery...........  45
14  Exhibit 3     United States Patent
                  US 7,986,319 B2...............  52
15  Exhibit 4     Original Complaint for Patent
                  Infringement..................  76
16  Exhibit 5     LinkedIn Profile of Charlotte
                  Rutherford.................... 110
17  Exhibit 6     Performance Appraisal and
                  Development Plan - Charlotte
18                Rutherford
                  (SLB 00000460 - 467).......... 159
19  Exhibit 7     Cover Page - "Intellectual
                  Property Strategy" -
20                Presented by Charlotte
                  Rutherford - Deputy General
21                Counsel IP - 17 Jan 2011 -
                  Schlumberger Secret........... 177
22  Exhibit 8     Declaration of David Cowen..... 182
    Exhibit 9     June 3, 2013 Acacia Press
23                Release....................... 233
    Exhibit 10    December 9, 2013 Acacia Press
24                Release....................... 240

25
```

```
 1                          EXHIBITS

 2      No.            Description                  Page

 3      Exhibit 11     Schlumberger Patent and
                       Confidential Information
 4                     Agreement.....................  247
        Exhibit 12     Schlumberger Business and
 5                     Employee Conduct Policy
                       Statement.....................  248
 6      Exhibit 13     Schlumberger Confidentiality
                       and Information Security
 7                     Policy........................  249
        Exhibit 14     Schlumberger Data Privacy and
 8                     Protection Policy.............  250
        Exhibit 15     Schlumberger Conflict of
 9                     Interest Policy...............  250
        Exhibit 16     Schlumberger Inventions
10                     Ownership and Confidential
                       Information Policy............  251
11      Exhibit 17     "Schlumberger - Our Values,
                       Conduct, and Behavior" .......  251
12      Exhibit 18     Schlumberger Code of Conduct...  252

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1   participation in suing Schlumberger.
 2        Q.   Okay.  And by "suing Schlumberger," that means
 3   the patent infringement lawsuit, Dynamic 3D Geosolutions
 4   versus Schlumberger, correct?
 5        A.   Yes.
 6        Q.   In fact, you attached that complaint as Exhibit 4
 7   to your motion, didn't you?
 8             MR. AHMAD:  I'll object to the form.
 9        A.   Yes.
10        Q.   (BY MR. GRANT)  Okay.  What was your
11   participation in the Dynamic 3D Geosolutions versus
12   Schlumberger lawsuit?
13        A.   I did not participate in the Dynamic 3D lawsuit
14   as it relates to Schlumberger.
15        Q.   Did you participate in it as it relates to
16   Halliburton?
17        A.   Yes, I did.
18        Q.   Can you describe generally, meaning in a topic
19   format, what your participation was in the Halliburton
20   lawsuit?
21             MR. AHMAD:  And I'll --
22             MR. COLLINS:  Go ahead.
23             MR. AHMAD:  I'm going to instruct you only to
24   answer that in terms of subject matter or -- or topic, and
25   not to go any further than that, as such would be an
```

 1   invasion of the attorney/client and attorney work product

 2   privilege.

 3            MR. COLLINS:  And I -- I want to lodge the

 4   same objection on behalf of Dynamic 3D Geo.

 5            MR. AHMAD:  You can answer, I think as

 6   worded.

 7            MR. COLLINS:  Yeah.

 8            MR. AHMAD:  If I heard it right, it was by

 9   topic.

10            MR. GRANT:  Correct.

11            MR. AHMAD:  Okay.

12       A.   Would you repeat your question, please?

13       Q.   (BY MR. GRANT)  Sure.  What was your

14   participation in the Dynamic 3D Geosolutions versus

15   Halliburton lawsuit in terms of topic or task?

16            MR. AHMAD:  And I want to be very clear, only

17   by general topic and subject matter.  Just generally

18   speaking.

19       A.   So, your -- is your question my participation in

20   the Dynamic 3D lawsuit?

21       Q.   (BY MR. GRANT)  Against Halliburton.

22       A.   Against Halliburton?

23       Q.   Correct.

24       A.   Okay.  So, in the Dynamic 3D litigation against

25   Halliburton, I did review a copy of the draft complaint as

```
 1   to Halliburton before it was filed.

 2       Q.    Did you review any Rule 11 pre-suit infringement

 3   analysis?  Yes or no?

 4               MR. AHMAD:  With respect to?

 5               MR. GRANT:  Halliburton.

 6               MR. AHMAD:  Halliburton only?

 7       A.    With respect to Halliburton, I did not review any

 8   infringement or Rule 11 analysis.  That was performed by

 9   Counsel.

10       Q.    (BY MR. GRANT)  Okay.  Did you provide edits to

11   that complaint when you reviewed it?

12               MR. COLLINS:  Objection, that's --

13               MR. GRANT:  It's a yes or no.

14               MR. COLLINS:  That -- that -- that still

15   calls for information that's protected by the

16   attorney/client privilege.  That -- that's just delving

17   too far into activities that -- that constitute work

18   product.

19               MR. AHMAD:  I'll -- I'll instruct the witness

20   not to answer based upon --

21               MR. COLLINS:  Correct.

22               MR. AHMAD:  -- that as calling for attorney

23   work product.

24       Q.    (BY MR. GRANT)  Are you going to follow that

25   instruction?
```

```
 1                    MR. AHMAD:  Well --
 2                    MR. GRANT:  I'm asking -- I'm asking if
 3    there's any non-privileged communications.
 4                    MR. AHMAD:  Well, the problem is I would like
 5    to discuss what is considered non-privileged.  That's --
 6                    MR. GRANT:  Sure.  Why don't we take a break
 7    and let you do that.
 8                    MR. AHMAD:  Sure.  Thanks, Max.
 9                    MR. GRANT:  You bet.
10                    THE VIDEOGRAPHER:  Off the record, 9:41.
11                    (Recess from 9:41 a.m. to 9:58 a.m.)
12                    THE VIDEOGRAPHER:  Tape 2, on the record,
13    9:58.
14                    MR. GRANT:  Okay.  Madam Court Reporter, can
15    you read the pending question, please.
16                    (Requested portion was read)
17         A.   No, not that I can recall.
18         Q.   (BY MR. GRANT)  Are there any non-privileged
19    communications you had with your colleagues at Dynamic 3D
20    regarding protecting Dynamic 3D's patent rights?
21         A.   Not that I can recall.
22         Q.   Does Dynamic 3D have any employees at all?
23         A.   Dynamic 3D has, I believe, a director.
24         Q.   My question, Ms. Rutherford, was does it have any
25    employees.  Can you answer that question?
```

```
 1       A.    I don't believe it does.
 2       Q.    Okay.  So, you don't actually have any colleagues
 3    at Dynamic 3D, do you?
 4       A.    Dynamic 3D's a subsidiary of Acacia.  I'm not
 5    aware that Dynamic 3D, other than its -- I know there's at
 6    least one director, I'm not aware of any other employees.
 7       Q.    Did -- did you reference the fact that it's a
 8    subsidiary of Acacia, because in your mind those are sort
 9    of interchangeable?
10       A.    I referenced it because it's my understanding
11    Dynamic 3D is a subsidiary of Acacia, so it's a separate
12    legal entity.
13       Q.    Can you give me a list --
14       A.    It's -- it's not the same as Acacia.
15       Q.    Can you give me a list of names of your
16    colleagues who are colleagues at Dynamic 3D?
17       A.    By "colleagues," do you mean employees?
18       Q.    I mean whatever you meant in your motion.
19             MR. AHMAD:  And I'm going to object to the
20    extent you're asking for what the lawyers meant; that's
21    going to call for attorney work product and
22    attorney/client privilege.  And I'll instruct her not to
23    answer if it's an interpretation of what the lawyers
24    meant.
25             MR. GRANT:  Well, we -- we can do it that
```

```
 1   office.

 2       Q.   (BY MR. GRANT)  What are their names?

 3       A.   Their names are Vincent Varghese.  V-A --

 4            THE WITNESS:  Would you like me to spell it?

 5       A.   V-A-R-G-H-E-S-E.  Gary Fischman, F-I-S-H-M-A-N.

 6   Phillip Mitchell, and Debra Hexsel, H-E-X-S-E-L.

 7       Q.   (BY MR. GRANT)  Who is the senior person in

 8   Acacia's Houston office?

 9       A.   I am.

10       Q.   Do --

11       A.   If you mean senior by rank, as opposed to

12   something else.

13       Q.   Who is in charge of the Houston office?

14       A.   I am in charge of the Houston office.

15       Q.   Do those four employees report to you?

16       A.   They report to me; but some of them also have a

17   dual reporting to other people, as well --

18       Q.   I understand --

19       A.   -- in Acacia.

20       Q.   I understand that there may be some dual

21   reporting; but each and every one of those people report

22   to you in at least one capacity, correct?

23            MR. AHMAD:  Object to the form.

24       A.   Yes, they do.

25       Q.   (BY MR. GRANT)  So, Gary Fischman, for example,
```

```
 1   information protected by the attorney work product and

 2   attorney/client privilege.  To the extent you can answer

 3   that without revealing any attorney work product or

 4   attorney/client communication, feel free to do so.

 5               MR. AHMAD:  I would join in that.  Instruct

 6   you not to answer if it's going to reveal attorney/client

 7   privilege or attorney work product, but if you can do so

 8   without breach of privilege, go ahead and answer it.

 9        A.   Would you, please, repeat the question?

10        Q.   (BY MR. GRANT)  Yeah.  What were the

11   circumstances under which you reviewed the '319 Patent?

12               MR. AHMAD:  Same instruction and objection.

13        A.   My -- my review of the '319 Patent was in

14   connection with privileged communications.

15        Q.   (BY MR. GRANT)  Okay.  Did you review the '319

16   Patent in anticipation of litigation?  "Yes" or "no"?

17        A.   Yes.

18        Q.   Okay.  And that would have been in the summer of

19   2013, correct?

20        A.   Yes.

21        Q.   Was there any review that you conducted of the

22   '319 Patent that was not in anticipation of litigation?

23        A.   No.

24        Q.   Now, who were the parties that you were

25   anticipating litigation with when you reviewed the '319
```

```
 1    know, you make your objection, you give your --

 2                MR. AHMAD:  You've got --

 3                MR. GRANT:  -- instruction, and we'll go from

 4    there.

 5                MR. AHMAD:  Okay.

 6                MR. SMYSER:  And you have to give those names

 7    in a privilege log.

 8                MR. GRANT:  Correct.  But we'll deal with

 9    that after the fact.

10                MR. AHMAD:  I -- I don't agree with that, by

11    the way.

12                MR. SMYSER:  Okay.

13                MR. GRANT:  Okay.

14       Q.   (BY MR. GRANT)  Were you involved in meetings

15    with Austin GeoModeling concerning the '319 Patent?

16                MR. AHMAD:  You can answer that "yes" or

17    "no," at least for now.

18       A.   Yes.

19       Q.   (BY MR. GRANT)  When did they occur?

20       A.   To the best of my recall, it was summer of 2013.

21       Q.   How many meetings?

22       A.   How many meetings with Austin Geo?  Is that your

23    question?

24       Q.   Yes, that's what we're talking about.

25       A.   Okay.  Two meetings that I recall and a phone
```

1    conversation.

2        Q.   Was that the total of all communications, written

3    or oral, that you had with Austin GeoModeling?

4        A.   That's all I can recall.

5        Q.   Okay.  Who was present at the first meeting?

6        A.   At the first meeting, the two inventors, Tron

7    Isaksen, I-S-A-K-S-O-N (sic), I believe, and Robin

8    Dommisse.  I believe the spelling is D-O-M-M-I-S-S-E.  So,

9    the two inventors.  And then, also, my Licensing Exec IP

10   attorney, John Schneider, S-C-H-N-E-I-D-E-R, I believe.

11       Q.   And -- sorry?

12       A.   Sorry.

13       Q.   Anybody other than the four of you at that first

14   meeting?

15       A.   Yeah, I'm -- I'm not through with my answer.

16       Q.   Sure.

17       A.   Eric Ahroon, I believe the spelling is

18   A-H-R-O-O-N.  And Phil Mitchell.  And, of course, me.

19       Q.   Who is Eric Ahroon?

20       A.   Eric Ahroon was in charge of business development

21   for the Energy Group at Acacia.

22       Q.   And who is Phil Mitchell?

23       A.   Phil Mitchell is the engineer working with the

24   Energy Group.

25       Q.   Okay.  About how long did the meeting last?

1        A.    I believe it was about an hour.

2        Q.    Tell me the substance of the discussions that

3    were held between third-party Austin GeoModeling, and

4    you-all from Acacia.

5                    MR. AHMAD:  And --

6                    MR. COLLINS:  Objection, that calls for

7    privileged communications.  It's covered by the common

8    legal interest privilege.  I'm going to instruct the

9    witness not to answer.

10                   MR. GRANT:  Is there a common legal interest

11   that existed as of the summer of 2013?  Is that your

12   assertion?

13                   MR. AHMAD:  It is.

14                   MR. COLLINS:  Absolutely.

15                   MR. GRANT:  Okay.  What was the date on which

16   that common legal interest arose, approximately?

17                   MR. COLLINS:  I can't tell you approximately.

18   It certainly arose well before that.

19                   MR. GRANT:  Okay.  Well, I'm going to ask for

20   that date, and I would ask you to let know what it is, in

21   writing or otherwise, after the deposition.

22                   MR. AHMAD:  And -- and by the way, if you

23   want to ask about anything related to Schlumberger, and if

24   you agree that's not going to waive anything, I -- I don't

25   think we have a problem with that.

```
 1                    hearing of the Reporter)
 2               MR. AHMAD:  Can we agree it doesn't
 3    constitute any waiver?
 4               MR. GRANT:  Yeah, we're going to do it the
 5    same way we did with Robin's.  There's no subject matter
 6    waiver based on the -- that answer.
 7               MR. AHMAD:  Well, I just don't want there to
 8    be any waiver, I mean, I -- you know.
 9               MR. GRANT:  Well, I get to use this answer,
10    right?
11               MR. AHMAD:  Well, you get to use the answer
12    in this case --
13               MR. GRANT:  Sure.
14               MR. AHMAD:  -- okay, but I don't -- you know,
15    I don't want somebody to go out, for example, in another
16    case and claim that they get to start taking depositions
17    of everybody there, because we waived the privilege at
18    this deposition.
19               MR. GRANT:  There's no waiver of the
20    privilege based on the answer.
21               MR. AHMAD:  Okay.  Go ahead and answer that
22    question.
23         A.    Can you, please, restate the question?
24         Q.    (BY MR. GRANT)  Sure.  Was one of the targets
25    that you or any one of the individuals at Acacia had in
```

```
 1    mind or discussed in this meeting with Austin

 2    GeoModeling, Schlumberger?

 3              MR. AHMAD:  Subject to our non-waiver

 4    agreement, you can answer that question.

 5        A.   Can you restate the question, Mr. Grant?

 6        Q.   (BY MR. GRANT)  Sure.

 7              MR. GRANT:  Can you just re-read it?

 8              (Requested portion was read)

 9        A.   Yes.

10        Q.   (BY MR. GRANT)  Okay.  Was there a -- "yes" or

11    "no."  Was there a specific discussion about Schlumberger

12    at the meeting?

13              MR. AHMAD:  Again, subject to our agreement?

14              MR. GRANT:  Correct.

15        A.   Repeat your question, please.

16        Q.   (BY MR. GRANT)  Was there a specific discussion

17    about Schlumberger at this first meeting with Austin

18    GeoModeling?  "Yes" or "no"?

19              MR. AHMAD:  You can go ahead and answer based

20    on our agreement.

21        A.   As to Schlumberger, I told the people attending

22    the meeting that I could not discuss Schlumberger.

23        Q.   (BY MR. GRANT)  I appreciate that.  My question

24    was:  Was there a discussion about Schlumberger at that

25    meeting?  "Yes" or "no"?
```

```
 1                     MR. AHMAD:  Again, you can answer based on
 2      our same agreement.
 3           A.    No.
 4           Q.    (BY MR. GRANT)  Was the Petrel product discussed
 5      during the first Austin GeoModeling agreement?
 6                     MR. GRANT:  And our agreement's good for the
 7      deposition.
 8                     MR. AHMAD:  Subject to our agreement, you can
 9      go ahead and answer.
10           A.    The word "Petrel" was mentioned.
11           Q.    (BY MR. GRANT)  It was?  Who mentioned it?  Name
12      is all I'm looking for.
13           A.    The -- Austin Geo did.
14           Q.    Yeah.  What was the substance of the discussion
15      regarding the Petrel product at the first meeting with
16      Austin GeoModeling?
17                     MR. AHMAD:  And subject to our agreement, you
18      can answer that question.
19           A.    The inventor mentioned that Schlumberger had a
20      software product called Petrel.
21           Q.    (BY MR. GRANT)  What else?
22           A.    Nothing else.
23           Q.    Okay.  Was there a discussion among your
24      colleagues at Acacia about Petrel, after you were told
25      that?
```

1              MR. AHMAD:  Object to the form, but subject

2    to our agreement, you can answer that.

3        A.   Would you repeat the question, please?

4        Q.   (BY MR. GRANT)  Sure.  Was there a discussion

5    among your colleagues at Acacia about Petrel after you

6    were told that by the Austin GeoModeling inventor?

7              MR. AHMAD:  Object to form.  But subject to

8    our agreement, you can answer that.

9        A.   I don't know.

10       Q.   (BY MR. GRANT)  Well, let's talk about the

11   second meeting, if we could.  Approximately how long

12   after the first meeting did the second meeting occur?

13       A.   One to two months later.

14       Q.   Who was present at that meeting?

15       A.   The two inventors, along with Phil Mitchell, Gary

16   Fischman, and Vincent Varghese, and myself.

17       Q.   And where did that meeting take place?

18       A.   That meeting took place at the Austin Geo office.

19       Q.   And I apologize if I asked, but where did the

20   first meeting take place?  Also at Austin GeoModeling?

21       A.   Same location.

22       Q.   Okay.  And how long did that meeting last, the

23   second one?

24       A.   About an hour.

25       Q.   Okay.

```
 1 | that instruction?
 2 |     A.   I am.
 3 |     Q.   What was the purpose of the first meeting?
 4 |     A.   The first meeting with Austin Geo was giving the
 5 | inventors an opportunity to talk about their invention and
 6 | their desire to partner with Acacia.
 7 |     Q.   Anything else?
 8 |          MR. AHMAD:   I'll object as to form.  But go
 9 | ahead.
10 |     A.   That was the purpose of the meeting.
11 |     Q.   (BY MR. GRANT)  Did they provide a presentation?
12 |     A.   They showed us a presentation that they had
13 | prepared.
14 |     Q.   Was it like a PowerPoint presentation?
15 |     A.   Yes.
16 |     Q.   Did they show you anything in addition to the
17 | PowerPoint presentation?
18 |     A.   Not that I recall.
19 |     Q.   Okay.  Did you -- did you and your col-- and/or
20 | your colleagues at Acacia retain a copy of the PowerPoint
21 | presentation?
22 |     A.   The -- the inventors sent a copy of the
23 | presentation to Gary Fischman.
24 |     Q.   Okay.  And he presumably still has that copy
25 | somewhere in his box --
```

```
 1                        MR. AHMAD:   Object at to form.
 2        Q.    (BY MR. GRANT)   -- to your knowledge?
 3        A.    I do not know.
 4        Q.    Okay.   What was the purpose of the second
 5   meeting?
 6        A.    The second meeting was a repeat of the first
 7   meeting, but with new members of the Acacia energy team.
 8        Q.    Okay.   And did they give a presentation at the
 9   second meeting?
10        A.    Yes.
11        Q.    Was it the same presentation?
12        A.    Yes.
13        Q.    Were there any other materials, other than the
14   PowerPoint presentation, provided to Acacia in connection
15   with either of the two meetings?
16        A.    I'm not aware.
17        Q.    So, to the best of your knowledge, the answer's
18   no?
19        A.    Repeat the question.
20        Q.    Sure.   Were there any other materials that were
21   provided to Acacia in connection with either of the two
22   meetings by Austin GeoModeling?
23        A.    Again, no, I'm not aware that there were.
24        Q.    Okay.   Is it correct that the -- Schlumberger was
25   discussed at the second meeting, as well as the first?
```

```
 1                        MR. AHMAD:  And --

 2                        MR. GRANT:  "Yes" or "no."

 3                        MR. AHMAD:  -- we have an agreement that --

 4    well, "yes" or "no," you can go ahead and answer.

 5         A.   Would you repeat the question?

 6         Q.   (BY MR. GRANT)  Is it -- was the -- Schlumberger

 7    discussed at the second meeting, as well as the first?

 8         A.   The name "Schlumberger" was mentioned at the

 9    second meeting.

10         Q.   Okay.  And is it correct that the Petrel product

11    was discussed at the second meeting, as well as the first?

12         A.   Again, the inventors showed the same PowerPoint,

13    and mentioned Petrel as a Schlumberger software package.

14         Q.   Was Petrel referenced in the PowerPoint

15    presentation, itself?

16         A.   I don't recall.

17         Q.   Was Schlumberger referenced in the PowerPoint

18    presentation, itself?

19         A.   Yes.

20         Q.   Did you or the other members of Acacia bring any

21    materials to the meeting that you provided, written

22    materials, to Austin GeoModeling?

23         A.   I don't believe so.

24         Q.   What was your -- well, you mentioned there --

25    there was also a phone call.  Was the phone call
```

```
 1    subsequent to the two meetings?

 2         A.    The phone call was after those two meetings, yes.

 3         Q.    What was the -- what was the purpose of the phone

 4    call?

 5         A.    That call was a discussion involving Counsel --

 6    outside Counsel.

 7         Q.    So, who was on the call?

 8         A.    It -- and, again, it was -- it was a call with

 9    outside Counsel, it was with Matt Vella, the CEO, and the

10    two inventors, Gary Fischman, possibly Phil Mitchell, and

11    myself.

12         Q.    Who were the outside Counsel that were on the

13    phone?

14         A.    Mike Collins.

15         Q.    Anyone else?

16         A.    Not that I can recall.

17         Q.    Okay.  Was that phone call conducted in

18    anticipation of litigation?

19         A.    Yes.

20         Q.    Okay.  Was Schlumberger mentioned on the phone

21    call, the way it was in the two meetings?

22              MR. AHMAD:  If you can answer that "yes" or

23    "no."

24         A.    Could you repeat your question, please?

25         Q.    (BY MR. GRANT)  Was Schlumberger mentioned on
```

 1  would be filed against Schlumberger.

 2       Q.   When was that?

 3       A.   Very soon -- just before the complaint was filed.

 4       Q.   Okay.  When did you learn that Acacia was

 5  considering suing Schlumberger?

 6                MR. AHMAD:  Object as to form.

 7       A.   I learned -- I learned that when the due

 8  diligence was completed and a recommendation made to the

 9  CEO to acquire the patent.

10       Q.   (BY MR. GRANT)  Schlumberger was a potential

11  target, to your knowledge, from the date of the first

12  meeting with Austin GeoModeling, wasn't it?

13       A.   Repeat your question, please.

14       Q.   Schlumberger was a potential target from the date

15  of the first meeting with Austin GeoModeling, wasn't it?

16       A.   I'd say, yes.

17       Q.   When did Acacia decide to acquire the '319

18  Patent?

19       A.   In the second half of 2013.

20       Q.   Well, how long did the transaction take to close?

21  How much time gap was there between the decision to

22  acquire and when Acacia acquired the rights?

23       A.   That's hard to say.  The reason being that Acacia

24  was aware of the '319 Patent before I joined Acacia.

25       Q.   Thank you for reminding me of that.  And Acacia

 1    decided to acquire the '319 Patent after you joined it,

 2    correct?

 3        A.    That is correct.

 4        Q.    And Acacia decided to assert the '319 Patent

 5    against Schlumberger after you had joined Acacia, correct?

 6        A.    Yes.

 7        Q.    What's the approximate date that you first saw

 8    any version of this complaint, Exhibit 4?

 9        A.    The first time that I read this complaint against

10    Schlumberger by Dynamic 3D was after it had been filed.

11        Q.    When was the first time you saw any version of

12    the complaint that Dynamic 3D filed against Halliburton?

13        A.    I would -- I would say within a couple of days of

14    the complaint being filed against Halliburton, as I can

15    best recall.

16        Q.    Aren't the complaints against Schlumberger and

17    Halliburton substantially identical?

18              MR. COLLINS:  Object to form.

19              MR. AHMAD:  I'll -- I'll join in that

20    objection.

21        A.    I know they both alleged patent infringement of

22    the '319.

23        Q.    (BY MR. GRANT)  Well, you've read both.  Can you

24    answer my question?  Isn't it true, Ms. Rutherford, that

25    the complaints filed by Dynamic 3D against Halliburton

```
 1    and against Schlumberger are substantially identical?

 2              MR. COLLINS:  Same objection.

 3              MR. AHMAD:  Object to the form.

 4        A.    I would say they're similar.

 5        Q.    (BY MR. GRANT)  Very similar, right?

 6              MR. AHMAD:  Object as to form.

 7        A.    Again, I would say they're similar.

 8        Q.    (BY MR. GRANT)  Now, in terms of the Halliburton

 9    complaint, I think -- well, let me ask it this way.  Were

10    you involved in drafting the Halliburton complaint?

11        A.    No, I was not.

12        Q.    Now, you said that you reviewed it.  I want to

13    make sure I've got this clear on the record.  Did you

14    provide any edits, "yes" or "no," to the Halliburton

15    complaint?

16        A.    No, I did not.

17        Q.    Can you describe for me your involvement in the

18    decision to acquire the '319 Patent by Acacia?

19              MR. COLLINS:  Objection, calls for

20    information protected by the attorney/client privilege and

21    attorney work product doctrine.

22              MR. AHMAD:  Max, do you mind if I confer with

23    the client about that?

24              MR. GRANT:  Not at all.

25              MR. AHMAD:  Okay.  Thanks.
```

```
 1                    THE VIDEOGRAPHER:  Tape 2, off the record at
 2      10:53.
 3                    (Recess from 10:53 a.m. to 11:06 a.m.)
 4                    THE VIDEOGRAPHER:  Tape 3, on the record,
 5      11:06.
 6                    MR. GRANT:  We had a pending question, Madam
 7      Court Reporter.  Could you, please, re-read it?
 8                    (Requested portion was read)
 9                    MR. AHMAD:  And subject to an agreement with
10      Counsel that that will not constitute a waiver,
11      Ms. Rutherford can answer that question.
12                    MR. GRANT:  That's fine.
13           A.   So, my involvement was to concur with the
14      recommendation to acquire the '319 Patent.
15           Q.   (BY MR. GRANT)  Whose recommendation?
16           A.   Outside Counsel and Gary Fischman, my Licensing
17      Executive IP Counsel, along with the engineer, Phil
18      Mitchell.
19           Q.   Okay.  So, you -- you received recommendations
20      from the Collins Edmonds firm, from Mr. Fischman and from
21      Mr. Mitchell to acquire the patent, correct?
22           A.   Yes.  Mr. Mitchell was working at the direction
23      of Counsel.
24           Q.   Which Counsel?
25           A.   He was working at the direction of both outside
```

```
 1   Counsel and in-house Counsel.
 2       Q.   Okay.  Which in-house Counsel was he working at
 3   the direction of?
 4       A.   Again, Gary Fischman, the Licensing Executive IP
 5   Counsel.
 6       Q.   Okay.  And -- and -- and that was your Licensing
 7   IP Executive, right?
 8                MR. AHMAD:  Object to the form.
 9       Q.   (BY MR. GRANT)  Right?  He's -- he works for
10   you?
11       A.   He works for me, and he also reports to someone
12   else at Acacia.
13       Q.   Did they provide you with a -- any one of them
14   provide you with a presentation?
15                MR. AHMAD:  And can we have the same
16   non-waiver agreement?
17                MR. GRANT:  Yeah.  I'm just trying to find
18   out what would be in a privileged log anyway.  So, I'm --
19   I'm not sure it applies, but I'm not arguing subject
20   matter waiver based on her answer.
21                MR. AHMAD:  I'm not -- I'm just trying to
22   make it easy --
23                MR. GRANT:  Sure.
24                MR. AHMAD:  -- because I'm not necessarily
25   saying there is a privilege, but I want to make it easy
```

```
 1    and just agree that we're not waiving any, if it exists.

 2                MR. GRANT:  That's -- that can apply for the

 3    whole day.

 4                MR. AHMAD:  Okay.  You can -- you can go

 5    ahead and answer that question subject to our non-waiver

 6    agreement.

 7         A.   Would you, please, repeat the question?

 8         Q.   (BY MR. GRANT)  Did they make a presentation,

 9    any one of those three, to you?

10         A.   Presentation was made by outside Counsel.

11         Q.   Okay.  Again, was that PowerPoint?

12         A.   Yes.

13         Q.   Okay.  How long did that presentation last?

14         A.   As best I recall, it was about an hour.

15         Q.   Okay.  Was Schlumberger referenced in that

16    presentation?

17         A.   Yes.

18         Q.   Let's go back, if we can, briefly, to the first

19    meeting with Austin GeoModeling.  Do you have that one in

20    mind?

21         A.   Okay.

22         Q.   Okay.  The two inventors were there, correct?

23         A.   Correct.

24         Q.   And, then, there was a Mr. Schneider, who is a

25    Licensing Executive, correct?
```

```
 1        A.    He's a License Executive and IP Counsel.

 2        Q.    Okay.  And a Mr. A-- Ahorn?

 3        A.    Ahroon.

 4        Q.    Ahroon?

 5        A.    Eric Ahroon.

 6        Q.    And he's a business development person?

 7        A.    He is.

 8        Q.    Okay.  And Mr. Mitchell, the engineer, was there?

 9        A.    Yes.

10        Q.    And you were there?

11        A.    Yes.

12        Q.    Okay.  Did either -- did you provide any legal

13   advice to Austin GeoModeling at that first meeting?

14        A.    I don't recall that I did.

15        Q.    Okay.  Did Mr. Schneider provide any legal advice

16   to Austin GeoModeling at that first meeting?

17        A.    I believe he did.

18        Q.    Well, what was the -- what was the -- the topic,

19   privilege log level description, of the legal advice he

20   was providing?

21                 MR. AHMAD:  And --

22                 MR. COLLINS:  I'm -- I'm going to object that

23   that calls for material -- or information covered by the

24   attorney/client privilege and the attorney work product

25   doctrine.
```

```
 1                        MR. AHMAD:  And --

 2                        MR. COLLINS:  Instruct the witness not to

 3      answer.

 4                        MR. AHMAD:  And I will let you answer subject

 5      to our non-waiver agreement, but on a subject matter level

 6      only; because I understood the question to be on a

 7      privilege log basis, just describing the subject matter or

 8      topic.

 9          Q.   (BY MR. GRANT)  Yeah.  And I -- I don't know

10      which one of your lawyers' instructions you're going to

11      follow.  So I guess --

12                        MR. AHMAD:  I hope it's.

13          Q.   (BY MR. GRANT)  -- the question is, which one is

14      it going to be?

15                        MR. COLLINS:  I'll -- I'll withdraw the

16      instruction not to answer, Ms. Rutherford.

17          Q.   (BY MR. GRANT)  Okay.  Can you answer consistent

18      with your lawyer's instruction?

19          A.   Could you, please, repeat the question?

20          Q.   What was the subject matter, consistent with a

21      privilege log level description, of the legal advice that

22      Mr. Schneider was giving Austin GeoModeling?

23          A.   It was a discussion of the '319 Patent.

24          Q.   Well, I -- I -- is there anything that you can

25      add to that without revealing the substance of his legal
```

```
 1   advice, regarding the topic on which he was giving legal

 2   advice?

 3       A.   I would say it in particular referred to the

 4   claims in the patent.

 5       Q.   Okay.  And you said that meeting lasted about an

 6   hour?

 7       A.   As best I recall.

 8       Q.   Were you present for the entire meeting?

 9       A.   I was present for the entire meeting, yes.

10       Q.   And the second meeting that -- that you recalled

11   was also roughly an hour; were you present for the

12   entirety of the second meeting, as well?

13       A.   I was.

14       Q.   Okay.  You said that you concurred in a

15   recommendation that outside Counsel made to you.  Who was

16   the person that made the decision to proceed with -- let's

17   start with the Halliburton lawsuit?

18       A.   Would you repeat your question, please?

19       Q.   You said that you concurred with a recommendation

20   by outside legal Counsel to proceed with the lawsuit.

21   Who's the person that made the decision -- in other words,

22   was your concurrence the decision to sue or did somebody

23   else make that decision?

24       A.   The recommendation to sue came from outside

25   Counsel and Gary Fischman, my Licensing Exec IP attorney.
```

1        Q.   Yes.  And then you said that you concurred.  I'm

2    not asking who made the recommendation --

3        A.   Uh-huh.

4        Q.   -- you've told us that.

5        A.   Uh-huh.

6        Q.   Whose decision was it to sue?

7        A.   Ultimately, the decision belongs to Acacia's CEO

8    and President, Matt Vella.

9        Q.   Okay.  So, when they make -- when the outside

10   Counsel and Mr. Fischman make a recommendation to you and

11   you concur, then I presume that recommendation is added to

12   the input that goes to Acacia's CEO.  Is that correct?

13       A.   That is correct.

14       Q.   Okay.  Who, senior to you, if anyone, also makes

15   a recommendation that's considered by Acacia's CEO in the

16   decision to sue?

17       A.   There is no one.

18       Q.   With regards to acquiring the '319 Patent as

19   opposed to suing, who made the final decision in acquiring

20   the patent?

21       A.   Ultimately, the final decision to acquire is made

22   by the CEO and President, Matt Vella.

23       Q.   Did you also receive a recommendation on the

24   decision to acquire, as well as the decision to sue?

25       A.   I did.

1      Q.    Okay.  And who made that recommendation to you?

2      A.    That recommendation was made by outside Counsel

3  and by Gary Fischman, the Licensing Exec IP Counsel.

4      Q.    Was the decision to acquire and the decision to

5  sue, the same decision?

6      A.    It was part of the same review process.

7      Q.    So, there was a single presentation that you got,

8  correct?  You referenced a presentation, a PowerPoint

9  presentation --

10     A.    Yes.

11     Q.    -- that outside Counsel gave to you.

12     A.    Yes.

13     Q.    There was only one of those, correct?

14     A.    Correct.

15     Q.    And that recommendation included both the

16  recommendation to acquire the patent and the

17  recommendation to sue, correct?

18     A.    As best I recall, yes.

19     Q.    Okay.  And those were both decisions that you

20  concurred in, right?

21     A.    I concurred with the recommendations of my

22  Counsel, yes.

23     Q.    Yes.  And then that became your recommendation,

24  which went to Acacia's CEO, who made the ultimate

25  decision, correct?

1      A.    Not exactly.

2      Q.    Please explain.

3      A.    Okay.  So, I concurred with the recommendation of

4  outside Counsel and my in-house Counsel.  Ultimately, the

5  presentation was made by outside Counsel and in-house

6  Counsel to the CEO, and the CEO approved the acquiring of

7  the patent.

8      Q.    Both the acquiring and the suing, right?

9            MR. AHMAD:  Objection, form.  Go ahead.

10     A.    Ultimately, yes.

11     Q.    (BY MR. GRANT)  Right.  And the CEO, at the time

12 that he received that recommendation, did he have your

13 knowledge of your concurrence or recommendation of the

14 decision to move forward?

15     A.    He knew that I approved the recommendation.

16     Q.    In addition to the two meetings and the phone

17 call that we've discussed, were there any e-mails or

18 written memos or communications that you received that

19 related to the evaluation of the '319 Patent by Acacia?

20           MR. AHMAD:  Subject to our non-waiver

21 agreement, you can go ahead and answer.

22     A.    I don't recall receiving any.

23     Q.    (BY MR. GRANT)  Did you draft any or send any?

24 Did you memorialize your views on the '319 Patent or

25 Austin GeoModeling in any written document?

```
 1        A.    Well, that's why I'm confused.  Your second
 2   question spoke to the litigation in front of Yeakel.
 3        Q.    (BY MR. GRANT)  Yes, the one that's consolidated
 4   for marketing purposes.  So at least for now, it appears
 5   to be a single litigation.
 6              MR. COLLINS:  No, there are two lawsuits,
 7   Counsel.  Which one?
 8        Q.    (BY MR. GRANT)  I want to know --
 9              MR. FOSSUM:  Either.
10        Q.    (BY MR. GRANT)  -- either.  What are the names
11   of the people you've spoken with at Collins Edmonds
12   regarding either of those lawsuits?
13              MR. COLLINS:  Object to form.
14        A.    So, I'm going to try to clarify your question,
15   and if I don't understand it, please tell me.  As to the
16   '319 litigation currently pending, I have not spoken to
17   people at the Collins firm concerning that.
18              Those discussions occur between the attorneys
19   at the Collins firm and my Licensing Exec IP Counsel, Gary
20   Fischman.
21        Q.    (BY MR. GRANT)  Okay.  So, is it your testimony,
22   Ms. Rutherford, that you've never been involved in any
23   discussion or communication with anyone at the Collins
24   Edmonds firm concerning the subject matter of either
25   lawsuit filed by 3D GeoModeling (sic)?
```

```
 1              MR. COLLINS:  Object to form.  You can answer
 2   if you understand the question.
 3       A.    I don't understand the question, so I -- I cannot
 4   answer it.  Can you rephrase it?  And could you do me a
 5   favor and split the two litigations up, because I get
 6   confused when you put them both in the same question.
 7       Q.    (BY MR. GRANT)  Well, I'm trying to simplify, so
 8   let's keep them both --
 9       A.    Well, don't simplify it, then.  Just clarify it
10   for me, please.
11       Q.    I'll keep them both in the same question.  Are
12   there -- or is it your testimony that you've spoken with
13   no one at the Collins Edmonds firm about any lawsuit in
14   which the '319 Patent was asserted?
15              MR. COLLINS:  Object to the form.
16       A.    I previously testified that I have been involved
17   in a conversation with someone from the Collins firm in a
18   presentation concerning the '319 Patent.  I've already
19   testified to that.
20       Q.    (BY MR. GRANT)  Okay.  Well, you testified about
21   that conversation that you had with them where they made
22   the recommendation to acquire and sue, correct?
23       A.    Yes.
24       Q.    Okay.  So, that one you were clearly involved in.
25   And who, other than Mr. Collins, participated in those
```

```
 1    communications, if anyone, from the Collins Edmonds firm?
 2         A.    I'm trying to remember.  Again, it was on the
 3    phone, so I -- I know that Mike was on the phone,
 4    Mike Collins.  I'm not sure if anyone else from the
 5    Collins firm was on the phone.
 6         Q.    Okay.  Beyond the discussion in which the
 7    decision to acquire and assert the '319 Patent was made in
 8    which there was that PowerPoint presentation that you've
 9    talked about, have you been involved in any other
10    communications with anybody at the Collins Edmonds firm
11    about any litigation in which the '319 Patent was
12    asserted?
13         A.    I don't -- don't recall having any conversations
14    with anyone at the Collins firm concerning the '319
15    litigation, beyond what I've already testified to.
16         Q.    Okay.  In terms of the arrangements with Austin
17    GeoModeling to acquire the rights to the '319 Patent, do
18    you know the terms of that transaction?
19         A.    I am familiar with some of the terms.
20         Q.    Okay.  Did you provide input to the terms that
21    were finally decided upon?  Agreed to?
22         A.    No, I did not.
23         Q.    Okay.  So, the -- the -- the terms of the
24    transaction, while you may be aware of them, you had no
25    input into them and weren't -- your views weren't
```

```
 1        A.    Yes.

 2        Q.    Okay.  Did you see that?  Have access to it?

 3        A.    I don't recall seeing it.

 4        Q.    Who did that valuation?  Was it done internally

 5   at Acacia or by the Collins Edmonds firm?

 6               MR. AHMAD:  Object to the form.

 7        A.    I did not participate, so I don't know the answer

 8   to your question.

 9        Q.    (BY MR. GRANT)  Was the valuation of the '319

10   Patent included in the presentation that was made to you

11   regarding the decision whether to acquire and assert the

12   patent?

13        A.    I don't --

14               MR. AHMAD:  Object to the form.

15        A.    I don't recall.

16        Q.    (BY MR. GRANT)  Other than Mr. Fischman, who at

17   Acacia is interacting or has had any communications with

18   the Collins Edmonds firm regarding the '319 Patent

19   litigation?

20        A.    To the best of my knowledge, it's Gary Fischman.

21        Q.    Okay.  To the best of your knowledge, nobody else

22   at Acacia is interacting with the Collins Edmonds firm.

23   Is that right?

24               MR. AHMAD:  Objection, form.

25        A.    Well, I -- I am aware that the inventors have
```

```
 1    discussions with Mike Collins, but, again, they're not at
 2    Acacia, right?
 3        Q.    (BY MR. GRANT)  And I'm talking about Acacia.
 4        A.    Uh-huh.
 5        Q.    Okay.
 6        A.    And -- and I would like to add to that, Phil
 7    Mitchell, who is at Acacia and who is an engineer.
 8        Q.    So, Mr. Mitchell is an engineer; he doesn't
 9    provide any legal advice, does he?
10        A.    He's an engineer.
11        Q.    He doesn't provide any legal advice, does he?
12              MR. AHMAD:  I'm -- I'm going to object to
13    form.
14        Q.    (BY MR. GRANT)  Well, he works for you.  Are you
15    aware of him providing any legal advice in the conduct of
16    his duties?
17        A.    No.
18              MR. AHMAD:  Same objection.
19        Q.    (BY MR. GRANT)  No.  Okay.
20              Is Mr. Fischman responsible for the
21    strategy and conduct of the '319 Patent litigation?
22              MR. AHMAD:  I'll object as to form.
23        A.    On behalf of Acacia.
24        Q.    (BY MR. GRANT)  Yeah, the client.  Who's the
25    client?
```

1      A.    The client is Dynamic 3D.

2      Q.    Okay.  And who is the person who's directing the

3    litigation on behalf of Dynamic 3D?  What's their name?

4      A.    I see it being outside Counsel and Gary Fischman.

5      Q.    Okay.  Is there anybody other than Gary Fischman,

6    putting aside outside Counsel --

7      A.    Uh-huh.

8      Q.    -- who's responsible for the conduct of the

9    litigation on behalf of Dynamic 3D?

10     A.    Well, Gary Fischman, now, also reports to Jaime

11   Siegel.  S-I-E-G-E-L, I think, is the spelling.

12     Q.    Yeah, I appreciate that.  Maybe I'm not

13   understanding your answer.

14           My question isn't who does he report to, my

15   question is who at Acacia is responsible for conduct of

16   the litigation.  Is it your answer that Mr. Siegel is also

17   responsible?

18           MR. AHMAD:  Hang -- hang on for a second.

19   Just so the record is clear, I -- I think we've left the

20   bounds of this lawsuit and the -- the Anti-SLAPP Motion --

21           THE WITNESS:  Uh-huh.

22           MR. AHMAD:  -- and we're going into, I -- I

23   think, issues related to your disqualification motion in

24   the Austin lawsuit, you know.

25           So unless there's some relevance here -- you

```
 1   past anything relevant in this lawsuit.
 2              MR. AHMAD:  I'll -- I'll join in that
 3   objection and instruction; particularly the question as to
 4   why he was asked to help out.
 5       Q.   (BY MR. GRANT)  Are you going to follow that
 6   instruction?
 7       A.   I am.
 8       Q.   Okay.  I'm going to ask you some more about your
 9   alleged participation in the lawsuit set forth in the
10   Anti-SLAPP Motion.  Who selected the firm that was
11   involved in the '319 Patent litigation?
12       A.   Ultimately, Acacia.
13       Q.   Yes.  But who?  What's the name of the person at
14   Acacia?
15       A.   Who selected the Collins firm?
16       Q.   That's my question.
17       A.   Okay.  The selection was done by Gary Fischman
18   and by me.
19       Q.   Okay.  With regards to any experts involved in
20   the '319 Patent litigation, were you involved in the
21   selection of those?
22       A.   No, I was not.
23       Q.   Okay.  Your involvement in the selection of
24   outside Counsel in the lawsuit, was that -- was your
25   decision the final one or did it have to be approved by
```

```
 1    someone else?
 2         A.    I believed that that was the final one.
 3         Q.    What was the final one?
 4         A.    The selection by Gary and me was the final
 5    decision.
 6         Q.    Okay.  And when you say by Gary and you, you're
 7    the boss, so you really mean you?
 8         A.    No.
 9         Q.    You made a recommendation and it was ultimately
10    your decision, correct?
11         A.    We jointly agreed.
12         Q.    Is the '319 Patent an asset of the Energy Group
13    at Acacia?
14         A.    The '319 is a patent asset that's assigned to
15    Dynamic 3D.
16         Q.    What's the relationship between Dynamic 3G --
17         A.    3D.
18         Q.    -- 3D -- when I say "G," I mean "D."
19               What's the relationship between Dynamic 3D
20    and the energy practice at Acacia?
21         A.    Well, Dynamic 3D is a subsidiary of Acacia.  The
22    employees in the Houston office that are part of the
23    energy practice are employees of Acacia Research Group,
24    which is part of Acacia Research Corp.
25         Q.    Well, the '319 Patent was -- was owned, at least
```

```
 1        A.    I do not know.

 2        Q.    Okay.  Just so we make sure we hit the high

 3   points.  You got your law degree from Loyola, correct?

 4        A.    Yes.

 5        Q.    Okay.  And what State Bars are you a member of?

 6        A.    Seven State Bars, some active and some inactive.

 7        Q.    Which State Bars?  And if you can delineate which

 8   ones are active, then --

 9        A.    Sure.

10        Q.    -- I'd appreciate it.

11        A.    Sure.  Be glad to.  All right.  So New Jersey is

12   active.  Pennsylvania is inactive.  New York is active.

13   Colorado is inactive.  D.C. Circuit Court of Appeals is

14   active.  Texas is active.  Louisiana is inactive.

15        Q.    And the PTO?

16        A.    It's not a State Bar, but, yes, I am a member of

17   the U.S. Patent Trademark Office Bar.

18        Q.    How long have you been a member of the Texas

19   State Bar?

20        A.    My profile says -- so I'll have to rely on that

21   because I can't rely on memory alone -- it says 1988.

22        Q.    Okay.  And you reside in Texas, correct?

23        A.    I do.

24        Q.    Okay.  You were a, by this description, a senior

25   intellectual property attorney at Schlumberger from July,
```

1    2006, to May, 2013, correct?

2        A.   No.

3        Q.   Okay.   When were you a senior intellectual

4    property attorney at Schlumberger?

5        A.   My title at Schlumberger, Senior Counsel, I

6    believe was from 2006 until 2009.

7        Q.   And, then, what title did you have at

8    Schlumberger?

9        A.   And then I believe it was in 2009, I was

10   promoted, my title changed several times.  I think at the

11   time that I was promoted, my title may have been Director

12   of Intellectual Property.

13       Q.   Okay.  So, in your -- in the Exhibit 1, the

14   motion to dismiss, it says, "Charlotte Rutherford was a

15   senior intellectual property attorney at Schlumberger's

16   Legal Department from July, 2006, until May, 2013."

17            When I asked you that, you disagreed.  So,

18   that's a mischaracterization of your role.  Is that right?

19       A.   Well, there are characterization of roles and

20   then there are titles.

21       Q.   Yeah.  Were you a senior intellectual property

22   attorney at Schlumberger from 2006 to May, 2013?

23       A.   I was a Senior Counsel.  My title changed and my

24   responsibilities changed.

25       Q.   Well, let's talk about those responsibilities.

```
 1    What were your responsibilities at Schlumberger when you

 2    first joined the company?

 3         A.    So, when I first joined Schlumberger, I was hired

 4    for the purposes of developing Schlumberger's enforcement

 5    and licensing program.

 6         Q.    Enforcement and licensing of what?

 7         A.    Of -- of Schlumberger's patents.

 8         Q.    Okay.  And did you do that?

 9         A.    I did set up a enforcement program for

10    Schlumberger's patents.  I tried to set up a licensing

11    program for Schlumberger's patents.  I was marginally

12    successful.

13         Q.    As the person responsible for enforcement of

14    patents at Schlumberger, were you involved in directing

15    enforcement lawsuits?

16              MR. AHMAD:  I'll object as to form.

17         A.    Yes, I was.

18         Q.    (BY MR. GRANT)  Okay.  And that included input

19    on litigation strategies, correct?

20              MR. AHMAD:  I'll object as to form.

21         A.    Yes.

22         Q.    (BY MR. GRANT)  In fact, you attended trials,

23    right?

24         A.    I did attend trials, yes.

25         Q.    How many?
```

```
 1   Schlumberger?

 2       A.    If you talk about lawsuits and arbitrations -- is

 3   that your question?

 4       Q.    Yes.  Any action involving enforcement of patent

 5   rights.

 6       A.    So, it goes well beyond arbitrations and

 7   lawsuits --

 8       Q.    Yes.

 9       A.    -- correct?  So, what's your question, again?

10       Q.    How many enforcement actions were you involved in

11   during you tenure at Schlumberger?

12       A.    So, while I was in a role for Senior Counsel

13   Enforcement and Licensing, I don't know how many.  There

14   were a number of enforcement actions ongoing --

15       Q.    Can you --

16       A.    -- between Schlumberger and other companies.

17       Q.    Can you give me an order of magnitude?  Was it

18   dozens?

19       A.    I'd say less than 25, is my best recollection.

20       Q.    So, in the vicinity of 20 to 25?

21       A.    I -- I just don't recall.

22       Q.    And can you describe, in topic level format, what

23   your role was and your responsibilities for those

24   enforcement actions?

25       A.    So, those enforcement actions, when I was Senior
```

1   Counsel for Enforcement and Licensing, there were a couple

2   of lawsuits, and I would be involved with those with

3   outside Counsel.

4            I also had two additional people in my

5   department, and they had, divided between them, the

6   various businesses, and they were the interface and

7   managed the enforcement for those businesses.

8       Q.   Did they report to you?

9       A.   Yes, they did.

10      Q.   Did they check with you on any important

11  decisions?

12      A.   Yes.

13           MR. AHMAD:   I'll object as to form, but go

14  ahead.

15      A.   Yes, they did.

16      Q.   (BY MR. GRANT)   Okay.   Now, once you became the

17  Deputy General Counsel, did you retain, at least for a

18  time, responsibility for patent enforcement at

19  Schlumberger?

20      A.   For a short period of time, yes.

21      Q.   Okay.   And during that time, what was -- how many

22  enforcement actions, as we've used the term, were you

23  responsible for?

24      A.   So when I was promoted, I recall that I was

25  involved in one patent litigation, and there was a Manager

```
 1    of IP Enforcement, his name is Jaime Castano, and Jaime
 2    worked on enforcement actions with the IP Counsels of the
 3    businesses.
 4        Q.   Okay.  Your LinkedIn page says that you managed
 5    global IP practice including monetization, enforcement and
 6    litigation with a department of about a hundred legal
 7    professionals.  Is that accurate?
 8        A.   Sure.  Yes.
 9        Q.   Okay.  What do you mean when you say managing
10    monetization aspect of a global IP practice?
11        A.   Schlumberger decided that it wanted to try and
12    license the patents that it owned, and so they made the
13    decision to try and monetize their patents.
14        Q.   Does that mean that you managed the patent
15    licensing for Schlumberger?
16        A.   I would say that I worked with the IP Counsels
17    with respect to businesses that managed those patents for
18    licensing purposes.  I couldn't do it unilaterally.
19        Q.   But they reported to you?
20        A.   They did report to me, yes.
21        Q.   So you were overall in charge of that work?
22        A.   I would --
23             MR. AHMAD:  I'll object as to form.
24        A.   I would say that's a mischaracterization.
25        Q.   (BY MR. GRANT)  The patents that you were
```

```
 1   involved in when you were managing the monetization for
 2   Schlumberger, that includes technologies relating to the
 3   energy market, correct?
 4       A.   Yes.
 5       Q.   Okay.  And when you say managing the enforcement,
 6   other than the discussions we've had about the specific
 7   enforcement actions that you were responsible for, what do
 8   you mean when you say managing enforcement of
 9   Schlumberger's global IP practice?
10       A.   Well, the enforcement included the lawsuits.  So,
11   I was involved in a couple of patent infringement lawsuits
12   that Schlumberger had.
13       Q.   Well, it says here you weren't just involved, you
14   managed them.  What does -- does that mean that you were
15   in charge of them all?
16       A.   I'm not in charge.  Managing means I work with
17   outside Counsel and the businesses and the IP attorneys to
18   reach agreement on the right approach.
19       Q.   Fair point.  I appreciate that.  So, as part of
20   managing Schlumberger's global IP practice and handling
21   enforcement of litigation, you worked closely with the
22   outside legal Counsel on the conduct of that type of
23   patent litigation, right?
24            MR. AHMAD:  Objection, form.
25       A.   Yes, for the patent lawsuits that I was involved
```

1      Q.    Okay.  With regards to Schlumberger's patent

2    litigation, right?

3      A.    With regards to the patent litigation I was

4    involved in.

5      Q.    With regards to Schlumberger's patent litigation

6    in the energy sector, correct?

7      A.    Well, Schlumberger is in the energy sector.

8      Q.    Yes.  And your work was with regards to

9    Schlumberger's patent litigation in the energy sector,

10   correct?

11     A.    Yes.

12     Q.    All right.  I want to focus on some of the claims

13   that Schlumberger's brought in this case that are

14   implicated by your motion.

15           So, let's start with the first one.  Are you

16   familiar with the term "fiduciary duty"?

17     A.    Yes, I am.

18     Q.    What's your understanding of that term?

19     A.    So, I have a fiduciary duty to Schlumberger to

20   not disclose confidential information.

21     Q.    Is there anything else involved in the fiduciary

22   duties that you owe Schlumberger based on your work or

23   employment there?

24     A.    Yes.

25     Q.    What are they?

```
 1        A.    I also have a duty not to be adverse to
 2   Schlumberger on the same matters essentially or similar
 3   matter that I had while at Schlumberger.
 4        Q.    Okay.  Anything else?
 5        A.    Yes.
 6        Q.    What else?
 7        A.    Also have a duty not to be adverse to
 8   Schlumberger if it's reasonably probable that confidential
 9   information may be disclosed.
10        Q.    Okay.
11              THE VIDEOGRAPHER:  Got about three minutes
12   left on the tape.
13        Q.    (BY MR. GRANT)  Is there anything else that is
14   included in your understanding of the fiduciary duties
15   that you owe Schlumberger based on your work and
16   representation of them?
17        A.    Yes.
18        Q.    What are they?
19        A.    I have a contractual duty with Schlumberger not
20   to disclose confidential information to third parties.
21        Q.    Is there anything else?  I want to make sure I
22   get the full scope of your understanding of the fiduciary
23   obligations that you owe Schlumberger.  Is there anything
24   else that is included in that?
25        A.    That's my understanding.
```

```
 1       Q.    Okay.
 2                MR. GRANT:  Why don't we take a break for the
 3    Videographer, please.
 4                MR. AHMAD:  Do you mind if we just take a
 5    lunch break?
 6                MR. GRANT:  I don't.
 7                THE VIDEOGRAPHER:  Off the record at 12:07.
 8                (Lunch Recess from 12:07 p.m.
 9                to 1:10 p.m.)
10                THE VIDEOGRAPHER:  Tape 4, on the record,
11    1:10.
12       Q.    (BY MR. GRANT)  All right.  Ms. Rutherford,
13    we -- one of the things we talked about before the lunch
14    break was that you had managed a couple of patent
15    litigations, or rather a couple of IP litigations.  Do
16    you recall that?
17       A.    I do.
18       Q.    Okay.  One of the IP litigations that you
19    managed was in 2007, and was a copyright assertion,
20    right?
21       A.    Yes, I managed that litigation with outside
22    Counsel and with Dianne Ralston, who at the time I believe
23    was General Counsel for SIS, Schlumberger Information
24    Solutions.
25       Q.    And the subject matter of that lawsuit was a
```

```
 1    copyright infringement assertion regarding the Petrel

 2    software, correct?

 3                THE VIDEOGRAPHER:  Your microphone.

 4                MR. SMYSER:  Microphone.

 5                THE VIDEOGRAPHER:  Yeah.  Your microphone

 6    is --

 7                THE WITNESS:  Oh.

 8                THE VIDEOGRAPHER:  Yeah.

 9                THE WITNESS:  Sorry.

10                THE VIDEOGRAPHER:  Sounded a bit muffled

11    before you got --

12                MR. GRANT:  I'll reask that and we'll --

13        Q.   (BY MR. GRANT)  The subject matter of the 2007

14    lawsuit that you were managing was a copyright

15    infringement assertion regarding Petrel software,

16    correct?

17        A.   Again, the lawsuit that I was managing -- the

18    copyright infringement lawsuit I was managing, was with

19    outside Counsel and with Dianne Ralston, who was General

20    Counsel at the time for Schlumberger Information

21    Solutions, I believe.

22        Q.   And when you say Schlumberger Information

23    Solutions, you mean what's sometimes referred to as "SIS,"

24    right?

25        A.   Yes.
```

1      Q.    And their main product is Petrel software, right?

2      A.    I don't know if it's their main product.  I know

3  it's one of their products.

4      Q.    And the copyright assertion case involved

5  software related to the Petrel product, correct?

6      A.    That's my understanding.

7      Q.    Well, you were the one managing the lawsuit with

8  others.  It wasn't just your understanding, that's the

9  case, isn't it?

10     A.    That was the case, yes.

11     Q.    Was that a -- a copying case or a theft of source

12 code case regarding Petrel?

13     A.    I know that it was a copying case, that the

14 software was being cop-- illegally copied.  I don't know

15 if it was also a source -- source -- source code case or

16 not.

17     Q.    Who is Jeff Griffin?

18     A.    Jeff Griffin was my Manager IP Operations at

19 Schlumberger.

20     Q.    Kind of your second in command?

21     A.    Yes, he was.  The Chief IP Counsels or Managing

22 IP Counsels for the different business units at

23 Schlumberger reported to Jeff, and Jeff reported to me.

24     Q.    And right now he's the Chief IP Counsel for a

25 company in this building, right?

1    A.   Well, if I don't recall seeing him, then I don't

2    recall having spoken with him.

3    Q.   Right.  This is the Houston Intellectual Property

4    Association dinner, right?

5    A.   Yes, I think that's what I said.

6    Q.   Okay.  I appreciate the fact that you don't

7    recall seeing him, now I'm asking a slightly different

8    question.  Do you deny saying that to him?  Or do you not

9    recall whether you said it one way or the other?

10   A.   I don't recall seeing Jeff, and I don't recall

11   saying anything to Jeff.

12   Q.   So, if he had a specific recollection of that

13   statement by you, based on your memory, you wouldn't have

14   a basis to know one way or the other whether you said it,

15   as you sit here today?

16            MR. AHMAD:  Objection, form.

17   A.   That's correct, I don't recall.

18   Q.   (BY MR. GRANT)  Okay.  We were talking a little

19   bit about fiduciary duties and your obligations to

20   Schlumberger based on your employment relationship.

21            Do you understand that you have a fiduciary

22   duty to Schlumberger as someone who acted as their

23   attorney, as well?

24   A.   I understand that as an attorney, having worked

25   for Schlumberger, I have fiduciary duties to Schlumberger.

```
 1        Q.   Okay.  And I just want to make sure; I know you
 2   talked about what you understand your fiduciary
 3   obligations to be, and that was based on my question in
 4   the context of being an employee, and if your answers are
 5   the same, fine.
 6              What's your understanding of your fiduciary
 7   duty to Schlumberger as its former attorney?
 8        A.   The privilege belongs to the company, meaning
 9   Schlumberger.
10        Q.   And you understand that as a former client, you
11   have an ongoing obligation of loyalty, right, to
12   Schlumberger?
13              MR. AHMAD:  Objection, form.
14        A.   I have an ongoing obligation to Schlumberger to
15   not disclose any confidential information obtained while
16   at Schlumberger.
17        Q.   (BY MR. GRANT)  Right.  I'm asking a separate
18   question, and if the answer is no, you can feel free to
19   answer it that way.
20              Do you understand that you have an ongoing
21   obligation of loyalty to Schlumberger?
22              MR. AHMAD:  Objection, form.
23        A.   How would you define "loyalty"?
24        Q.   (BY MR. GRANT)  If you can't answer the question
25   because that term is something you don't understand as a
```

1  Texas Bar lawyer, I'll take that answer.

2      A.    I have a fiduciary duty to Schlumberger not to

3  disclose any confidential information obtained while I was

4  employed at Schlumberger.

5      Q.    Okay.  Do you have -- is it your understanding

6  that you have an ongoing obligation of loyalty to

7  Schlumberger?  Yes, no, or you're unable to answer?

8              MR. AHMAD:  Objection, form.

9      A.    Yes.

10     Q.    (BY MR. GRANT)  Okay.  Is it your understanding

11 that you have an ongoing obligation of candor to

12 Schlumberger?  Yes, no, or you can't answer?

13              MR. AHMAD:  Objection, form.

14     A.    Yes.

15     Q.    (BY MR. GRANT)  You're familiar with the term

16 "trade secrets," right?

17     A.    I am.

18     Q.    In fact, you've been involved in managing or had

19 your people managing trade secret litigation, haven't you,

20 when you were at Schlumberger?

21     A.    I had people who reported to me who were managing

22 trade secret litigation.

23     Q.    All right.  And you had to have the ability to

24 understand that well enough to manage them, didn't you?

25     A.    The only trade secret litigation that I recall

1          MR. GRANT:  But I'm -- that's the context to

2    the extent you needed it.

3          MR. AHMAD:  I appreciate that, and I will

4    instruct the witness not to answer.

5    Q.    (BY MR. GRANT)  Okay.  Are you going to follow

6    that instruction?

7    A.    I am.

8    Q.    Was the meetings that you had with Austin

9    GeoModeling in your non-legal business development

10   context?

11   A.    My meetings with Austin Geo, I would not

12   understand that to be business development because Austin

13   Geo had already come to Acacia before I joined Acacia.

14   So, Austin Geo was trying to convince Acacia to partner

15   with them and acquire their patent to license it.

16   Q.    Okay.  Does that mean that your involvement in

17   the meetings with Austin GeoModeling were -- was in a

18   legal role?

19   A.    I would say, yes.

20   Q.    And the -- there's no doubt, is there, that the

21   presentation that you received from the Collins Edmonds

22   firm related to the '319 Patent litigation, that was

23   something that you received in a legal role, correct?

24   A.    I would say, yes.

25   Q.    Now, you were the Chief IP Counsel at

```
 1    Schlumberger from 2009 to May, 2013, correct?

 2        A.   My -- as I mentioned, my title varied.  It was

 3    Director of Intellectual Property.  I think they -- after

 4    the title changed, it was, then, Deputy General Counsel

 5    for Intellectual Property.

 6        Q.   When did that title change occur, approximately?

 7        A.   I can't recall.

 8        Q.   Did your responsibilities change when your title

 9    changed?

10        A.   No, but my responsibilities changed while I was

11    in those roles.

12        Q.   While you served as Deputy General Counsel for

13    IP, and in the other roles that you served at

14    Schlumberger, you had access to all aspects of

15    Schlumberger's confidential and privileged information

16    regarding intellectual property, correct?

17             MR. AHMAD:  Objection, form.

18        A.   I would not characterize it that way.

19        Q.   (BY MR. GRANT)  You had access to Schlumberger

20    confidential and privileged information relating to the

21    company's technology development, right?

22             MR. AHMAD:  Objection, form.

23        A.   Again, I did not have access.  My Chief IP

24    Counsels or Managing IP Counsels, they had access to the

25    company's confidential information.  Them having access
```

1        Q.    Just so I make sure I've got your testimony

2   right, Ms. Rutherford, it's your testimony that you

3   received a sum total of two presentations regarding the

4   SIS business unit's IP strategy.  Is that correct?

5        A.    I recall receiving them twice at the end of the

6   year.

7        Q.    The Petrel product was part of those two

8   presentations, wasn't it?

9        A.    I don't recall.  The presentations were sent to

10  Jeff Griffin, my IP Operations Manager, because the

11  Managing IP Counsel for SIS reported to Jeff, and Jeff

12  worked with the Managing IP Counsel to prepare the

13  strategy.

14              And then the strategy -- operational

15  strategy, again, in terms of the patents to file and the

16  patents to get granted, was done at the end of the year.

17       Q.    Bryan Galloway reported to you, correct?

18       A.    Bryan did.

19       Q.    And he was directly responsible for the IP issues

20  relating to the SIS business segment, correct?

21       A.    Yes, when he was in that role.

22       Q.    And the SIS business segment is the one that

23  includes Petrel, correct?

24       A.    Yes, it does.

25       Q.    And he presented presentations to you on those

```
 1        Q.    (BY MR. GRANT)   Is that a term with which you're
 2    unfamiliar?
 3        A.    "Technology roadmap" is a term that I remember
 4    someone named Justin Rounce in Schlumberger was developing
 5    as part of a communication and planning tool for
 6    technology, but I don't know if that was a term used
 7    across Schlumberger and necessarily which technologies he
 8    was applying it to.
 9        Q.    What happened at these meetings was that you were
10    determining where to spend your patent prosecution budget
11    in terms of where to cover various commercial technologies
12    with patent protection, weren't you?
13        A.    The --
14              MR. AHMAD:  Objection, form.
15        A.    The technologies discussed ranged over commercial
16    opportunities and also projects that were under
17    development, not just those that were going to be
18    commercialized.
19        Q.    (BY MR. GRANT)   And part of what was presented
20    and discussed by the people there, including yourself,
21    was where to spend the patent prosecution budget in terms
22    of IP protection, right?
23        A.    My discussions revolved around what additional
24    patents needed to be filed in terms of more patents, less
25    patents, or possibly licensing in patents for particular
```

1   projects that were planned.

2       Q.    And those projects, the reason that you were

3   having these discussions about whether to prosecute

4   patents or in-license patents, was to cover those products

5   with patent protection, correct?

6       A.    It -- yes, it was about strengthening the patent

7   position --

8       Q.    And in order --

9       A.    -- for those particular projects or it could be a

10  -- it could be programs.

11      Q.    So, you inherently were involved in discussions

12  about where Schlumberger products needed to have

13  strengthened patent protection, right?

14      A.    Well, the recommendation would come from the

15  respective Chief IP Counsel, the businesses as to where

16  they thought they needed to file more patents.

17      Q.    Were you involved in such discussions?

18      A.    I was involved in the meetings where the

19  discussions took place.

20      Q.    Discussions concerning how to strengthen existing

21  patent protection on various Schlumberger products --

22              MR. AHMAD:   Objection, form.

23      Q.    (BY MR. GRANT)   -- correct?

24      A.    Well, again, how to strengthen boiled down to

25  filing additional patents or acquiring additional patents.

```
 1        Q.   (BY MR. GRANT)  Okay.  We're handing you what's
 2   been marked as Exhibit 10.  What's that, Ms. Rutherford?
 3        A.   Appears to be a press announcement about Acacia
 4   launching a Houston office and energy practice.
 5        Q.   Well, who was the person responsible for that
 6   launch?
 7        A.   I was responsible for the launch of the Houston
 8   office for Acacia.
 9        Q.   Okay.  And Houston's -- rather -- strike that.
10             Acacia's ener-- energy practice is directed
11   from its Houston office, correct?
12        A.   It is today.
13        Q.   Has it ever been different from today?
14        A.   Yes.
15        Q.   When was -- when was Acacia's energy practice not
16   directed out of its Houston office?
17        A.   Before I joined Acacia.
18        Q.   So, at least since June 3rd, 2013, Acacia's
19   energy practice has been directed by you out of its
20   Houston office, correct?
21        A.   By me, and over time out of the Houston office.
22        Q.   And that's because you didn't have an office for
23   a while, it was just you -- were you working out of home
24   until they opened the office?
25        A.   No, we were office sharing with a law firm.
```

```
1        A.    Yes.

2        Q.    Who was in charge of it?

3        A.    I'm not sure who was in charge.

4        Q.    Had it acquired any patents?

5        A.    I believe they had acquired at least one patent,

6   and I am aware that they were looking at other patents.

7        Q.    What materials did you provide to Acacia during

8   your interview and application process?

9        A.    I may have given them a copy of my resume.

10       Q.    Anything else?

11       A.    Not that I can recall.

12       Q.    Did you perform any work for or on behalf of

13  Acacia or any affiliate while -- well, prior to May 29,

14  2013?

15       A.    The only work that I did in connection with

16  Acacia, up until that time, was working on the press

17  release, which we've talked about, and the position

18  descriptions of the energy team.

19       Q.    When did you accept Acacia's offer to work there?

20       A.    On April 10, 2013.

21                   (Conference out of the

22                   hearing of the Reporter)

23       Q.    (BY MR. GRANT)   In your motion, the Exhibit 1

24  that we talked about, there's discussion about attorneys'

25  fees and your potential -- or arguable entitlement to
```

```
 1                    CAUSE NO. 2014-13621

 2    SCHLUMBERGER LIMITED AND     ) IN THE DISTRICT COURT
      SCHLUMBERGER TECHNOLOGY      )
 3    CORPORATION,                 )
                                   )
 4             PLAINTIFF(S),       )
                                   )
 5    VS.                          ) HARRIS COUNTY, TEXAS
                                   )
 6    CHARLOTTE RUTHERFORD,        )
                                   )
 7             DEFENDANT(S).       ) 127TH JUDICIAL DISTRICT

 8
                    REPORTER'S CERTIFICATION
 9           ORAL AND VIDEOTAPED DEPOSITION OF
                    CHARLOTTE RUTHERFORD
10                     MAY 29, 2014

11        I, Tammy S. Brown, Certified Shorthand Reporter in

12    and for the State of Texas, hereby certify to the

13    following:

14        That the witness, CHARLOTTE RUTHERFORD, was duly

15    sworn by the officer and that the transcript of the oral

16    deposition is a true record of the testimony given by the

17    witness;

18        That the deposition transcript was submitted on

19    _____, to the witness or to the attorney for

20    the witness for examination, signature and return to me by

21    _____;

22        That the amount of time used by each party at the

23    deposition is as follows:

24        Mr. Maximilian A. Grant - 05:52

25        Mr. Andrew J. Fossum - 00:00
```

```
 1        Mr. Craig Smyser- 00:00

 2        Mr. Garland "Land" D. Murphy, IV - 00:00

 3        Ms. Paula Whitten-Doolin - 00:00

 4        Ms. Robin C. Nava, P.E. - 00:00

 5        Mr. Joseph Y. Ahmad - 00:01

 6        Mr. Timothy C. Shelby - 00:00

 7        Mr. Ashish Mahendru - 00:00

 8        Mr. Richard B. Specter - 00:00

 9        Mr. Michael Collins - 00:00

10        That pursuant to information given to the deposition

11   officer at the time said testimony was taken, the

12   following includes Counsel for all parties of record:

13        Mr. Maximilian A. Grant appearing for Plaintiff(s)

14   Schlumberger Limited and Schlumberger Technology

15   Corporation;

16        Mr. Andrew J. Fossum appearing for Plaintiff(s)

17   Schlumberger Limited and Schlumberger Technology

18   Corporation;

19        Mr. Craig Smyser and Mr. Garland "Land" D. Murphy, IV

20   appearing for Plaintiff(s) Schlumberger Limited and

21   Schlumberger Technology Corporation;

22        Ms. Paula Whitten-Doolin appearing for Plaintiff(s)

23   Schlumberger Limited and Schlumberger Technology

24   Corporation;

25        Ms. Robin C. Nava, P.E. appearing for Plaintiff(s)
```

```
 1    Schlumberger Limited and Schlumberger Technology

 2    Corporation;

 3         Mr. Joseph Y. Ahmad and Mr. Timothy C. Shelby

 4    appearing for the Defendant(s) Charlotte Rutherford;

 5         Mr. Ashish Mahendru appearing for the Defendant(s)

 6    Charlotte Rutherford;

 7         Mr. Richard B. Specter appearing for the Defendant(s)

 8    Charlotte Rutherford;

 9         Mr. Michael Collins appearing for Dynamic 3D

10    Geosolutions LLC;

11         I further certify that I am neither Counsel for,

12    related to, nor employed by any of the parties or

13    attorneys in the action in which this proceeding was

14    taken, and further that I am not financially or otherwise

15    interested in the outcome of the action.

16         Further certification requirements pursuant to Rule

17    203 of TRCP will be certified to after they have occurred.

18         Certified to by me this the 2nd day of June, 2014.

19

20                        _____
                          Tammy S. Brown, Texas CSR 3269, RMR
21                        Expiration Date:  12/31/15
                          DepoTexas, Inc.
22                        Firm Registration No. 95
                          Sunbelt Reporting
23                        Firm Registration No. 300
                          13101 Northwest Freeway, Suite 210
24                        Houston, Texas 77040
                          (281) 469-5580
25
```

```
 1              FURTHER CERTIFICATION UNDER RULE 203 TRCP

 2         The original deposition/correction page was/was not

 3    returned to the deposition officer on _____

 4    _____;

 5         If returned, the attached Changes and Signature page

 6    contains any changes and the reasons therefor;

 7         If returned, the original deposition was delivered to

 8    Mr. Maximilian A. Grant, Custodial Attorney;

 9         That $ _____ is the deposition officer's charges to

10    the Plaintiffs for preparing the original deposition

11    transcript and any copies of exhibits;

12         That the deposition was delivered in accordance with

13    Rule 203.3, and that a copy of this certificate was served

14    on all parties shown herein on _____

15    _____ and filed with the Clerk.

16         Certified to by me this _____ day of

17    _____, 2014.

18

19                          _____
                            Tammy S. Brown, Texas CSR 3269, RMR
20                          Expiration Date:  12/31/15
                            DepoTexas, Inc.
21                          Firm Registration No. 95
                            Sunbelt Reporting
22                          Firm Registration No. 300
                            13101 Northwest Freeway, Suite 210
23                          Houston, Texas 77040
                            (281) 469-5580
24

25
```