# Exhibit 2

```
 1                  CAUSE NO. 2014-13621
 2                             )
   SCHLUMBERGER LIMITED        )   IN THE DISTRICT COURT OF
 3 AND SCHLUMBERGER            )
   TECHNOLOGY CORPORATION      )
 4                             )
   Plaintiffs,                 )
 5                             )
                               )   HARRIS COUNTY, TEXAS
 6 V.                          )
                               )
 7                             )
   CHARLOTTE RUTHERFORD,       )
 8                             )
   Defendant.                  )   127TH JUDICIAL DISTRICT
 9
10
          *****************************************
11
                       ORAL DEPOSITION OF
12                    CHARLOTTE RUTHERFORD
                          VOLUME 2
13                     JULY 17, 2014
14        *****************************************
15
16      ORAL DEPOSITION of CHARLOTTE RUTHERFORD, produced as
17 a witness at the instance of Plaintiff, and duly sworn,
18 was taken in the above-styled and numbered cause on
19 Thursday, July 17, 2014, from 1:30 p.m. to 2:50 p.m.,
20 before Suzanne G. Saulsberry, CSR, CRR in and for the
21 State of Texas, reported by machine shorthand, at the
22 offices of 127th District Court, 201 Caroline, 10th
23 Floor, Houston, Texas, pursuant to the Texas Rules of
24 Civil Procedure and the provisions stated on the record
25 or attached hereto.
```

```
 1                    A P P E A R A N C E S
 2  FOR THE PLAINTIFF:
 3      Mr. Craig Smyser - SBOT 18777575
        SMYSER KAPLAN & VESELKA, L.L.P.
 4      700 Louisiana Street, Suite 2300
        Houston, Texas 77002
 5      Phone: 713-221-2300
 6          -and-
 7      Mr. Andrew J. Fossum
        LATHAM & WATKINS, LLP
 8      811 Main Street, Suite 3700
        Houston, Texas 77002
 9      Phone: 713-546-5400
10
    FOR THE DEFENDANTS:
11
        Mr. Joseph Y. Ahmad - SBOT 00941100
12      Mr. Adam Milasincic - SBOT 24079001
        AHMAD, ZAVITSANOS, ANAIPAKOS, ALAVI
13          & MENSING, P.C.
        1221 McKinney Street, Suite 3460
14      Houston, Texas 77010
        Phone:  713-655-1101
15
                 -and-
16
         Mr. Ashish Mahendru - SBOT 00796980
17       MAHENDRU, P.C.
         639 Heights Boulevard
18       Houston, Texas 77007
         Phone:  713-571-1519
19
    FOR DYNAMIC 3D GEOSOLUTIONS LLC:
20
         Mr. Michael Collins
21       COLLINS, EDMONDS, POGORZELSKI, SCHLATHER &
         TOWER, PLLC
22       1616 S. Voss Road, Suite 125
         Houston, Texas  77057
23       Phone:  281-501-3490
24  ALSO PRESENT:
        Ms. Paula Whitten-Doolin, in-house counsel for
25      Schlumberger
```

3

```
 1                        I N D E X
 2                                                          Page
 3  Appearances                                              2
 4  WITNESS:  CHARLOTTE RUTHERFORD
 5       Examination by Mr. Smyser                           9
 6
    Outside Counsel Eyes Only Portion        57 through 60
 7
    Changes and Signature                                   63
 8  Reporter's Certification                                65
    Reporter's Further Certification                        67
 9
                        EXHIBIT INDEX
10
    Number        Description                              Page
11
    Exhibit A     "Next Generation Patent                    40
12                Appraisal (Buying Patents)"
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1      Q.   Did you provide edits to that complaint when
 2 you reviewed it?
 3      A.   No, sir, I did not.
 4      Q.   Did you provide edits to the Dynamic 3D
 5 complaint against Schlumberger?
 6      A.   No, I did not.
 7      Q.   Did you review that litigation -- a copy of
 8 that compliant before it was filed?
 9           MR. AHMAD:  So we are clear, which
10 complaint are we talking about?
11      Q.   (BY MR. SMYSER)  The Schlumberger complaint.
12      A.   No, I did not.
13      Q.   The first time you saw the Schlumberger
14 complaint was after it had been filed?
15      A.   Yes, sir.
16      Q.   How long after it was filed?
17      A.   I don't recall.  Maybe a few days.
18      Q.   And in what context did you see that complaint?
19      A.   Once it was filed, I asked Gary Fishman for a
20 copy.  He's my Acacia IP attorney.
21      Q.   And did you review that complaint then?
22      A.   I read it.
23      Q.   Did you make any suggestions regarding that
24 complaint after you read it?
25      A.   No, sir, I did not.
```

```
 1      Q.   Sure.  I want to make sure we are on the same
 2 page?
 3      A.   I do, too.  Thank you.
 4      Q.   "Are there any conversations with colleagues at
 5 Acacia that you had regarding protecting Dynamic 3G's
 6 (sic) patent rights?"
 7           You answered that question "yes."
 8      A.   Yes.
 9      Q.   And so my question is who were those
10 conversations with?
11      A.   Okay.  Thank you.  Gary Fishman.
12      Q.   And in those conversations were you speaking
13 with him in your role as a business development officer
14 at Acacia?
15      A.   I wear two hats, you know, a business
16 development general manager hat and also a lawyer hat;
17 so I would say it was part lawyer and part business
18 person.
19           THE COURT:  Who is Mr. Fishman?
20           THE WITNESS:  Mr. Fishman is my IP
21 attorney.
22           THE COURT:  Okay.  So he's counsel?
23           THE WITNESS:  He is counsel, in-house
24 counsel, yes, sir.
25           THE COURT:  Does he wear two hats, as well?
```

1    Q.   (BY MR. SMYSER)  Right.  I understand that.
2 And I assume those conversations occurred both before
3 and after the 3D -- I'm sorry -- the 319 Patent was
4 acquired?
5    A.   Before and after, yes.
6    Q.   Okay.  And were these conversations that you
7 were referring to here both the before and after
8 conversations?
9    A.   Yes, again, my conversations with Mr. Fishman
10 on the patent were with respect to Halliburton and not
11 Schlumberger before the suit was filed.
12    Q.   Okay.  Actually, the question I'm asking
13 doesn't refer to either Halliburton or Schlumberger.  I
14 am asking about the conversations you had with Gary
15 Fishman regarding protecting those patent rights.
16    A.   Yes, so my conversations were with Gary Fishman
17 before and after the filing of the suit and acquiring
18 the patent.
19    Q.   They were before and after acquiring the patent
20 and before and after filing suit on the patent?
21    A.   Yes, sir.
22    Q.   And your conversations with him were in a --
23 before the patent was acquired, were your conversations
24 with him in -- as part of your role as a business
25 development person deciding whether or not to acquire

1  this patent?
2      A.   My conversations were both as a lawyer and as a
3  business person.
4      Q.   Okay.  What part of the conversation was the
5  business part of the conversation in your business role?
6           MR. AHMAD:  Judge, and this part I will
7  have to object because I think this is getting into --
8           THE COURT:  Not her privilege.  It's
9  Acacia's privilege, correct?
10          MR. COLLINS:  It is Acacia's privilege,
11 Your Honor.  And I would like to point out that it
12 doesn't matter whether she's acting in her role as an
13 attorney or a business person if indeed this is work
14 product and it is because, as the Court knows, the Texas
15 Work Product Doctrine was changed from the Attorney Work
16 Product Doctrine.
17          THE COURT:  And it doesn't really matter so
18 much because Fishman is counsel.
19          MR. COLLINS:  He is, Your Honor.
20     Q.   (BY MR. SMYSER)  Ms. Rutherford, is it true
21 that Mr. Fishman is listed on the Acacia website not as
22 a lawyer but as the executive vice president?
23     A.   No, sir.
24     Q.   Vice president, I'm sorry.  As vice president
25 of licensing?

1    A.   His title is vice president of licensing.
2    Q.   He's not in the legal section, is he?
3    A.   Sir, we don't have a legal section in the
4 company.  He reports to -- he reports to me and he also
5 reports to another attorney at Acacia whose name is
6 Jaime Siegel.  And Jaime Siegel is executive vice
7 president of -- I believe his title is licensing and
8 litigation.
9    Q.   Okay.  Was that conversation with him for the
10 purpose of seeking legal advice?
11   A.   My conversation with Gary?
12   Q.   Yes.
13   A.   Yes.
14   Q.   What were those conversations with Mr. Fishman?
15        MR. COLLINS:  Objection, Your Honor, on
16 behalf of Acacia and Dynamic 3D.  That goes into the
17 substance of privileged communications covered by the
18 attorney/client privilege and the Work Product Doctrine.
19        THE COURT:  Sustain the assertion.
20   Q.   (BY MR. SMYSER)  Was anyone else present at
21 those conversations?
22   A.   No, sir.
23   Q.   Were they in person or were they over the
24 phone?
25   A.   Most of the conversations were in person.

1            (The requested portion was read.)
2      A.   Again, you know, my communication was the
3 concurrence to acquire and file the litigation against
4 Schlumberger by Dynamic 3D.
5      Q.   (BY MR. SMYSER)  Okay.  Is there any other
6 communication that you claim is relevant to
7 Schlumberger's ownership of property and its claim
8 against you that you stole that property or converted
9 that property?
10     A.   I concurred with the decision by the company to
11 acquire the 319 Patent and to enforce the patent through
12 litigation, so I believe that's implicating my right to
13 both the association and petition.
14     Q.   And that's the only communication you're
15 identifying; is that correct?
16     A.   Communication identifies my concurrence with
17 the recommendation by outside counsel and Gary Fishman
18 to acquire the patent and to file the litigation.
19     Q.   Schlumberger, of course, had no knowledge of
20 your concurrence until you testified to that, correct?
21          MR. AHMAD:  Object to the form, Your Honor,
22 and this is outside the scope.
23          THE COURT:  Sustained.
24          MR. SMYSER:  And, Your Honor, did you --
25 I'm sorry, I --

 1              THE COURT:  Sure.  I'm sorry, I thought I
 2  heard Page 58.
 3              MR. AHMAD:  I thought 51.
 4              THE COURT:  51 sorry.  That's fine.
 5      Q.   (BY MR. SMYSER)  What elements of the Texas
 6  Theft Liability Act implicates your First Amendment
 7  rights of petition or association in your view?
 8      A.   Again, I am not relying on any individual
 9  element.  I'm relying on the lawsuit as a whole as
10  implicating my rights both for petition and association.
11      Q.   What communication are you relying on to say
12  that your First Amendment rights of petition and
13  association are affected by the claim against you under
14  the Texas Theft Liability Act?
15      A.   Well, I believe my concurrence with the
16  recommendation from outside counsel and in-house counsel
17  to acquire the 319 Patent and to sue Schlumberger
18  implicate those rights to petition and association.
19      Q.   Do you believe if you stole Schlumberger
20  property, that Schlumberger does not have the right to
21  sue you for theft of their property?
22              MR. AHMAD:  Judge, I'm going to object.
23  This is irrelevant, No. 1, but also outside the scope.
24              THE COURT:  Sustained.
25              MR. SMYSER:  Let's go the Item No. 9, 51/20

```
 1  Schlumberger you concurred?"  You know, this isn't a
 2  huge deal but --
 3              THE COURT:  You can answer, Ms. Rutherford.
 4              MR. SMYSER:  And I'll ask the question the
 5  way Mr. Ahmad suggested he wouldn't have an objection to
 6  your answering.
 7       Q.   (BY MR. SMYSER)  Did you tell anyone outside of
 8  Acacia about your decision to concur in the acquisition
 9  of the 319 or the filing of the lawsuit against
10  Schlumberger?
11              MR. AHMAD:  Just to be clear, I actually
12  said outside of the deposition.
13              THE COURT:  Yeah.
14              MR. AHMAD:  That's what I said.
15              MR. SMYSER:  Okay.
16              MR. AHMAD:  That's fine.
17       A.   What's the pending question?
18              (The requested portion was read.)
19       A.   So if you consider outside counsel to be
20  outside of Acacia and outside counsel was on -- in that
21  meeting or a conversation about whether or not to
22  acquire and litigate, then I would say, yes, but it was
23  only outside counsel.
24       Q.   (BY MR. SMYSER)  That's the only people with
25  whom you have had a conversation about concurring or
```

1           MR. SMYSER:  The next item I have is Item
2  No. 11, 56/24 through 57/17.  Let me see here.  This is
3  one that I believe we were going to take up -- I have it
4  allowed.
5           MR. AHMAD:  I'm fine with it, Your Honor.
6  I mean, I...
7           THE COURT:  Okay.
8           MR. AHMAD:  As to that question, which I'm
9  anticipating, which is who were the parties.
10      Q.   (BY MR. SMYSER)  Yeah, who were the parties
11  that you were anticipating litigation with when you
12  reviewed the 319 Patent?
13      A.   Well, at the time I reviewed the 319 Patent, I
14  didn't have particular parties in mind; but I did
15  participate in a meeting with the inventors and they had
16  identified people or companies who they felt were
17  potential infringers.
18      Q.   And who were those companies?
19      A.   Two companies I recall they identified in the
20  meeting were Halliburton and Schlumberger.
21      Q.   Who identified Schlumberger -- or who
22  identified those companies?
23      A.   Those companies were identified by the patent
24  owners, the inventors when they made their presentations
25  to Acacia, including me.

1    Q.   As a potential target?
2    A.   I don't recall using those words by them.  I
3 think they called it potential infringer.
4    Q.   Okay.  That's the term Acacia uses when it is
5 looking at someone who might be a potential infringer;
6 is that correct?
7    A.   Acacia likes to use the term "potential
8 infringer" or "potential licensee."
9         MR. SMYSER:  This may be getting beyond the
10 scope, Your Honor, so I'll alert so they can object; but
11 attached to my motion to strike confidential
12 designations was a PowerPoint called "Next Generation
13 Patent Appraisal (Buying Patents)" and if the Court
14 doesn't have a copy of it, I'll bring it up there.  I
15 was going to ask the witness with respect to this target
16 issue, which is -- this is done by their president in
17 which he describes how they look for targets.
18         MR. AHMAD:  Well, Judge, this is way
19 outside the scope.  This issue didn't even come up and
20 it has nothing to do with the designation of
21 confidentiality.  They could have raised this in the
22 deposition.
23         THE COURT:  I'll sustain it.
24         MR. SMYSER:  Your Honor, may I approach the
25 bench?

```
 1                THE COURT:  Please.
 2                MR. SMYSER:  I'm just going to hand him a
 3   copy of the exhibit.
 4                MR. AHMAD:  Do you have an extra one?
 5                MR. SMYSER:  Yes, I do.  Here is the
 6   exhibit, Your Honor, and I'd like to attach it to the
 7   record.
 8                THE COURT:  This will be Exhibit A to the
 9   record.
10                (Marked Exhibit A.)
11                MR. SMYSER:  Joe, I'm going to give you a
12   copy; but I may need to use this copy as we go along
13   later on.
14       Q.   (BY MR. SMYSER)  Next is Item 12 --
15                MR. SMYSER:  And incidentally, or before I
16   get to Item 12, let me ask you guys.  You should have a
17   copy of that.  We filed that with the Court so I think
18   you have that.
19                MR. AHMAD:  I don't recall seeing it.  I am
20   not doubting, Mr. Smyser, but I don't recall seeing it.
21                Do you recall seeing this?
22                MR. SMYSER:  If you didn't, that's, again,
23   my mistake; but I believe it was filed with our latest
24   response here.
25                THE COURT:  I don't see that.
```

 1  Geo meetings.  The potential infringers, I prefer to
 2  call them, are ones that Austin Geo identified.
 3       Q.   And you just listened and had no idea about any
 4  potential targets?
 5       A.   Well, again, the inventors identified them.  I
 6  didn't.  And until a thorough evaluation is done as to
 7  whether or not these companies are, in fact, infringing,
 8  including due diligence, they are not potential
 9  infringers or targets until it's been termed that they
10  satisfy a Rule 11 basis.  That's not an evaluation that
11  I did.
12       Q.   Did you tell them you had worked on Petrel?
13       A.   No, I did not because I had not worked on
14  Petrel.  I had a case involving Petrel but --
15       Q.   Right.
16       A.   -- I don't know what you mean by "worked on
17  Petrel."  I assume you mean involved in the software
18  development.  I don't know.
19       Q.   I obviously don't mean something that you've
20  said you are not part of.  I mean as a lawyer, you
21  worked --
22       A.   I worked on a case involving Petrel, yes.
23       Q.   You worked on a case involving Petrel.
24       A.   Back in 2006.  It was a copyright case,
25  pirating software.