# Exhibit 17B

Court File No:

# FEDERAL COURT

BETWEEN:

SCHLUMBERGER CANADA LTD.

Plaintiff

- and -

GEOMODELING TECHNOLOGY CORP.

Defendant

## PLAINTIFF'S MOTION RECORD
(Re: ex-parte injunction)

October 5, 2006

**BAKER & McKENZIE LLP**
Barristers and Solicitors
BCE Place
181 Bay Street, Suite 2100
P.O. Box 874
Toronto, Ontario M5J 2T3

Jim Holloway (343074)
jim.holloway@bakernet.com
Tel: (416) 865-6914
Fax: (416) 863-6275

Carlos M. de Vera (50720W)
carlos.m.devera@bakernet.com
Tel. (416) 865-23391
Fax. (416) 863-6275

Solicitors for the Plaintiff

Court File No:

# FEDERAL COURT

BETWEEN:

## SCHLUMBERGER CANADA LTD.

Plaintiff

- and -

## GEOMODELING TECHNOLOGY CORP.

Defendant

## INDEX

TAX

| | |
|---|---|
| Notice of Motion, dated October 5th, 2006 | 1 |
| Written Submissions, dated October 5th, 2006 | 2 |
| Affidavit of Sarah Wilson, sworn September 27, 2006 | 3 |
| Affidavit of Keith Tushingham, sworn September 6, 2006 | 4 |
| Affidavit of Thomas Cox, sworn September 26, 2006 | 5 |
| Draft statement of claim | 6 |
| Draft order | 7 |

# TAB 1

Court File No:

# FEDERAL COURT

BETWEEN:

### SCHLUMBERGER CANADA LTD.

Plaintiff

- and -

### GEOMODELING TECHNOLOGY CORP.

Defendant

## NOTICE OF MOTION

THE PLAINTIFF will make a motion to a Judge, without notice, at a time and date to be fixed by the Court, at the courthouse, 180 Queen Street West, Toronto, Ontario, M5V 3L6.

### THE MOTION IS FOR:

1.  An order granting the plaintiff leave to bring this motion without notice.

2.  An order directing that certain of the evidence filed in support of the motion be marked and treated as confidential.

3.  An order granting the plaintiff an *ex parte* injunction, for a 14-day period. subject to any extension obtained pursuant to Rule 374, restraining the defendant from copying, downloading, uploading, installing, distributing, transferring, using or exploiting any unauthorized or unlicensed copies of the plaintiff's PETREL software application.

4.  An order allowing the plaintiff and its appointed agents to enter the premises at 1100, 665-8th Street SW, Calgary, Alberta, Canada, T2P 3K7, or such parts thereof as the defendant may

occupy or use, and any vehicles owned by the defendant and located at these premises, for the purpose of locating, inspecting, copying, photographing, videotaping, cataloguing, uploading, downloading and/or removing certain evidence relating to the defendant's acquisition and use of unlicensed copies or versions of the PETREL software program.

5. An order restraining the defendant, including its officers, directors, shareholders, employees and agents, and any company or companies over whom it or they exercise control, from using, copying, uploading, downloading, transferring, deleting, altering, defacing, destroying, hiding or removing from their present location anything referred to in paragraph 4 herein, without the plaintiff's prior written consent or leave of the court obtained on notice to the plaintiff.

6. An order requiring the defendant to forthwith disclose to the plaintiff the names, addresses and phone numbers of anyone from whom they have obtained or to whom they have delivered any copies of the PETREL Program, including any related or affiliated companies.

7. An order restraining the defendant from communicating the fact of these proceedings or any related matter to any and all persons mentioned in paragraph 6, for a stipulated period of time.

8. An order appointing independent counsel for the purpose of the execution of any order obtained and reporting to the court with respect to the execution of any order obtained.

9. An order directing the appropriate police authorities to assist the plaintiff in executing and enforcing any order granted, if such assistance is deemed necessary by plaintiff's counsel.

10. An order granting the plaintiff such further and other relief as counsel may advise and this Honourable Court may deem just, including that ancillary relief described in the draft order included in the plaintiff's motion materials.

## THE GROUNDS FOR THE MOTION ARE:

11. It would be impracticable and inappropriate to give the defendant notice of this motion, as doing so would defeat the purpose of the motion.

12. Schlumberger Canada Ltd. ("Schlumberger Canada") is a corporation with a head office in Calgary, Alberta, Canada, in the business of, amongst other things, marketing technology and related services to the oil and gas industry, including proprietary software applications.

13. Geomodeling Technology Corp. ("GTC") a corporation with a head office in Calgary, Alberta, Canada, and is also in the business of selling software applications to companies in the oil and gas industry, in Canada and elsewhere.

14. Schlumberger Canada is the owner of the copyright in the PETREL software application (the "Petrel Program"), which is an application widely used in oil and gas exploration. On August 25, 2006, Schlumberger Canada obtained Canadian copyright registrations no. 1040833 and 1040834 for Version 1.0 and Version 2003 of the Petrel Program.

15. By virtue of section 3(1) of the *Copyright Act*, Schlumberger Canada has the sole right to produce or reproduce the Petrel Program, or any substantial part of the protected works, in any material form whatever, and to authorize such acts.

16. GTC has, without license or authority, acquired unauthorized copies of the Petrel Program in China and has reproduced and installed these pirated copies on the computers of its software developers in Calgary and Beijing.

17. GTC, by virtue of acquiring and reproducing unauthorized copies of the Petrel Program via the installation of these copies on the computers of its employees, has infringed Schlumberger Canada's copyright therein contrary to section 27(1) of the *Copyright Act*.

18. GTC, by virtue of importing, possessing and distributing infringing copies of the Petrel Program in the manner aforesaid, has infringed Schlumberger Canada's copyright therein contrary to section 27(2) of the *Copyright Act*.

19. The plaintiff is entitled to an injunction because:

    (a) It has a *prima facie* case;

    (b) The defendant's activities will cause the plaintiff irreparable harm; and

    (c) The balance of convenience favors the plaintiff.

20. The plaintiff is entitled to an *Anton Piller* order because:

    (a) It has a strong *prima facie* case;

    (b) It will suffer damage if the order sought is not granted, including the inability to secure evidence necessary to prove its claims; and

    (c) The defendant is in possession of evidence, including incriminating documents, and there is a real possibility that it will remove and/or dispose of that evidence if it is given prior notice of this motion.

21. The plaintiff will rely generally on:

    (a) Rules 372, 373, 374, 377 and 378 of the *Federal Court Rules*;

    (b) Sections 2, 3(1), 5(1), and 27 of the *Copyright Act*, R.S.C. 1985, chapter C.42, as amended.

22. The plaintiff will rely on such further and other grounds as counsel may advise and this Honourable Court may permit.

## THE FOLLOWING DOCUMENTARY EVIDENCE will be used at the hearing of the motion:

    (a) The affidavit of Sarah Wilson sworn September 27, 2006;

    (b) The affidavit of Keith Tushingham, sworn September 6, 2006;

    (c) The affidavit of Thomas Cox, sworn September 26, 2006;

(d)     A confidential affidavit of Laura Rogers, sworn October 4, 2006;

(e)     A confidential affidavit of John Doe, sworn October     , 2006; and

(f)     Such further and other materials as counsel may advise and this Honourable Court permit.

October 5, 2006                                                    **BAKER & McKENZIE LLP**

Barristers and Solicitors
BCE Place
181 Bay Street, Suite 2100
P.O. Box 874
Toronto, Ontario M5J 2T3

Jim Holloway (343074)
Jim.holloway@bakernet.com

Tel: (416) 865-6914
Fax: (416) 863-6275

Carlos M. de Vera (50720W)
carlos.m.devera@bakernet.com

Tel. (416) 865-2339
Fax. (416) 863-6275

Solicitors for the Plaintiff

Court File No.

# FEDERAL COURT

BETWEEN:

## SCHLUMBERGER CANADA LTD.

Plaintiff

- and -

## GEOMODELING TECHNOLOGY CORP.

Defendant

### NOTICE OF MOTION

BAKER & McKENZIE LLP
Barristers & Solicitors
BCE Place, Suite 2100
181 Bay Street
Toronto, Ontario
M5J 2T3

Jim Holloway (343074)
jim.holloway@bakernet.com
(416) 865-1221 - telephone
(416) 863-6275 – facsimile

Carlos M. de Vera
carlos.m.devera@bakenet.com

(416) 865-2339 – telephone
(416) 863-6275 – facsimile

Solicitors for the Plaintiff

# TAB 2

Court File No:

## FEDERAL COURT

BETWEEN:

### SCHLUMBERGER CANADA LTD.

Plaintiff

- and -

### GEOMODELING TECHNOLOGY CORP.

Defendant

## MEMORANDUM OF FACT & LAW
## OF THE MOVING PARTY

### NATURE OF THE MOTION

1.    The plaintiff brings this motion to restrain the defendant's use of pirated copies of its Petrel software application. In addition, the plaintiff seeks an *Anton Piller* order authorizing a search at the defendant's premises for evidence of its infringing activities. Finally, the plaintiff seeks an order sealing certain of the confidential evidence to be filed in support of these motions, which is not included in the motion record.

### PART I – CONCISE STATEMENT OF FACT(S)

3.    Schlumberger Canada is a subsidiary of Schlumberger Limited ("Schlumberger"), a global supplier of products and services to the oil and gas industry, with over 60,000 employees in over 80 countries, including Canada. Schlumberger's products include project management, technology and information solutions, including software.

Reference: see paragraph 3 of the *Affidavit of Sarah Wilson*, Plaintiff's Motion Record, Tab 3

4. A key Schlumberger software solution is the PETREL Program, which is an integrated Windows-based software program that enables licensees to capture and manage subsurface information and data, such as seismic interpretation and reservoir simulation. That program, which is licensed for approximately US \$160,000 per copy in North America, is used by many leading Canadian oil and gas companies. In Canada, Schlumberger Canada owns the copyright in the Petrel Program and holds two related copyright registrations.

Reference: see paragraphs 4-8 and Exhibit A to the *Affidavit of Sarah Wilson*, Plaintiff's Motion Record, Tab 3: see also paragraph 2 of the *Affidavit of Keith Tushingham*, Plaintiff's Motion Record, Tab 4

5. The defendant ("GTC") is a Calgary-based company that also develops software for the oil and gas industry. In that respect, it is a competitor of Schlumberger Canada. It operates from premises at 1100, 665-8th Street SW, Calgary, Alberta, Canada T2P3K7. It also has offices in the U.S., Norway and China.

6. Representatives of GTC have, in the past, demonstrated a keen interest in Schlumberger Canada's PETREL Program.

Reference: see the *Affidavit of Thomas Cox*, Plaintiff's Motion Record, Tab 5

7. Schlumberger Canada recently learned that GTC had acquired unauthorized and pirated copies of the PETREL Program in China. Thereafter, it made further copies which were installed on the computers used by its software developers in Calgary and China, to assist them in developing a competitive product. Schlumberger Canada has received specific information regarding these activities, including photographs of the unauthorized or pirated software running on GTC computers in Calgary (the "GTC Photographs").

*Reference:* see paragraphs 9-18 and Exhibit D to the *Affidavit of Sarah Wilson*, Plaintiff's Motion Record, Tab 3

8. While GTC is licensed to have limited use of one recent version of the PETREL Program (via its license to Schlumberger's OCEAN software), Keith Tushingham of Schlumberger Information Solutions has confirmed via the examination of the GTC Photographs that it is not licensed to have or to use the software that appears in these images.

*Reference:* see paragraphs 5-7 and Exhibits D and E of the *Affidavit of Keith Tushingham*, Plaintiff's Motion Record, Tab 4

9. The evidence shows that GTC has and is using the pirated copies of the PETREL Program that it had earlier acquired in China. In addition, it has made further unauthorized copies of this software for the purpose of installing it on its computer programmers' computers, to assist them in developing a competitive product. As Ms. Wilson explains, this use of the PETREL Program is not authorized by the software license.

10. Ms. Wilson explains the serious harm that these activities will cause Schlumberger Canada, which include: (a) substantial lost licensing revenue (i.e. 25 licensed copies of the PETREL program would typically cost close to $4 million); (b) pending loss of market share; (c) an inability to recover potentially infringing product after it is sold to third parties; (d) the loss of "pull through" revenue to be derived from other Schlumberger products; (e) the harm posed by the existence of unauthorized copies of the company's software in the market and outside Canada; (f) the harm caused by a competitor launching a competitive product derived from allegedly unfair or unlawful activities; and (g) the loss of control over its intellectual property. As Ms. Wilson notes, GTC is unlikely to be able to compensate Schlumberger Canada for these damages, given the size of the company and its apparent revenue stream.

Reference:     see paragraphs 19, 25-29 and Exhibit E to the *Affidavit of Sarah Wilson*,
               Plaintiff's Motion Record, Tab 3

11.    Ms. Wilson explains why she believes GTC may not disclose evidence of its infringing
       activities during any litigation. While this necessarily involves a level of speculation, as in
       every *Anton Piller* case, she notes that the defendant company has already demonstrated a
       willingness to conduct itself in an unlawful manner, via acquiring pirated software in China
       and then copying and installing that pirated software on its computers. Moreover, Ms.
       Wilson points out that the evidence of the defendant's infringing activities, which is likely
       stored on computer drives, could be easily deleted or moved if the defendant was given
       notice of these proceedings. As well, prior notice could result in the deletion of evidence
       that is located on computers in Beijing, China. Schlumberger Canada would obviously face
       substantial challenges pursuing its claim for copyright infringement in the event that this
       evidence was moved, concealed or destroyed.

Reference:     see paragraphs 20-23 of the *Affidavit of Sarah Wilson*, Plaintiff's Motion
               Record, Tab 3

12.    Schlumberger Canada has undertaken to compensate GTC for any recoverable damages
       associated with its execution of any *Anton Piller* order granted and, further, to compensate it
       for any damages awarded by the court flowing from any injunction issued which the court
       subsequently determines should not have been issued.

Reference:     see paragraph 30 of the *Affidavit of Sarah Wilson*, Plaintiff's Motion Record,
               Tab 3

## PART II – POINTS IN ISSUE

23.    The plaintiff submits that the issues on this motion are as follows:

       (a)     In furtherance of obtaining an interim and/or interlocutory injunction, has SCL
               shown that it has a *prima facie* case, that it will suffer irreparable harm without an

injunction, and that the balance of convenience favours an injunction?

(b)    In furtherance of obtaining an *Anton Piller* order, has SCL shown that: (a) it has a strong *prima facie* case, (b) the damage it has or will suffer is serious, and (c) it appears the defendant has evidence in its possession and there is a possibility that it will be destroyed or moved if it is given notice of these proceedings?

## PART III – SUBMISSIONS

### *The Interlocutory Injunction*

24.    This court has jurisdiction to grant interim and interlocutory injunctive relief, and will grant an *ex parte* injunction for a period of not more than 14 days where a judge is satisfied that: (a) urgency renders giving notice impossible; or (b) giving notice would defeat the purpose of the motion. Here, giving notice to the defendant would defeat the purpose of the motion.

Authority:    Section 44 of the *Federal Courts Act*, R.S.C. 1985, C. F-7, as amended; Rules 373-374 of the *Federal Court Rules*, SOR/98-106, as amended

25.    Under the governing *American Cyanamid* approach to interlocutory injunctions, SCL is required to show that: (a) it has a *prima facie* case; (b) it will suffer irreparable harm unless an injunction is granted; and (c) the balance of convenience favours the injunction.

Authority:    *American Cyanamid Co. v. Ethicon Ltd.*, [1975] 1 All E.R. 504 (H.L.); *RJR-MacDonald Inc. v. Canada* (1994), 54 CPR (3d) 114 (S.C.C.).

### *(a) SCL has a prima facie case*

26.    SCL must show that it has a *prima facie* case, which means that its claims are not frivolous or vexatious. At this stage, the court will not engage in a prolonged assessment of the merits. As explained below, the evidence presented demonstrates that SCL has a strong *prima facie* case.

Authority:    *American Cyanamid Co. v. Ethicon Ltd.*, [1975] 1 All E.R. 504 (H.L.); *RJR-MacDonald Inc. v. Canada* (1994), 54 CPR (3d) 114 (S.C.C.); *Caterpillar Inc. v. Chaussures Mario Moda Inc.* (1995), 62 C.P.R. (3d) 338 (F.C.T.D.) at page 342;

27.     SCL is the owner of the copyright in the Petrel Program and holds two related Canadian copyright registrations (version 1.0 and version 2003). By virtue of these registrations and section 34.1 of the *Copyright Act*, SCL is presumed to be the copyright owner in the works covered by the registrations. As such, it has the exclusive right to reproduce and to authorize the reproduction of the Petrel Program. The defendant, by making unauthorized copies of the protected works (i.e. by loading pirated copies of the software program onto the computers of its software developers), has infringed the copyright in these works, in violation of section 27(1) of the *Copyright Act*.

28.     The defendant's activities also constitute secondary infringement under section 27(2) of the *Copyright Act*. First, it has distributed the protected work in a manner as to prejudicially affect the rights of the copyright owner. Second, it has possessed unauthorized copies of the protected work for the purposes of distributing the work in a manner as to prejudicially affect the rights of the copyright owner. Finally, it has imported pirated copies of the protected work into Canada from China for these purposes. In so doing, it knew or should have known that the pirated copies of the program acquired in China for a fraction of the regular price were infringing copies.

        *Authority:*     Section 27(1) and 27(2) of the *Copyright Act*, R.S.C. 1985, chapter C.42, as amended

### (b) Irreparable harm: Adequacy of Damages

29.     In considering the issue of irreparable harm, the Federal Court of Appeal has recognized that copyright infringement cases warrant special consideration. In the *Somerville House Books* case, it held that, where substantial or complete copying is established, the plaintiff should succeed at the interlocutory injunction stage regardless of the considerations typically involved in these cases.

        *Authority:*     *Somerville House Books v. Tormont Publications Inc:* (1993), 50 C.P.R. (3d) 390 (FCTD), affirmed at (1993), 53 CPR (3d) 77 (Fed. C.A.)

30. In *RJR-MacDonald*, the Supreme Court of Canada confirmed that "irreparable harm" refers to the nature of the harm rather than its magnitude. The Court stated that: *"[Irreparable harm] is harm which either cannot be quantified in monetary terms or which cannot be cured, usually because one party cannot collect damages from the other."* In assessing irreparable harm, the court can draw appropriate inferences from the evidence.

       Authority:    *RJR-MacDonald Inc. v. Canada* (1994), 54 C.P.R. (3d) 114 at page 135 (S.C.C.); *Syntex Inc. v. Novopharm Ltd.* (1991), 36 C.P.R. (3d) 129 (FCA), reversing 26 C.P.R. (3d) 481 (FCTD); *Caterpillar Inc. v. Chaussures Mario Moda Inc.*, (1995), 62 CPR (3d) 338 (FCTD) at pages 342-45.

31. Where a defendant lacks the resources to pay any ultimate damage award, any damages will be irreparable, since the plaintiff will be unable to collect damages from the defendant. In this case, the defendant is a relatively small company with sales in the range of $2 million per year. The plaintiff's direct losses associated with lost licensing fees are already in the range of $4 million (25 unauthorized copies at US $160,000 per copy). It is therefore likely that the defendant would be unable to satisfy any monetary judgment, even if the court could otherwise quantify the damages.

       Authority:    *Fednav Ltd. v. Fortunair Canada Inc.* (1994), 59 C.P.R. (3d) 1 (FCTD); *Apple Computer, Inc. v. Minitronics of Canada Ltd. et al.* (1985), 7 C.P.R. (3d) 104 (FCTD); *Dyckerhoff & Widmann Aktiengesellschaft et al. v. Advanced Construction Enterprise Inc. et al.* (1985), 11 C.P.R. (3d) 371 (FCTD); *Titan Linkabit Corp. v. S.E.E. See Electronic Engineering Inc.*, (1993), 48 C.P.R. (3d) 62 (FCTD)

32. In counterfeiting (and piracy) cases, the defendant's activities are almost always likely to cause irreparable harm, because: (a) it is impossible to determine with any level of certainty the ensuing damages; and (b) the risk of harm to the brand owner's reputation and the goodwill associated with its intellectual property is very high. In a case where a defendant has obtained pirated copies of valuable software, and has made further copies that it is using to develop a competitive product, it would be impossible to quantify the copyright owner's ensuing losses, particularly if that competitive product was released.

Authority:    Hermes Canada v. Park (2004), 37 CPR (4th) 244 (BCSC); Northern Lights Expeditions Ltd. v. Spirit Wind Expeditions Ltd (2001), 15 C.P.R. (4th) 134 (B.C.S.C.); Gianni Versace S.p.A. et al. v. 1154979 Ontario Ltd. et al. (2003), 28 C.P.R. (4th) 217 (Federal Court of Canada); Jeffrey Rogers Knitwear Productions Ltd. Et Al. V. R. D. International Style Collections Ltd. (1985), 6 C.P.R. (3d) 409 (Federal Court, Trial Division).

33.   Where an infringing activity leads to a situation where the intellectual property rights owner loses control of the use of its property (e.g. its protected works), the ensuing damage constitutes harm which may be irreparable.

Authority:    Hermes Canada v. Park (2004), 37 CPR (4th) 244 (BCSC); Toronto Cricket Skating & Curling Club v. Cricket Club Townhouses Inc., [2003] O.J. No. 3558 (QL), 27 C.P.R. (4th) 417 (S.C.J. (Div. Ct.); BMW Canada Inc. v. Nissan Canada (2005), 46 CPR (4th) 62 (FCTD)

34.   In this case, the defendant has already installed unauthorized copies of the protected works on computers that are located outside of this Court's jurisdiction. Since the court may lack the jurisdiction to deal with these activities, the plaintiff's related damages are irreparable, since the court may not be able to effectively compensate the plaintiff for these foreign losses.

35.   Where a defendant's activities will cause a plaintiff to lose market share, the ensuing damages are usually irreparable, since: (a) money cannot put the plaintiff back into the market at the same position; (b) a judge cannot quantify the lost opportunities caused by market exclusion; and (c) it is impossible to attribute a loss of market share to a particular event in light of the other market forces at play. Here, the sale of the defendant's new and competitive product (being developed in part via the pirated copies of the Petrel product) will necessarily lead to lost market share, as explained in Ms. Wilson's affidavit.

Authority:    Ault Foods Ltd. v. Dairy Producers Co-Operative Ltd., (1996), 65 C.P.R. (3d) 344 (Ontario Court (General Division)) at page 356; see also RJR Macdonald, supra, note 8 at page 135; Procter & Gamble Inc. v. Colgate-Palmolive Canada Inc. (1995), 61 C.P.R. (3d) 160 (FCTD) per Teitelbaum J.

36.   Where a defendant's conduct is likely to damage the plaintiff's business relationships and

commercial reputation, the resulting harm is irreparable. This is because one cannot readily value a reputation or a relationship and, moreover, it is virtually impossible to calculate what the plaintiff's future earnings from these relationships.

Authority:    Rolls-Royce plc et al. v. Fitzwilliam et al. (2000), 10 CPR (4ᵗʰ) 1 at paras. 17 and 18 (F.C.T.D.); Mascot International v. Harman Investments Ltd., (1993), 46 C.P.R. (3d) 161 (FCTD); Titan Linkabit Corp. v. S.E.E. See Electronic Engineering Inc. (1993), 48 C.P.R. (3d) 62 (FCTD); Polo Ralph Lauren Corp. v. Cameo Optical Ltd. (1991), 38 C.P.R. (3d) 207 (FCTD)

37.    SCL has reason to believe that the defendant is developing a competitive product via the unauthorized use of infringing copies of its PETREL software. If the defendant is allowed to continue these activities pending trial, that product would be released to the market and would, seemingly, be unrecoverable.

## (c) The Balance of Convenience

38.    The court must weigh the effect of the defendant's conduct on the plaintiff against the effect of an injunction on the defendant. In most situations like this, the balance of convenience favors the established enterprise (i.e. SCL). Here, the relief sought only precludes the defendant from using or further copying pirated software, which does not impose any unfair burden upon it. Rather, it only directs the defendant to abide by SCL's legal rights under the Copyright Act pending trial.

Authority:    Ault Foods Ltd. v. Dairy Producers Co-Operative Ltd., (1996), 65 C.P.R. (3d) 344 (Ontario Court (General Division); H.J. Heinz Co. of Canada Ltd. v. Edan Foods Sales Inc. (1991), 35 C.P.R. (3d) 213 (F.C.T.D.)

## The Anton Piller Order

39.    This court has jurisdiction to grant an order for the custody or preservation of any property in question in a proceeding or relevant to an issue in a proceeding.

Authority:    Section 44 of the Federal Courts Act, R.S.C. 1985, C. F-7, as amended; Rule 377 of the Federal Court Rules, SOR/98-106, as amended

40.   The court will grant an *Anton Piller* order where: (a) there is a strong *prima facie* case, (b) the damage, potential or actual, is serious for the plaintiff; and (c) there is evidence of the defendant's possession of incriminating documents or things, and a real possibility of destruction of same prior to an application being made on notice. As explained below, the evidence presented satisfies each of these requirements.

> **Authority:** *Anton Piller K.G. v. Mfg. Processes Ltd.,* [1976] 1 All E.R. 779 (C.A.); *Bardeau Ltd. et al. v. Crown Food Service Equipment Ltd. et al.* (1982) 36 O.R. (2d) 355 (Ont. H.C.J.); *Nintendo of America, Inc. v. Coinex Video Games Inc. et al.* (1982) 69 C.P.R. (2d) 122 (Fed. C.A.) per Heald and Urie JJ. and Cowan D.J.;

## (a) Strength of the Plaintiffs' Case

41.   With respect to the strength of its case, SCL relies upon the evidence summarized above, which clearly demonstrates that the defendant is in possession of infringing copies of protected works, has made further unauthorized copies of the protected works, and is using those copies for an unfair and improper purpose. These facts strongly support the plaintiff's claim for copyright infringement.

## (b) The Risk of Serious Harm

42.   The defendant's continued reproduction and use of the pirated software will cause SCL serious harm, as explained in the Wilson Affidavit. In addition, SCL will suffer harm if the order is not granted because it may have to prove its case without access to the evidence of the defendant's infringing activities, which is precisely the sort of harm relevant vis-à-vis *Anton Piller* motions:

> The third requirement is that the damage, potential or actual, must be very serious for the plaintiff. As stated by E.M. Myers, supra, at 45:
>
> > This "requirement" has fortunately not been interpreted as requiring the [applicant] to show that damages would be an inadequate remedy at trial, which could limit the scope of the order. Rather, the harm addressed by this requirement is the inability of the [applicant] to prove his case at trial should the infringing material not be available. This applies to both liability and damages [Emphasis added]

Authority:   *Capitanescu et al, v. Universal Weld Overlays Inc. et al.* (1996), 71 C.P.R. (3d) 37at para. 23 (Alta. Ct. of Q.B.) per Paperny J.; see also *Adobe Systems Inc. v. KLJ Computer Solutions Inc.* (1999), 3 FC 621 (FCTD).

## (c) There Is Evidence at the Location to Be Searched

43.   The evidence shows that: (a) the location to be searched is the location of the defendant company; and (b) there is pirated software at that location. Therefore, there appears to be evidence of the defendant's infringing activities at the location (see the GTC Photographs).

## (d) The Risk that Evidence will be Rendered Unavailable

44.   Demonstrating that evidence could be moved or destroyed necessarily involves inferences, since it is impossible for the moving party to bring forward actual evidence on this point. As explained below, the court will presume that the evidence is at risk where a defendant has demonstrated a propensity for dishonesty and, further, where the evidence can be easily destroyed or concealed.

> It is almost impossible for an applicant to produce direct proof that a defendant will destroy the material. Generally, courts have inferred a risk of destruction when it is shown that the defendant has been acting dishonestly, for example where matter has been acquired in suspicious circumstances, or where the defendant has knowingly violated the applicant's rights.

Authority:   *Capitanescu et al. v. Universal Weld Overlays Inc. et al.* (1996), 71 C.P.R. (3d) 37 at para. 22 (Alta. Ct of Q. B.) per Paperny J.; see also *Yousif v. Salama,* [1980] 3 All E.R. 405 (U.K.C.A.); *Nintendo of America, Inc. v. Coinex Video Games Inc. et al.* (1982) 69 C.P.R. (2d) 122 (Fed. C.A.) per Heald and Urie JJ. and Cowan D.J.; see also *Viacom Hai Holding Co. et al. v. Jane Doe et al.* (2000) 6 C.P.R. (4th) 36 (F.C.T.D.)

45.   This defendant has violated SCL's rights by acquiring and copying pirated copies of the Petrel Program. The Cox Affidavit shows that it was aware that Schlumberger Canada was the owner of this program. Where a defendant has conducted itself with such flagrant disregard for another's rights, the court can presume that it will likewise refuse to produce evidence of its wrongdoing pursuant to its obligations arising under the *Federal Court Rules.*

46.    Where a defendant is knowingly engaged in illegal activities, it is even more appropriate to assume that it is willing and even likely to destroy or conceal evidence of its wrongdoing. In this case, there is a sufficient evidence on which the court can conclude that the defendant is knowingly engaged in willful copyright infringement.

Authority:    *WIC Premium Television v. Levin,* [1999] FCJ 652 at para. 23 and 28 (FCTD); *Chum Limited v. Stempowicz,* [2003] FCJ No. 1041 at para 34 (FCTD)

47.    The risk of destruction increases dramatically where, as here, the evidence is stored on computers, since that evidence can be quickly moved or deleted if a defendant is given notice of legal proceedings. The court can and in this case should presume that a defendant that has acquired pirated copies of valuable software in China in the manner described and for the purpose alleged would be ready, willing and able to get rid of the evidence of its wrongdoing via the push of a button, if alerted to these proceedings.

Authority:    *Nintendo of America, Inc. v. Coinex Video Games Inc. et al.* (1983) 69 C.P.R. (2d) 122 (Fed. C.A.) per Heald and Urie JJ. and Cowan D.J.; see also *Chum Limited v. Stempowicz,* [2003] FCJ No. 1041 at para 34 (FCTD); *Yaghi v. WMS Gaming Inc.* [2004] 2 W.W.R. 657, 18 Alta L.R. (4th) 280 at paras. 78 and 81 (Alta. Ct. of Q.B.)

## *The confidentiality of the affidavits*

48.    Under the *Federal Court Rules,* affidavits on motions may contain statements regarding the opponent's belief, with the grounds included. While the grounds do not necessarily include disclosure of the source's identity, the source is usually identified to the court. Here, counsel will disclose the identity of the source, but can only do so if measures are in place to protect his/her identity. This will fully enable the court to assess the credibility of the plaintiff's evidence on this *ex parte* motion.

49.    On this *ex parte* motion, there is no prejudice arising from an order sealing these affidavits. The defendant still knows the full particulars of the plaintiff's case and the nature of the evidence relied on. The only missing piece is the source of the internal evidence. In

software cases, these internal sources are often anonymous, as in complaints made to the *Business Software Alliance* and/or the *Canadian Alliance Against Software Theft*.

50. If a search discloses evidence of the defendant's infringing activities, there will be no issue with respect to the credibility of the confidential evidence. In the event that a search fails to disclose evidence of the defendant's infringing activities, the defendant will have the right to challenge that evidence and can look to the plaintiff's undertaking on damages.

51. In the *Innovative Health Group* case, the moving party initially obtained an order sealing the entire file on an *Anton Piller* motion. The target of the search later sought to have the file unsealed in a subsequent action. While the court unsealed parts of the file, it refused to unseal anything that would disclose the informant's identity or investigative techniques. This approach is consistent with the approach summarized in *Sopinka on Evidence*, where the learned author summarizes the circumstances in which the source of information cannot be disclosed.

**Authority:** *Innovative Health Care Group v. Calgary Health* [2006] A.J. No. 50 (Alta. C.A.); *Sopinka on Evidence*, paragraph 15.5

52. The court has authority to seal these affidavits. Under Rule 137 of the Ontario *Courts of Justice Act* and Rule 151 of the *Federal Court Rules*, the court can grant an order directing that certain material not form part of the public record. Under the *Federal Court Rules*, it will do so if it is satisfied that the materials should be confidential, notwithstanding the public interest in open, accessible court proceedings.

53. In *Sierra Club of Canada v. Canada*, the Supreme Court of Canada held that the key issue in these cases is whether: (a) the order is necessary to prevent a serious risk to an important interest; and (b) the salutary effects of the confidentiality order outweigh its deleterious effects. SCL submits that the confidentiality order is both necessary and appropriate here, having regard to these tests.

Authority: *Sierra Club of Canada v. Canada (Minister of Finance)*, [2002] 2 SCR 522

54.   In considering exercising its discretion, the court may also examine sections 487.3(1) and 487.2 of the *Criminal Code*, which empower a judge, when issuing warrants, production orders, orders authorizing entry, etc., to grant an order prohibiting access to, amongst other things, information pertaining to the source of certain information. In *Van Dongen*, Ross J. held that the common law principles regarding sealing orders to maintain the confidentiality of witnesses were the same as those in section 487 of the *Criminal Code*.

Authority: *Van Dongen v. Society for the Prevention of Cruelty to Animals*, [2004] BCJ No. 2170 (British Columbia Supreme Court),

55.   Weighing all of the relevant considerations, the plaintiff submits that an order sealing the John Doe affidavit be granted.

## PART IV - ORDER SOUGHT

56.   The applicant respectfully requests an order in the form presented as well as such further relief as to this Honourable Court may appear just.

ALL OF WHICH IS RESPECTFULLY SUBMITTED this 5th day of October 2006.

BAKER & McKENZIE LLP

James J. Holloway (343074)
Carlos M. de Vera (50720W)

Counsel for the Moving Party

## PART V – LIST OF AUTHORITIES

*American Cyanamid Co. v. Ethicon Ltd.*, [1975] 1 All E.R. 504 (H.L.)

*RJR-MacDonald Inc. v. Canada* (1994), 54 CPR (3d) 114 (S.C.C.).

*Caterpillar Inc. v. Chaussures Mario Moda Inc.* (1995), 62 C.P.R. (3d) 338 (F.C.T.D.)

*Somerville House Books v. Tormont Publications Inc.* (1993), 50 C.P.R. (3d) 390 (FCTD), affirmed at (1993), 53 CPR (3d) 77 (Fed. C.A.)

*Fednav Ltd. v. Fortunair Canada Inc.* (1994), 59 C.P.R. (3d) 1 (FCTD);

*Apple Computer, Inc. v. Minitronics of Canada Ltd.* et al. (1985), 7 C.P.R. (3d) 104 (FCTD)

*Dyckerhoff & Widmann Aktiengesellschaft et al. v. Advanced Construction Enterprise Inc.* et al. (1985), 11 C.P.R. (3d) 371 (FCTD);

*Titan Linkabit Corp. v. S.E.E. See Electronic Engineering Inc.*, (1993), 48 C.P.R. (3d) 62 (FCTD)

*Hermes Canada v. Park* (2004), 37 CPR (4th) 244 (BCSC)

*Northern Lights Expeditions Ltd. v. Spirit Wind Expeditions Ltd.* (2001), 15 C.P.R. (4th) 134 (B.C.S.C.);

*Gianni Versace S.p.A. et al. v. 1154979 Ontario Ltd.* et al. (2003), 28 C.P.R. (4th) 217 (Federal Court of Canada);

*Jeffrey Rogers Knitwear Productions Ltd. Et Al. V. R. D. International Style Collections Ltd.* (1985), 6 C.P.R. (3d) 409

*Toronto Cricket Skating & Curling Club v. Cricket Club Townhouses Inc.*, [2003] O.J. No. 3558 (QL), 27 C.P.R. (4th) 417 (S.C.J. (Div. Ct.)

*BMW Canada Inc. v. Nissan Canada* (2005), 46 CPR (4th) 62 (FCTD)

*Ault Foods Ltd. v. Dairy Producers Co-Operative Ltd.*, (1996), 65 C.P.R. (3d) 344

*Procter & Gamble Inc. v. Colgate-Palmolive Canada Inc.* (1995), 61 C.P.R. (3d) 160 (FCTD)

*Rolls-Royce plc et al. v. Fitzwilliam* et al. (2000), 10 CPR (4th)

*Mascot International v. Harman Investments Ltd.*, (1993), 46 C.P.R. (3d) 161 (FCTD)

*Polo Ralph Lauren Corp. v. Cameo Optical Ltd.* (1991), 38 C.P.R. (3d) 207 (FCTD)

*H.J. Heinz Co. of Canada Ltd. v. Edan Foods Sales Inc.* (1991), 35 C.P.R. (3d) 213 (F.C.T.D.)

*Anton Piller K.G. v. Mfg. Processes Ltd.*, [1976] 1 All E.R. 779 (U.K.C.A.)

*Bardeau Ltd. et al. v. Crown Food Service Equipment Ltd.* et al. (1982) 36 O.R. (2d) 355 (Ont. H.C.J.)

*Nintendo of America, Inc. v. Coinex Video Games Inc.* et al. (1982) 69 C.P.R. (2d) 122

*Capitanescu et al. v. Universal Weld Overlays Inc.* et al. (1996), 71 C.P.R. (3d) 37at para. 23 (Alta. Ct. of Q.B.) per Paperny J.; see also

*Adobe Systems Inc. v. KLJ Computer Solutions Inc.* (1999), 3 FC 621 (FCTD).

*Yousif v. Salama*, [1980] 3 All E.R. 405 (U.K.C.A.)

*Viacom Ha! Holding Co. et al. v. Jane Doe* et al. (2000) 6 C.P.R. (4th) 36 (F.C.T.D.)

*WIC Premium Television v. Levin*, [1999] FCJ 652 (FCTD)

*Chum Limited v. Stempowicz*, [2003] FCJ No. 1041 at para 34 (FCTD)

*Yaghi v. WMS Gaming Inc.* [2004] 2 W.W.R. 657, 18 Alta L.R. (4th) 280 (Alta. Ct. of Q.B.)

Court File No.

# FEDERAL COURT

**BETWEEN:**

## SCHLUMBERGER CANADA LTD.

Plaintiff

- and -

## GEOMODELING TECHNOLOGY CORP.

Defendant

### MEMORANDUM OF FACT & LAW
### OF THE MOVING PARTY

BAKER & McKENZIE LLP
Barristers & Solicitors
BCE Place, Suite 2100
181 Bay Street
Toronto, Ontario
M5J 2T3

Jim Holloway (343074)
jim.holloway@bakernet.com
(416) 865-1221 - telephone
(416) 863-6275 – facsimile

Carlos M. de Vera
carlos.m.devera@bakenet.com

(416) 865-2339 – telephone
(416) 863-6275 – facsimile

Solicitors for the Plaintiff

# TAB 3

Court File No.

## FEDERAL COURT

BETWEEN:

### SCHLUMBERGER CANADA LTD.

Plaintiff

- and -

### GEOMODELING TECHNOLOGY CORP.

Defendant

## AFFIDAVIT OF SARAH WILSON
### Sworn on September 27, 2006

I, SARAH WILSON, of the City of Calgary, in the Province of Alberta, MAKE OATH AND SAY:

1.    I work with Schlumberger Canada Ltd. ("Schlumberger Canada"). Until recently, I was Operations Manager for the Schlumberger Information Solutions ("SIS") division and responsible for, amongst other things, the licensing of my company's products in the Canadian market. In May 2006, I became the Schlumberger Canada Marketing Manager, still based in Calgary. As such, I am familiar with the seismic-to-simulation PETREL software application (the "PETREL Program"), which is described below. I have personal knowledge of my evidence, unless otherwise stated.    In those cases where my evidence is based on

information I have received from others, I have identified the source of my information (with the exception of the confidential source) and, in each such case, I verily believe it to be true.

3.  Schlumberger Limited ("Schlumberger") is a global supplier of products and services to the oil and gas industry, with over 64,000 employees located in over 80 countries, including Canada. Schlumberger Canada is a Schlumberger Limited subsidiary in the business of providing project management, technology and information solutions to the Canadian oil and gas industry. SIS is a division that develops and licenses software used for finding, developing and exploiting oil and gas reserves through state-of-the-art workflow capabilities.

### The PETREL Program

4.  A key SIS software solution is the PETREL Program, which is an integrated Windows-based software solution that enables licensees to capture and manage subsurface information and data, such as seismic interpretation and reservoir simulation.

5.  I am generally aware that the PETREL Program was developed by a company called Technoguide in about 1998. Technoguide released updated versions, culminating in version 2002SE. In 2002, Schlumberger acquired the PETREL Program and, thereafter, released its own versions developed and written by its employees.

6.  Schlumberger Canada owns the copyright in the Petrel Program in Canada. On August 25, 2006, it received Canadian copyright registrations no. 1040833 and 1040834 over the works comprising the PETREL Program. I have attached a true copy of these registrations to my affidavit as *Exhibit A*.

7.  According to internal company records, Schlumberger Canada's licensees for the Petrel Program include leading companies like Encana, Nexen, Talisman, Devon,

2

Burlington and Anadarko, and the company has generated over $11.8 million in revenue from this product since 2002.

8.     The PETREL Program is currently licensed on average for approximately US $160,000 per copy in North America.

### Geomodeling Technology & the PETREL Program

9.     Geomodeling Technology Corp. ("GTC") is a Calgary-based company that develops software for the oil and gas industry, including products used for seismic and reservoir modeling. In this sense, it is a competitor of our company. I have attached a true copy of excerpts from its Internet web site describing its business (www.geomodeling.com) as *Exhibit B* to my affidavit.

10.     I have attached a true copy of a GTC corporation profile search as *Exhibit C* to my affidavit. While according to this profile GTC's registered head office is 1400, 350-7th Ave. SW, Calgary, Alberta, Canada, T2P3N9, I understand from the company's web site that its operations are at 1100, 665-8th Street SW, Calgary, Alberta, Canada T2P3K7.

11.     In reviewing the GTC web site, I see that it also has offices in Houston: (2825 Wilcrest Drive, Suite 218, Houston, Texas, 77042, USA); Norway (Prof. Olav Hanssensvei 15 Postboks 8046 4068 Stavanger, Norway) and China (Zhongguancun Software Park Suite 1214 or 1217, Building 3B Haidian District, Beijing 100094, China).

12.     On Friday, June 9, 2006, I met with an individual (referred to by the alias "John") at a coffee shop in downtime Calgary to discuss information that he claimed to have regarding the activities of GTC vis-à-vis our PETREL Program. Another Schlumberger Canada employee, Betsy Tsang, was also there.

3

13. John explained that GTC has several software developers working in Calgary and Beijing on software for the oil and gas industry. He further explained that GTC had obtained 3 pirated copies of our PETREL Program in China; for something in the range of CDN $800 per copy. He said that GTC had installed: (a) its first pirated copy of the PETREL Program (version 2003SE, September 3, 2004) in November 2004 on one computer in Calgary; (b) its second pirated copy of the PETREL Program (version 2003SE, November 16, 2004) in December 2004 on 5 computers in Calgary and 10 computers in China; and (c) its third pirated copy of the PETREL Program on several computers (version 2004, February 25, 2005) in December 2005.

14. According to John: (a) GTC acquired the pirated versions of our software for the purpose of developing a competitive product with a similar interface that would mimic the PETREL Program and run on 3 platforms (i.e. Unix, Windows and Linux); (b) GTC made a number of unauthorized copies of the pirated PETREL Program and distributed these to its software developers in Calgary and China, so that they could work on this project; (c) GTC has 15 employees in Beijing and 10 employees in Calgary working on this project; (d) the pirated PETREL Program is installed on at least 15 computers in Calgary, located at 1100, 665-8th Street SW, Calgary, Alberta, Canada T2P3K7 and on 10 computers in Beijing at Zhongguancun Software Park, Suite 1214 or 1217, Building 3B Haidian District, Beijing 100094, China; (e) GTC had purchased our OCEAN development kit to be used by their programmers for this project; and (f) GTC plans to release its competitive product later this year or early next.

15. John was able to provide us with pictures of screen shots of the PETREL Program running on GTC computers in Calgary. I have attached true copies of these images as *Exhibit D* to my affidavit. I am advised by Keith Tushingham that these screen shots show versions of the PETREL Program that GTC is not licensed or authorized to have or to run.

4

16.     To the best of our current knowledge, GTC does not have the source code for the PETREL Program.

17.     According to John, many or all of the GTC programmers working on the aforementioned project are Chinese nationals who, in his view, do not fully understand the legal issues surrounding software piracy or counterfeiting.

18.     John has not sought any benefits or consideration in return for the provision of the aforementioned information. Given the level of detail he has been able to provide, I believe that there are pirated and unlicensed copies of our PETREL Program installed on GTC computers at its Calgary and Beijing offices.

## A summary of Schlumberger Canada's concerns

19.     Schlumberger Canada is concerned about the aforementioned activities. First, we are concerned about the lost revenue caused by software piracy. Second, we are concerned about the loss of control over our intellectual property caused by software piracy. Third, we are concerned about the existence of unauthorized copies of our software, since we cannot control what is done with these copies. For example, GTC could make and distribute unauthorized copies of our software, in Canada and elsewhere. Fourth, we are concerned about the damage to our reputation and brand goodwill caused by counterfeiting. Finally, we are concerned that GTC is copying and using our PETREL Program without authority for the improper purpose of developing a product that will compete directly with our product. In the event that GTC was using licensed copies of our software, the license terms would prohibit these activities.

## Why I believe that GTC may move, destroy or conceal evidence

20.     I believe there is a real possibility that GTC will not disclose or produce evidence of its infringing activities during the course of any legal proceedings. While I can only speculate on this issue, I say this because those who run GTC have

5

shown a willingness to conduct themselves with disregard for our legal rights and their obligations. In these circumstances, I believe there is a real possibility they would likewise disregard any obligation to preserve and produce evidence that would be incriminating and expose the company to liability.

21. In addition, I am concerned that, if GTC is given advance notice of these proceedings, there is a risk that its employees in China would move, conceal or destroy the evidence of their wrongdoing that we believe is located on the GTC computers in Beijing.

22. In addition, I am concerned that the evidence of the company's infringing activities, which is stored on computer hard drives, could be quickly and easily destroyed if GTC were given prior notice of any legal action. Again, since GTC has demonstrated a willingness to engage in unlawful activities, I believe there is cause to be concerned about the destruction of any evidence that may be located at the cited Calgary address.

23. In addition, I am concerned about the challenges we would face in pursuing our legal remedies without access to the information and evidence that GTC may move, conceal or destroy if it is given notice of this legal action. In the event that GTC deleted its infringing copies of our software, it would be virtually impossible for us to prove its infringing activities.

## Why We Request an Injunction

24. I believe that the activities of GTC will cause Schlumberger Canada serious and irreparable harm, for the reasons stated below.

25. First, if GTC is allowed to make, distribute and use unauthorized copies of our PETREL Program pending trial, and these copies find their way into the market, we will not be able to recover these copies or, further, determine whether and to what extent further copies are made. Moreover, these copies may find their way

6

into foreign countries such as the U.S., China and Norway, Brazil, Mexico, Malaysia and Venezuela (including via their channel partners).

26. Second, since GTC has already provided copies of our PETREL Program to its employees in China, we are concerned that the courts in Canada could lack the authority or jurisdiction over individuals who may decide to continue to copy and use this protected work.

27. Third, if GTC is able to launch a competitive product that is derived from our PETREL Program, this will result in a loss of market share since it will compete with our PETREL product. We cannot accurately measure these losses since we will not be able to ascertain the extent to which the GTC product was sold in lieu of our product, having regard to the various other market forces at play. Moreover, it will be virtually impossible to locate and recover every copy of this competitive product after it has been sold to third parties.

28. Fourth, if GTC is able to launch a competitive product that is derived from our PETREL Program, we will suffer a loss of 'pull-through' revenue for other SIS products. This is because the PETREL Program is designed to be an integrated part of our whole software suite. Therefore, by losing a sale, or our market position with it, we will almost certainly lose sales of other applications to our competitors as the advantage of 'staying in the SIS software domain' will be lost. It would be impossible to identify and calculate these related losses.

29. Finally, I understand that GTC is a relatively small company, which employs somewhere in the range of 30 people and has annual sales revenue of only $2 million. In light of the significant value of our PETREL Program (25 licensed copies would cost on average $4.5 million). I am concerned that GTC will be unable to pay any significant damage award. In this regard, I refer to a D&B report dated August 15, 2006. I have attached a true copy of that report to my affidavit as *Exhibit E.*

7

## Our Undertaking

30.     Schlumberger Canada will compensate GTC for any damages associated with the
        execution of any *Anton Piller* order granted and, further, will compensate it for
        any damages awarded by the court flowing from any injunction issued which the
        court subsequently determines should not have been issued.

**SWORN BEFORE ME** at the

City of Calgary, in the Province of Alberta,

this 27ᵗʰday of September 2006

_____
A Commissioner, notary public

_____
Sarah Wilson

        Shailaz Nenshi
        Student-at-Law

8

This is Exhibit "A" referred to in
the Affidavit of Sarah Wilson
sworn before me September 27th, 2006

A Notary Public. etc.

Shailaz Nenshi
Student-at-Law



**Office de la propriété intellectuelle du Canada**

**Canadian Intellectual Property Office**

Un organisme d'Industrie Canada

An Agency of Industry Canada

*Certificate of Registration of*

*Copyright*

*Certificat d'enregistrement du*

*Droit d'auteur*

*This Certificate of Registration is issued pursuant to sections 49 and 53 of the Copyright Act. The copyright in the work described below was registered on the date of registration as follows.*

*Ce certificat d'enregistrement est émis conformément aux articles 49 et 53 de la Loi sur le droit d'auteur. Le droit d'auteur sur l'œuvre décrite ci-dessous, a été enregistré à la date d'enregistrement comme suit.*

*Date of Registration - Date d'enregistrement :* **August 25, 2006**

*Registration No. - Numéro d'enregistrement :* **1040833**

*First Publication - Première publication :* **December 1998 Norway**

*Title - Titre :* **Petrel Version 1.0**

*Category - Catégorie :* **Literary**

*Owner(s) - Titulaire(s) :*  Schlumberger Canada Limited
Eau Clair Place I, 525 3rd Avenue SW, 7th Floor
Calgary, Alberta
Canada, T2G 0P4

*Author(s) - Auteur(s) :*

Jan Pihl Grimnes

Sven Vik

Anders Kihlberg

Oscar Skold

Nils Petter Fremming

Robert Schmidt





(CIPO 00200)
01-01-06



**Office de la propriété
intellectuelle
du Canada**

Un organisme
d'Industrie Canada

**Canadian
Intellectual Property
Office**

An Agency of
Industry Canada

Per Sverre Kristensen

*Date of Issuance of Certificate - Date d'émission du certificat :*     **August 25, 2006**

Monique Laurin
Registrar of Copyrights   Registraire des droits d'auteur
Copyright Office   Bureau du droit d'auteur



1040833

(CIPO 00200)
01-01-06

OPIC   CIPO



**Office de la propriété intellectuelle du Canada**

Un organisme d'Industrie Canada

**Canadian Intellectual Property Office**

An Agency of Industry Canada

*Certificate of Registration of*

*Copyright*

*Certificat d'enregistrement du*

*Droit d'auteur*

This Certificate of Registration is issued pursuant to sections 49 and 53 of the Copyright Act. The copyright in the work described below was registered on the date of registration as follows:

Ce certificat d'enregistrement est émis conformément aux articles 49 et 53 de la Loi sur le droit d'auteur. Le droit d'auteur sur l'œuvre décrite ci-dessous, a été enregistré à la date d'enregistrement comme suit :

Date of Registration - Date d'enregistrement : **August 25, 2006**

Registration No. - Numéro d'enregistrement : **1040834**

First Publication - Première publication : **June 2003 Norway**

Title - Titre : **Pétrel Version 2003**

Category - Catégorie : **Literary**

Owner(s) - Titulaire(s) :
**Schlumberger Canada Limited**
**Eau Clair Place 1, 525 3rd Avenue SW, 7th Floor**
**Calgary, Alberta**
**Canada, T2G 0P4**

Author(s) - Auteur(s) :
**Paal Hovdenak**

**Vivek Jain**

**Nils Petter Fremming**

Date of Issuance of Certificate - Date d'émission du certificat : **August 25, 2006**

Mougie Laurin

Registrar of Copyrights    Registraire des droits d'auteur
Copyright Office           Bureau du droit d'auteur





(CIPO 30200)
01-01-06.

This is Exhibit "B" referred to in
the Affidavit of Sarah Wilson
sworn before me September 27th, 2006

A Notary Public. etc.

Geomodelling Home

Geomodelling

Geomodelling Support

Get support
Login for
Geomodelling
product support

Enter username

Login

Latest News & Events

JUST RELEASED! SBEDStudio
2006 v2.
Available for download in the client
support area.

**View More News & Events**

Our Joint Industry Partners



ExxonMobil

Our Research Partners
Thank you to the SBED JIP
partners for their support and



Experience
our Training

Geomodelling's trainers remain responsive our
commitments such in our customers and
software with the focus attention. Our software
training you pursing plainly into your workflow.

**» Learn More About Training**

Learn About VisualVoxAt

VisualVoxAt is integrated
software for seismic attribute
generation, visualization,
calibration, classification and



Learn About SBED

SBED is the only software for
identifying reservoir potential
through small-scale heterogeneity
modeling and flow-based



Learn About SBEDStudio

SBEDStudio maximizes reservoir
potential by incorporating
geological details into reservoir
models using process-oriented

8/29/2006

Geomodeling Home

expertise. Our partners have helped make SBED the new standard in geological modeling tools.

Learn More & Join Us

interpretation.
Learn More About VisualVoxAt

upscaling.
Learn More About SBED

methodology.
Learn More About SBEDStudio

Privacy Policy

Admin Login    Client Login

# Geomodeling

Solutions:

Solutions: Overview

**Subtle Plays**

**Interpreting Noisy Data**

**Thin-Bedded Reservoirs**

**Sub-Seismic Geological Heterogeneity Effects on Fluid Flow**

Need More Info?

**Contact Us**
For additional information or to discuss how our software can assist with your specific challenge, please contact us.

Geomodeling > Solutions

## Insight from Innovation

Solving challenges is the heart and soul of why Geomodeling software was developed. Explore the following solutions and get the most out of your reservoir assets.



VisualVoxAt Solution:

Subtle Plays



VisualVoxAt Solution:

Interpreting Noisy Data

Geomodeling



**SBED solution:**

N/G

Thin-Bedded Reservoirs

**SBEDStudio Solution:**

Sub-Seismic Geological Heterogeneity
Effects on Fluid Flow

Admin Login    Client Login

Privacy Policy



Geomodeling

Geomodeling > News & Events

News & Events:

News & Events Overview

News Release Archives

Corporate Overview

Upcoming Events

Newsletters

Media Inquiries

For media inquiries, please
contact:
Marta Styler
Telephone: 1-403-262-9172
Email: marta@geomodeling.com

**Welcome**

Welcome to Geomodeling's Media Center, your on-line resource for news, company
and product information as well as upcoming events.

Media inquiries can be directed to our media team. We're here to respond to your
questions directly or to help you get in touch with the right information source.

**Latest Headlines**

NEW Commercial release of SBEDStudio 2006 v2.
July 27, 2006

Geomodeling publishes article in Hart's E & P Global Exploration & Production
News
July 24, 2006

Geomodeling Launches New Website
June 28, 2006

Geomodeling Highlighted with Speaking Opportunities at CSPG/CSEG/ CSLW
Convention
May15, 2006

Geomodeling Releases SBED 2006 Version 1
April 10, 2006

Geomodeling Releases Multi-Phase Upscaling in SBED2005 Version 4 Software
January 10, 2006

Upcoming Events:

• SEG International Exposition & 76th
Annual Meeting
View All Upcoming Events

Geomodeling

View more in the news archive

Admin Login     Client Login

Privacy Policy.



Geomodeling

Training & Support:

Training & Support
Overview

Client Login

Training Schedule

Course Registration

Geomodeling Support

Get support
Login for
Geomodeling
product support

Enter username

[ Login ]

Geomodeling > Training & Support



## Our Commitment

At Geomodeling, it's about our clients. We are committed to providing the highest professional standard in customer support and product excellence. Our Customer Support staff offers personal, direct-link and web-based support services for our clients worldwide.

### Training

Geomodeling offers training sessions for new and existing users. The sessions guide trainees through many relevant topics in VisualVoxAt, SBED and SBEDStudio software through interactive demonstrations and practical exercises.

### Support Services

Our support package includes:
- 8 hours software training
- Technical support (phone and e-mail)
- Online access to software downloads, updates and user guides

Geomodeling

For an email notification of new training courses, please complete the form.

Clients can purchase support services on an annual basis.

Your name:

Title:

Company:

E-mail: *required

Phone:

Send

Privacy Policy

Admin Login     Client Login

Geomodeling

Geomodeling > Channel Partners

Channel Partners:

Become a Channel Partner > > > > > >

**Become a Channel Partner**

Questions?

For more information, send an e-mail to: channel@geomodeling.com

**Channel Partner Login**



Login for channel
partner information

Enter username

Login



## Geomodeling Channel Partner Program

Channel Partners are an important part of meeting our customers' needs globally. The Geomodeling Channel Partner Program is a comprehensive program designed to provide Geomodeling Partners with the tools required to be successful in the geoscience software market. Our Partners build profitable businesses by selling Geomodeling software solutions.

We are actively seeking value added resellers and consultants with experience in selling to the geoscience and reservoir engineering teams in the oil and gas marketplace. Together we can grow your business!

## Geomodeling Authorized Channel Partner:

The benefits of becoming a Geomodeling Authorized Reseller include:

Geomodeling Partner Tool Kit via **Web** Access

Get it all at your fingertips. The tools you need to get the job done are just a click away. With Geomodeling's channel partner website, you can be sure to get the information you need, when you need it.

Geomodeling Sales and Technical Expert Training... and more

Learn how to get the most out of your contacts and leads - take sales training from those who have learned what it takes. You will learn the products, features, technical capacity and application of our software and the way to position them to those who buy.

Additional sales and marketing support includes:

• Collaboration with Geomodeling sales staff to support your Geomodeling solution sales
• Priority Technical Assistance Center (TAC) Support
• Quarterly newsletters
• Marketing programs
• Regular announcements

Program Requirements

Participating in the Geomodeling Channel Partner Program has certain requirements which are outlined below. We look forward to working with you to achieve our mutual goals together.

Requirements:

• Located in or serving a strategic market for Geomodeling
• Complete Geomodeling Sales and Technical Training
• Review Geomodeling sales objectives with Geomodeling Representative on a quarterly basis and meet annual sales targets as per Geomodeling channel partner
• Must have required Geologists, Geophysicists and Technical Support Staff on site.

Geomodeling is currently looking for channel partners and agents in the USA, Europe and the Middle East to market and sell its line of geoscience software. Interested?

Become a Channel Partner.

Privacy Policy                                     Admin Login          Client Login

This is Exhibit "C" referred to in
the Affidavit of Sarah Wilson
sworn before me September 27ᵗʰ/2006

A Notary Public. etc.

# Alberta Corporation/Non-Profit Search
## Corporate Registration System

Date of Search:        2006/08/08
Time of Search:        11:34 AM
Search provided by:    ACCUSEARCH LICENCE REGISTRY

Service Request Number:    8984413
Customer Reference Number:

Corporate Access Number: 207135500
Legal Entity Name:        GEOMODELING TECHNOLOGY CORP.

Name History:

| Previous Legal Entity Name | Date of Name Change (YYYY/MM/DD) |
|---|---|
| 713550 ALBERTA LTD. | 1996/11/06 |
| GEOMODELING RESEARCH CORP. | 2002/04/12 |

Legal Entity Status:        Active
Alberta Corporation Type:   Named Alberta Corporation
Registration Date:          1996/10/18 YYYY/MM/DD
Date of Last Status Change: 1999/09/03 YYYY/MM/DD

Revival/Restoration Date: 1999/09/03 YYYY/MM/DD

Registered Office:
Street:        1400, 350 - 7TH AVENUE SW
City:          CALGARY
Province:      ALBERTA
Postal Code:   T2P 3N9

Records Address:
Street:        1400, 350 - 7TH AVENUE SW
City:          CALGARY
Province:      ALBERTA
Postal Code:   T2P 2N9

Directors:

Last Name: CHRISTIE
First Name: MURRAY
Street/Box Number: 6340 DALBEATTIE HILL NW
City: CALGARY
Province: ALBERTA
Postal Code: T3A 1M2

Last Name: LAEGREID
First Name: TRYGVE
Street/Box Number: FORUSBEEN 50, N-4035
City: STAVANGER
Postal Code: .
Country: NORWAY

Last Name: WEN
First Name: RENJUN
Street/Box Number: 127 HAMPSHIRE GROVE NW
City: CALGARY
Province: ALBERTA
Postal Code: T3A 5B3

Last Name: WIRAK
First Name: STANLEY
Street/Box Number: FORUSBEEN 50
City: STAVANGER
Postal Code: N-4035
Country: NORWAY

Voting Shareholders:

Last Name: OFFTECH INVEST AS
Street: FORUSBEEN 50
City: STAVANGER
Postal Code: N4035
Country: NORWAY
Percent Of Voting Shares: 15.9

Last Name: SHI
First Name: YAN
Street: 127 HAMPSHIRE GROVE NW

City:                            CALGARY
Province:                        ALBERTA
Postal Code:                     T3A 5B3
Percent Of Voting Shares: 27.43

Last Name:                       WEN
First Name:                      RENJUN
Street:                          127 HAMPSHIRE GROVE NW
City:                            CALGARY
Province:                        ALBERTA
Postal Code:                     T3A 5B3
Percent Of Voting Shares: 56.67

Details From Current Articles:

The information in this legal entity table supersedes equivalent electronic attachments

| Share Structure: | THE ATTACHED SCHEDULE "A" IS INCORPORATED INTO AND FORMS A PART OF THIS FORM. |
|---|---|
| Share Transfers Restrictions: | THE ATTACHED SCHEDULE "C" IS INCORPORATED INTO AND FORMS PART OF THIS FORM. |
| Min Number Of Directors: | 1 |
| Max Number Of Directors: | 15 |
| Business Restricted To: | NONE |
| Business Restricted From: | NONE |
| Other Provisions: | THE ATTACHED SCHEDULE "B" IS INCORPORATED INTO AND FORMS A PART OF THIS FORM. |

Other Information:

Last Annual Return Filed:

| File Year | Date Filed (YYYY/MM/DD) |
|---|---|
| 2005 | 2005/12/20 |

Filing History:

| | | |
|---|---|---|
| | | |

| List Date (YYYY/MM/DD) | Type of Filing |
|---|---|
| 1998/12/01 | Status Changed to Start for Failure to File Annual Returns |
| 1999/04/09 | Status Changed to Struck for Failure to File Annual Returns |
| 1999/09/03 | Initiate Revival of Alberta Corporation |
| 1999/09/03 | Complete Revival of Alberta Corporation |
| 2002/04/12 | Name Change Alberta Corporation |
| 2005/01/20 | Change Address |
| 2005/02/28 | Name/Structure Change Alberta Corporation |
| 2005/03/03 | Capture Microfilm/Electronic Attachments |
| 2005/12/20 | Enter Annual Returns for Alberta and Extra-Provincial Corp. |
| 2005/12/20 | Change Director / Shareholder |

Attachments:

| Attachment Type | Microfilm Bar Code | Date Recorded (YYYY/MM/DD) |
|---|---|---|
| Share Structure | ELECTRONIC | 1999/09/03 |
| Other Rules or Provisions | ELECTRONIC | 1999/09/03 |
| Share Structure | ELECTRONIC | 2003/09/19 |
| Restrictions on Share Transfers | ELECTRONIC | 2003/09/19 |
| Consolidation, Split, Exchange | ELECTRONIC | 2003/09/19 |
| Shares in Series | ELECTRONIC | 2005/02/28 |
| Letter - Spelling Error | 10000902000624525 | 2005/03/02 |
| Amended Annual Return | 10000804100522342 | 2005/03/03 |

This is to certify that, as of this date, the above information is an accurate reproduction of data contained within the official records of the Corporate Registry.



## Rogers, Laura

From:          Bratsalis, Harriet
Se: ':         Tuesday, August 08, 2006 2:30 PM
To: ⁴         Rogers, Laura
Cc:            Holloway, James J
Subject:       RE: Schlumberger rush!!!

Attachments:   Profile - Geomodeling (Ab).pdf


Profile -
:omodeling (Ab).pdf

Attached is a corporate profile for this company.

From:          Rogers, Laura
Sent:          Tuesday, August 08, 2006 12:27 PM
To:            Bratsalis, Harriet
Subject:       FW: Schlumberger rush!!!

From:          Holloway, James J
Sent:          Tuesday, August 08, 2006 12:23 PM
To:            Rogers, Laura
Subject:       Schlumberger

Here's the company I need searched ASAP

Geomodeling Technology Corp.
1100, 665 - 8 Street SW
Calgary AB T2P 3K7
Canada
Tel: +1 403 262 9172
Fax: +1 403 262 9171
info@geomodeling.com

שart regards

עm אמכאכ.
Bawer & Mcit = rawe .uF
פ. ה פארe .Ruote ,.א4
ה 53. Stree א . Ruw ב הא
" .amo Dhnina . ama03 .א4. 2T3
ּnאי-יּ10 565 הי-4
היג-+1 אוג-963 12/9

:oen: & McKenze ..F an Ootuno limited sability partndrship is a mencer of Baren & McKenzie International a Swiss .ereio

# Alberta Corporation/Non-Profit Search
## Corporate Registration System

Date of Search:           2006/08/08
Time of Search:           11:34 AM
Search provided by:       ACCUSEARCH LICENCE REGISTRY

Service Request Number:   8984413
Customer Reference Number:

Corporate Access Number: 207135500
Legal Entity Name:        GEOMODELING TECHNOLOGY CORP.

Name History:

| Previous Legal Entity Name | Date of Name Change (YYYY/MM/DD) |
|---|---|
| 713550 ALBERTA LTD. | 1996/11/06 |
| GEOMODELING RESEARCH CORP. | 2002/04/12 |

Legal Entity Status:      Active
Alberta Corporation Type: Named Alberta Corporation
Registration Date:        1996/10/18 YYYY/MM/DD
Date of Last Status Change: 1999/09/03 YYYY/MM/DD

Revival/Restoration Date: 1999/09/03 YYYY/MM/DD

**Registered Office:**
Street:          1400, 350 - 7TH AVENUE SW
City:            CALGARY
Province:        ALBERTA
Postal Code:     T2P 3N9

**Records Address:**
Street:          1400, 350 - 7TH AVENUE SW
City:            CALGARY
Province:        ALBERTA
Postal Code:     T2P 2N9

Directors:

Last Name:          CHRISTIE
First Name:         MURRAY
Street/Box Number: 6340 DALBEATTIE HILL NW
City:               CALGARY
Province:           ALBERTA
Postal Code:        T3A 1M2

Last Name:          LAEGREID
First Name:         TRYGVE
Street/Box Number: FORUSBEEN 50, N-4035
City:               STAVANGER
Postal Code:        .
Country:            NORWAY

Last Name:          WEN
First Name:         RENJUN
Street/Box Number: 127 HAMPSHIRE GROVE NW
City:               CALGARY
Province:           ALBERTA
Postal Code:        T3A 5B3

Last Name:          WIRAK
First Name:         STANLEY
Street/Box Number: FORUSBEEN 50
City:               STAVANGER
Postal Code:        N-4035
Country:            NORWAY

Voting Shareholders:

Last Name:          OFFTECH INVEST AS
Street:             FORUSBEEN 50
City:               STAVANGER
Postal Code:        N4035
Country:            NORWAY
Percent Of Voting Shares: 15.9

Last Name:          SHI
First Name:         YAN
Street:             127 HAMPSHIRE GROVE NW

City:                               CALGARY
Province:                           ALBERTA
Postal Code:                        T3A 5B3
Percent Of Voting Shares: 27.43

Last Name:                          WEN
First Name:                         RENJUN
Street:                             127 HAMPSHIRE GROVE NW
City:                               CALGARY
Province:                           ALBERTA
Postal Code:                        T3A 5B3
Percent Of Voting Shares: 56.67

## Details From Current Articles:

The information in this legal entity table supersedes equivalent electronic attachments

| Share Structure: | THE ATTACHED SCHEDULE "A" IS INCORPORATED INTO AND FORMS A PART OF THIS FORM. |
|---|---|
| Share Transfers Restrictions: | THE ATTACHED SCHEDULE "C" IS INCORPORATED INTO AND FORMS PART OF THIS FORM. |
| Min Number Of Directors: | 1 |
| Max Number Of Directors: | 15 |
| Business Restricted To: | NONE |
| Business Restricted From: | NONE |
| Other Provisions: | THE ATTACHED SCHEDULE "B" IS INCORPORATED INTO AND FORMS A PART OF THIS FORM. |

## Other Information:

Last Annual Return Filed:

| File Year | Date Filed (YYYY/MM/DD) |
|---|---|
| 2005 | 2005/12/20 |

Filing History:

| | | |
|---|---|---|
| | | |

| List Date (YYYY/MM/DD) | Type of Filing |
|---|---|
| 1998/12/01 | Status Changed to Start for Failure to File Annual Returns |
| 1999/04/09 | Status Changed to Struck for Failure to File Annual Returns |
| 1999/09/03 | Initiate Revival of Alberta Corporation |
| 1999/09/03 | Complete Revival of Alberta Corporation |
| 2002/04/12 | Name Change Alberta Corporation |
| 2005/01/20 | Change Address |
| 2005/02/28 | Name/Structure Change Alberta Corporation |
| 2005/03/03 | Capture Microfilm/Electronic Attachments |
| 2005/12/20 | Enter Annual Returns for Alberta and Extra-Provincial Corp. |
| 2005/12/20 | Change Director / Shareholder |

### Attachments:

| Attachment Type | Microfilm Bar Code | Date Recorded (YYYY/MM/DD) |
|---|---|---|
| Share Structure | ELECTRONIC | 1999/09/03 |
| Other Rules or Provisions | ELECTRONIC | 1999/09/03 |
| Share Structure | ELECTRONIC | 2003/09/19 |
| Restrictions on Share Transfers | ELECTRONIC | 2003/09/19 |
| Consolidation, Split, Exchange | ELECTRONIC | 2003/09/19 |
| Shares in Series | ELECTRONIC | 2005/02/28 |
| Letter - Spelling Error | 10000902000624525 | 2005/03/02 |
| Amended Annual Return | 10000804100522342 | 2005/03/03 |

This is to certify that, as of this date, the above information is an accurate reproduction of data contained within the official records of the Corporate Registry.



This is Exhibit "D" referred to in
the Affidavit of Sarah Wilson
sworn before me September 27th, 2006

A Notary Public, etc.







This is Exhibit "E" referred to in
the Affidavit of Sarah Wilson
sworn before me September ⟩ 2006

A Notary Public. etc



Decide with Confidence

**D&B Small Business Solutions**

Close | Print

## Business Information Report: Geomodeling Technology Corp

© 2002 Dun & Bradstreet, Inc  All Rights Reserved.
Refer comments or questions to Customer Service.

Business Summary

| | |
|---|---|
| Geomodeling Technology Corp | RATING  - - |
| 640 5 Ave SW Suite 1510 | SUMMARY |
| Calgary AB T2P 0M2 | |
| | CONTROL YR  1996 |
| | SALES       2,000,000 |
| | EMPLOYS     30 |
| | RECORD      Incomplete |
| | OPERATION   Computer prgm deval |
| | SIC         7372 |

TEL   403 762-9172
FAX:  403 262-9171
DUNS: 25-371-5163
Renjun Wen, President

LAST FULL REVISION: SEP 14 2005
MOST RECENT UPDATE: JUL 01 2006

;==================================================================

Payments

D&B Canada receives millions of payment experiences each year. We enter these
new and updated experiences into D&B Reports as this information is received.
Below is a summary of the company's payments, segmented by the amount of
credit extended.

| IN FILE: | | NUMBER OF EXP | AMOUNT ($) | % TOTAL HIGH CREDIT AMOUNT | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | DISCT PROMPT | ---- DAYS SLOW ---- | | | |
| | | | | | 1-30 | 31-60 | 61-90 | 91+ |
| | | | | % | % | % | % | % |
| 12 months ending Jul 2006 | | 5 | 7500 | 100 | 0 | 0 | 0 | 0 |
| 3 months ending Jul 2006 | | 3 | 4500 | 100 | 0 | 0 | 0 | 0 |
| Credit extended: | $100.+ | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| (5000) | $50-99.9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | $15-49.9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | $5-14.9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | $1-4.9 | 5 | 7500 | 100 | 0 | 0 | 0 | 0 |
| | less than $1.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Trade at net terms | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Trade at discount | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Cash Experiences | | 0 | 0 | | | | | |
| Placed for Collection | | 0 | 0 | | | | | |
| Unfavourable Comments | | 0 | 0 | | | | | |

Note: In some instances, payments beyond terms can be the results of overlook-
ed invoices or disputed accounts. Remember that accounts are sometimes placed
for collection even though the existence of debt, or the amount, is disputed.

INDUSTRY PAYMENTS
_____

Below is a summary of the company's dollar-weighted payments, segmented by the
suppliers' primary industries:

|  | TOTAL RCV'D | TOTAL DOLLAR AMOUNTS | LARGEST HIGH CREDIT | % W/IN TERMS | ---- DAYS SLOW ---- | | | |
|---|---|---|---|---|---|---|---|---|
|  |  |  |  | % | 1-30 % | 31-60 % | 61-90 % | 91+ % |
| Total in D&B's file | 5 | 7500 | 1500 |  |  |  |  |  |
| Payment By Industry: |  |  |  |  |  |  |  |  |
| 1 INTERNATIONAL TRADE | 5 | 7500 | 1500 | 100 | 0 | 0 | 0 | 0 |
| Other Payment Categories: |  |  |  |  |  |  |  |  |
| Cash experiences: | 0 | 0 | 0 |  |  |  |  |  |
| Payment record unknown | 0 | 0 | 0 |  |  |  |  |  |
| Unfavorable comments | 0 | 0 | 0 |  |  |  |  |  |
| Placed for collection: |  |  |  |  |  |  |  |  |
| with D&B | 0 | 0 |  |  |  |  |  |  |
| other | 0 | N/A |  |  |  |  |  |  |

The highest "Now Owes" on file is $800.
The highest "Past Due" on file is $ 0.

DETAILED PAYMENT EXPERIENCES
_____

| DATE REPORTED | PAYMENT RECORD | HIGH CREDIT | NOW OWING | PAST DUE | SELLING TERMS | LAST SALE |
|---|---|---|---|---|---|---|
| 07-2006 | Ppt | 1500 | 0 | 0 |  | 1 mo |
| 06-2006 | Ppt | 1500 | 100 | 0 |  | 1 mo |
| 05-2006 | Ppt | 1500 | 0 | 0 |  | 1 mo |
| 04-2006 | Ppt | 1500 | 0 | 0 |  | 1 mo |
| 03-2006 | Ppt | 1500 | 800 | 0 |  | 1 mo |

=================================================================
Finance

     Estimated Profit & Loss for the 12 months ending 12-31-2004: Sales
     2,000,000.

     09-14-2005 Marion Maurer, Mgr - Office, deferred current financial
     statement but submitted the above figures and confirmed ownership
     and operation details.
     Lease expires 2009.

     09-14-2005 Marion Maurer, Mgr - Office, submitted the following
     estimates:

     Projected 12 months ending 12-31-2005: Sales 3,000,000.

=================================================================
History

     Corporation registered AB law 10-18-1996. Business commenced

11-1996.

Wen, Renjun, Pres, director.  Active with subject since 1996.  In
    current position since 1996.
Christie, Murray, Officer - Operation, director.  Active with
    subject since 2003.  In current position since 2005.  1997-
    2003 Paradam.
Klingbeil, Mark, Officer - Finance, director.  Active with subject
    since 2005.  In current position since 2005.
Zhuang, Donghai, Officer - Technical Service, director.  Active with
    subject since 2003.  In current position since 2003.
Laegreid, Trygve, director.  In current position since 2005.
Royland, Jan Inge, director.  In current position since 2005.

Operation
7372 0002 Provides development of computer programs or systems (software).
7372 9902 Provides business oriented computer software.
    Business peaks:  non-seasonal.
    Principal clients:  commercial concerns.  Principal territory:
    international.  Exports.  Principal selling terms:  net 30 100%.
    5 active accounts (5 active accounts last year).
    Employs 30.  (Employed 20 last year).
    FACILITIES.  Rents 557 sq.m. frame building.
    1 vehicles.  LOCATION: Central business section.

    SUBSIDIARIES
    Geomodeling Corp, Houston USA.
    Geomodeling Beijing Technology Corp, Beijing
    Geomodeling AS, Stavanger, Norway

    BMO Bank of Montreal, 8 ave 6th, Calgary, AB.

This report is prepared and provided under contract for the exclusive use of Harriet Giannoukos,Baker & McKenzie LLP
This report may not be reproduced in whole or in part by any means of reproduction.

Close |  Print



## D&B Small Business Solutions

Decide with Confidence

Close | Print

### Business Information Report : Geomodeling Technology Corp

℗ 2002 Dun & Bradstreet, Inc. All Rights Reserved
Refer comments or questions to Customer Service.

Business Summary

| | |
|---|---|
| Geomodeling Technology Corp | RATING -- |
| 540 5 Ave SW Suite 1510 | SUMMARY |
| Calgary AB T2P 0MZ | |

| | |
|---|---|
| CONTROL YR | 1996 |
| SALES | 2,000,000 |
| EMPLOYS | 30 |
| RECORD | Incomplete |
| OPERATION | Computer prgm devel |
| SIC | 7372 |

TEL:  403 262-9172
FAX:  403 262-9171
DUNS:  25-371-5163
Renjun Wen, President

LAST FULL REVISION: SEP 14 2005
MOST RECENT UPDATE: JUL 01 2006

Payments

J&B Canada receives millions of payment experiences each year. We enter these
new and updated experiences into D&B Reports as this information is received.
Below is a summary of the company's payments, segmented by the amount of
credit extended.

| IN FILE: | | NUMBER OF EXP | AMOUNT ($) | % TOTAL HIGH CREDIT AMOUNT | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | DISCT | PROMPT | 1-30 | 31-60 | 61-90 | 91+ |
| | | | | % | % | % | % | % |
| 12 months ending Jul 2006 | | 5 | 7500 | 100 | 0 | 0 | 0 | 0 |
| 4 months ending Jul 2006 | | 3 | 4500 | 100 | 0 | 0 | 0 | 0 |
| Credit extended | $100.+ | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 50000 | $50-99.9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | $15-49.9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | $5-14.9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | $1-4.9 | 5 | 7500 | 100 | 0 | 0 | 0 | 0 |
| | less than $1.0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Trade at net terms | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Trade at discount | | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Cash Experiences | | 0 | 0 | | | | | |
| Placed for Collection | | 0 | 0 | | | | | |
| Unfavourable Comments | | 0 | 0 | | | | | |

Note: In some instances, payments beyond terms can be the results of overlook-
ed invoices or disputed accounts. Remember that accounts are sometimes placed
for collection even though the existence of debt, or the amount, is disputed.

INDUSTRY PAYMENTS

Below is a summary of the company's dollar-weighted payments, segmented by the
suppliers' primary industries:

|  | TOTAL RCV'D | TOTAL DOLLAR AMOUNTS | LARGEST HIGH CREDIT | % W/IN TERMS % | --- DAYS SLOW --- | | | |
|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  | 1-30 % | 31-60 % | 61-90 % | 91+ % |
| Total in D&B's file | 5 | 7500 | 1500 |  |  |  |  |  |
| Payment By Industry: |  |  |  |  |  |  |  |  |
| 1 INTERNATIONAL TRADE | 5 | 7500 | 1500 | 100 | 0 | 0 | 0 | 0 |
| Other Payment Categories: |  |  |  |  |  |  |  |  |
| Cash experiences | 0 | 0 | 0 |  |  |  |  |  |
| Payment record unknown | 0 | 0 | 0 |  |  |  |  |  |
| Unfavorable comments | 0 | 0 | 0 |  |  |  |  |  |
| Placed for collection |  |  |  |  |  |  |  |  |
| with D&B | 0 | 0 |  |  |  |  |  |  |
| other | 0 | N/A |  |  |  |  |  |  |

The highest "Now Owes" on file is $800.
The highest "Past Due" on file is $ 0.

DETAILED PAYMENT EXPERIENCES

| DATE REPORTED | PAYMENT RECORD | HIGH CREDIT | NOW OWING | PAST DUE | SELLING TERMS | LAST SALE |
|---|---|---|---|---|---|---|
| 07-2006 | Ppt | 1500 | 0 | 0 |  | 1 mo |
| 06-2006 | Ppt | 1500 | 100 | 0 |  | 1 mo |
| 05-2006 | Ppt | 1500 | 0 | 0 |  | 1 mo |
| 04-2006 | Ppt | 1500 | 0 | 0 |  | 1 mo |
| 03-2006 | Ppt | 1500 | 800 | 0 |  | 1 mo |

Finance

        Estimated Profit & Loss for the 12 months ending 12-31-2004:  Sales
        2,000,000.

        09-14-2005 Marion Maurer, Mgr  Office, deferred current financial
        statement but submitted the above figures and confirmed ownership
        and operation details.
        Lease expires 2009.

        09-14-2005 Marion Maurer, Mgr - Office, submitted the following
        estimates:

        Projected 12 months ending 12-31-2005:  Sales  3,000,000.

History

        Corporation registered AB law 10-18-1996.  Business commenced

11 1996.

Wen, Renjun, Pres, director.  Active with subject since 1996.  In
    current position since 1996.
Christie, Murray, Officer - Operation, director.  Active with
    subject since 2003.  In current position since 2005.  1997-
    2003 Paradam.
Klingbeil, Mark, Officer - Finance, director.  Active with subject
    since 2005.  In current position since 2005.
Zhuang, Donghai, Officer - Technical Service, director.  Active with
    subject since 2003.  In current position since 2003.
Laegreid, Trygve, director.  In current position since 2005.
Royland, Jan Inge, director.  In current position since 2005.

=================================================================

**Operation**
7372 0003 Provides development of computer programs or systems (software).
7372 9902 Provides business oriented computer software.
          Business peaks:  non-seasonal.
          Principal clients:  commercial concerns.  Principal territory:
          international.  Exports.  Principal selling terms:  net 30 100%.
          5 active accounts (5 active accounts last year).
          Employs 30.  (Employed 20 last year).
          FACILITIES: Rents 557 sq.m, frame building.
          1 vehicles.  LOCATION: Central business section.

          SUBSIDIARIES
          Geomodeling Corp, Houston USA
          Geomodeling Beijing Technology Corp, Beijing
          Geomodeling AS, Stavanger, Norway

          BMO Bank of Montreal, 8 ave 6th, Calgary, AB.
=================================================================

This report is prepared and provided under contract for the exclusive use of Harriet Giannoukos,Baker & McKenzie LLP.
This report may not be reproduced in whole or in part by any means of reproduction.

Close |  Print

Court File No.

# FEDERAL COURT

BETWEEN:

## SCHLUMBERGER CANADA LTD.

Plaintiff

- and -

## GEOMODELING TECHNOLOGY CORP.

Defendant

### AFFIDAVIT OF SARAH WILSON

BAKER & McKENZIE LLP
Barristers & Solicitors
BCE Place, Suite 2100
181 Bay Street
Toronto, Ontario
M5J 2T3

Jim Holloway (343074)
jim.holloway@bakernet.com
(416) 865-1221 - telephone
(416) 863-6275 – facsimile

Carlos M. de Vera
carlos.m.devera@bakenet.com

(416) 865-2339 – telephone
(416) 863-6275 – facsimile

Solicitors for the Plaintiff

TAB 4

Court File No.

## FEDERAL COURT

BETWEEN:

### SCHLUMBERGER CANADA LTD.

Plaintiff

- and -

### GEOMODELING TECHNOLOGY CORP.

Defendant

## AFFIDAVIT OF KEITH TUSHINGHAM
### Sworn on September 6th, 2006

I, KEITH TUSHINGHAM, of the City of Houston, in the State of Texas, in the Province of Alberta, MAKE OATH AND SAY:

1.    I am employed by Schlumberger Information Systems ("SIS"), as the Ocean Portfolio Manager. I have worked in the Schlumberger organization for over 20 years, throughout the world. By way of technical background, I was educated as a geologist. By virtue of my position as the company's Ocean Portfolio Manager, I am personally familiar with that product (the "OCEAN Program"), our seismic-to-simulation software PETREL software application (the "PETREL Program"), the terms and conditions governing the use of these applications, and my company's various licensees. I thus have personal knowledge of my evidence. In those situations where my evidence is based on information that I have received from others, I have identified the source of my information and, in each case, I verily believe it to be true.

2.   The PETREL Program is a key SIS software application, which is currently licensed for an average global price of approximately US $160,000 per copy, although this can be higher for the full program with all modules. This application is an integrated Windows-based solution that enables end-user customers to capture and manage subsurface information and data, such as seismic interpretation and reservoir simulation, used for oil and gas exploration and extraction. The application is comprised of modules, including geophysics, geology, reservoir engineering, well engineering, and data and results viewer. It is used by many of the leading companies globally in the oil and gas industry. I have attached as *Exhibit A* to my affidavit a true copy of information regarding the PETREL application.

3.   The OCEAN Program is a development platform on which the PETREL Program is based but which can also be used by our licensees to create their own proprietary applications that can be integrated with or plugged into our PETREL Program, for separate sale to those who are licensed through SIS to use the PETREL Program. Our licensees can either use the plug-ins they create for their own internal purposes or, alternatively, can license these to third parties, depending upon the type of license they purchase. I have attached as *Exhibit B* to my affidavit a true copy of information regarding the OCEAN application.

4.   Under our OCEAN Program license, licensees receive a full version of the PETREL 2007 pre-alpha developers' release, which they are entitled to use solely for non-commercial purposes (i.e. for ensuring that their own applications will integrate and interact with the PETREL Program as intended). This license does not give the user the rights to have or to use any earlier versions of the PETREL Program or to use PETREL 2007 for any purpose other than creating their own plug-in applications or writing code to interact with PETREL objects.

5.   According to our license database records, which I have reviewed, Geomodeling Technology Corp. ("GTC") of Calgary, Alberta has one license for our OCEAN Program (Dongle ID 1-7Q1PP4/151F), which would include the aforementioned

2

version of our PETREL Program. Under the license terms, GTC is authorized to use the product solely for the purpose of developing its own integrated software applications. I have attached as *Exhibit C* to my affidavit a true copy of the GTC purchase order (dated December 12, 2005) along with the terms and conditions and an addendum thereto governing use of the OCEAN Program.

6.     According to our license database records, which I have reviewed, GTC is not a separate PETREL Program licensee nor is it authorized to have or to use any software version prior to the 2007 version, which was included with the OCEAN Program. More particularly, it is not licensed to have or to use any version of the PETREL Program with a 2003, 2004 or 2005 build date.

7.     I have reviewed photographs of the PETREL Program which, I understand, are running on GTC computers in Calgary. In reviewing these images, I note that they relate to PETREL version 2004, with a build date of February 25, 2005. I have reviewed our license database records and can confirm that GTC is not authorized to have or to use this version of that software. Without question, this copy of the PETREL Program would not have been included along with the OCEAN Program. I have attached these photographs as *Exhibit D* to my affidavit. By way of reference, I have attached as *Exhibit E* to my affidavit a true copy of the image that would appear if a copy of the program that GTC is licensed to use was opened on a CPU. As can be seen, it is different.

SWORN BEFORE ME at the
City of Houston, in the State of Texas, one
of the United States of America, this     GK
day of September 2006

_____
A commissioner, notary public, &c.

$$K-T\zeta\gamma.$$

Keith Tushingham

GWENLYN JEAN KING
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
JULY 21, 2007

3

This is Exhibit "A" referred to in
the Affidavit of Keith Tushingham
sworn before me September 6th , 2006

A Notary Public. etc

GWENLYN JEAN KING
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
JULY 21, 2007

Schlumberger Information Solutions

**Schlumberger**

Jennie Salazar
IP Counsel, SIS
5599 San Felipe, Suite 1700
Houston, TX 77056
Direct (713) 513-3754
Fax(713) 513-2056
email: jsalazar9@slb.com

August 14, 2006

Jim Holloway
Baker & McKenzie LLP
BCE Place, Suite 2100
181 Bay Street, P.O. Box 874
Toronto, Ontario, Canada M5J 2T3

Re:    PETREL Brochures

Dear Jim,

Per your request, I have enclosed a brochure of the Petrel software program. Please let us know if you need anything further.

Yours truly,

Jennie Salazar
IP Counsel, SIS

# Schlumberger



# Petrel

Geology • Geophysics • Reservoir Engineering





"It's like having an extra geologist sitting there; it's telling you things that you didn't know; it's testing your theories like you never saw before and helping you come up with new ideas."
David E. Hamilton, SCM Inc

"There are a number of software packages on the market that are integrated, but there is something unique about Petrel."
Mike Bahorich, Apache





"We drilled 27 wells last year with a 30 percent increase in economic completions—which was equivalent to drilling eight wells for free."
Larry Brooks, Pioneer Natural Resources

# Unified team. Unified earth model.



n the past, interpretation was performed in domain-specific software applications built in a data-centric world. Information was passed from geophysicist to geologist to reservoir engineer, data import and export were commonplace, and knowledge transfer was limited. Today, this is no longer the case. Petrel workflow tools apply a model-centric methodology to the entire process, from prospecting through production.



### Why is this important to you?

Are your geophysicists, geologists, and reservoir engineers sharing their knowledge effectively? Are they using all the capabilities available to them?

Is your current reservoir description predictive, honoring all data and domain expertise, production history, geology, and geophysics?

Are you getting enough information out of your investment in 3D seismic, and are you making the best, most informed development and production decisions possible?



How do you evaluate uncertainty in your existing seismic interpretations, risk the presence of reservoir away from well control, or incorporate production barriers in your models?

How do you know which alternative model realization makes a difference to development decisions? What if you could test multiple scenarios easily?

Do you have the tools you need to easily identify and recover bypassed oil, and to achieve accurate reserves estimates and production forecasts?



Are you sure your reservoir description has captured the geological features that impact reservoir performance?

Does it currently take you too long to update your reservoir simulation models with new information or perform a history match?

What if your geoscientists and engineers could do all their work from the same hardware?

Wouldn't you like a truly integrated system that lets you do away with awkward hand-offs between domain specialists?



### Faster, better decisions

An integrated asset team can now collaborate on a unified earth model using a single software system, eliminating the barriers that once existed. No more hand-over-the-wall data transfers, with the associated inaccuracies and errors.



Combining the expertise of entire asset teams in a single, unified system results in unprecedented efficiency and accuracy. Combined with other Schlumberger and third-party products and services within The Living Model™ workflow, Petrel software provides measurable improvements in exploration and production operational processes.





# For the **first time,** a **seamless workflow** for the subsurface



n today's oil and gas industry, aligning the knowledge of many into the focused power of one is the prevailing direction of change. Integrated operations; collaborative workflows; seamless technologies: combining forces achieves greater efficiency, cleaner data handling, and streamlined processes.

For the first time, one software solution unites the subsurface domains of geophysics, geology, and reservoir engineering. Petrel™ workflow tools is the complete seismic-to-simulation solution. Now, traditional communication, workflow, and software barriers between technical disciplines are eliminated, opening the way for real-time reservoir description.

Petrel is an integrated Windows®-PC software solution encompassing seismic interpretation through reservoir simulation. With Petrel, all work processes lead to one unified earth model, enabling faster, better decisions.

### One view. One cohesive process. One shared goal.



"When the disciplines in the team are more integrated, then the product that each discipline produces is a lot more relevant to the needs of the team. For example, the petrophysical properties, the zonations, the facies predictions, are all very much fit-for-purpose because the team is working together. There is no extra work."
John Nieto, Anadarko

# Petrel

The first single software solution for:

- 2D & 3D seismic interpretation
- Seismic volume rendering and extraction
- Seismic attribute creation
- Structural modeling
  Time and depth conversion
- Velocity modeling
- Well correlation
- Mapping and plotting
- Well log upscaling
- Data analysis
- Facies modeling
- Petrophysical modeling
  Volume calculations
- Fault seal analysis
- Simulation grid design
- Upscaling
- Pre and post processing of reservoir simulations
  Reservoir simulation run and case management
  History matching
- Well design
- Uncertainty analysis



 enabled

To learn more about Petrel, visit www.sis.slb.com/petrel.



March 2005
© 2005 Schlumberger Information Solutions. All rights reserved. The enabled and design are service marks of Schlumberger.

**Schlumberger**

# Petrel

# Schlumberger

## GEOLOGY

dentifying and recovering hydrocarbons requires an accurate, high resolution geological model of the reservoir structure and stratigraphy. The geology capabilities found within Petrel™ workflow tools, all seamlessly unified with the geophysical and reservoir engineering tools, enable an integrated study by providing an accurate static reservoir description that evolves with the reservoir.

For geologists wishing to spend their time on geological questions rather than software challenges, Petrel software is the ideal solution. The overall ease-of-use, linked displays, and automated update capabilities enable the geologist to be effective in assessing and understanding the subsurface. Petrel software offers a full suite of geology tools including traditional marker picking, well correlation, mapping, and plotting, in addition to 3D geocellular modeling.



The Core module is your entry point to Petrel workflow tools, and is needed for running the various geological and geophysical modules. The system includes tools for 2D and 3D visualization,



mapping and plotting, 3D grid building, workflow editing, well log calculations, synthetic seismograms, and stereo imaging.

### Workflow editing

An integral part of the seismic-to-simulation workflow, the Workflow Editor function captures data relationships and parameters, enabling

you to rapidly update models as new data arrives, create multiple model realizations to assess the impact on volumetrics, or cost a well placement strategy. Overall, the editor reduces project cycle time and maximizes your productivity.

### 3D grid building

Generating a structural model is an iterative process. Faults and horizons are

Case 1:14-cv-00112-LY   Document 48-22   Filed 08/15/14   Page 88 of 151

# Petrel

## GEOLOGY



**enabled**

interpreted and created in true 3D, which results in precise fault intersections and accurate cell volumes, and makes modeling reverse faults possible. As new data arrives, inconsistencies often appear in the structural framework. Using the Workflow Editor, updating structural models and re-running surface-to-surface calculations take only a matter of minutes.

Petrel software offers well correlation in a 3D window or traditional 2D views. Well formatting templates are created for individual wells and are applied globally, adding gaps for faults or repeated sections, and split panels for horizontal well inter-



pretation. Synthetics, image logs, and dip/azimuth tadpoles can be added to the display to maximize your interpretation. Displays can be seen in all depth indices, while marker picking and correlating horizons across multiple wells are accomplished by picking on the well trace in 3D or 2D windows.

### Mapping and Plotting

Using gridding and contouring algorithms, developed for and proven in CPS-3™



mapping and surface modeling software, it's a simple task to create structural, isochore, isopach, or net sand maps. Interactively edit your grid and contours, and with one click, create your final presentation map or view your grid in 3D.

### Classification and Estimation

Neural Networks have emerged as proven technology to address data estimation and forward modeling problems. The Classification and Estimation module provides an ideal alternative to geostatistics





when co-kriging or co-simulation with a single secondary data source is too restrictive. Classification and Estimation provides another option to the current object modeling and geostatistical property estimation offering found within Petrel software, and it introduces new workflows for log estimation, property mapping, and seismic classification.

### Fault Analysis

Once the static reservoir description is complete, the asset team still needs to know whether faults are sealing or open to flow in order to develop a proper

field plan. The Fault Analysis module allows you to calculate fluid flow properties and sealing potential for all faults in the reservoir and is the next logical workflow step prior to reservoir simulation.

Geological models, built to honor structure and stratigraphy, are rarely conditioned to production data. Simulation models, while honoring the dynamic data, only approximate geological complexities. Petrel software keeps the geological and simulation models in step with one another, and provides for smooth and efficient fluid flow simulation using the simulators found in ECLIPSE® reservoir simulation software. With Petrel workflow tools, you have updatable, dependable reservoir models on which to base business decisions throughout the life of the asset. Petrel software is a key enabler of real-time field management.



www.sis.slb.com/petrel

# Schlumberger

© 2003 Schlumberger Information Solutions. All rights reserved. Petrel and CPS-3 are trademarks of Schlumberger. The in-abled and design are service marks of Schlumberger. Produced by Schlumberger Marketing Communications  06.IC.046

# Petrel

# Schlumberger

## GEOPHYSICS

eflection data is the primary input for resolving structural and lithological contradictions between points of well control in the majority of the world's sedimentary basins. For qualifying exploration prospects on 2D or 3D datasets or sub-volumes of large regional surveys, or for performing seismic interpretation during appraisal, development, and production phases, Petrel™ geophysics tools offer outstanding integration, usability, and repeatability.

In these situations and more, Petrel workflow tools offer outstanding integration, usability, and repeatability.

Petrel software provides the tools to perform all traditional seismic interpretation tasks





involved in 2D/3D/4D subsurface workflows. Without ever leaving the application's user-friendly interface, the geophysicist can interpret horizons and faults, generate synthetic seismograms, analyze and correct mistie errors between 2D lines, perform time-to-depth conversions, create maps, and gather the information required to support the next well proposal.

Fully unified with the geology and reservoir engineering tools, seismic interpretations and structural models can be easily domain converted to integrate with depth-indexed data. Petrel software provides a suite of seismic attributes that, combined with the data analysis and cross-plotting tools, help asset teams understand how these attributes relate to

reservoir properties. Using 3D neural network technology, geophysicists can quickly identify patterns in multiple seismic attributes that may indicate hydrocarbon content.



Automated Structural Interpretation

Accurate structural interpretation is critical throughout the exploration and production (E&P) cycle. Fault compartmentalization is

# Petrel

## GEOPHYSICS



fundamental to forecasting reservoir production and well planning.

For years it has been possible to spatially interpret horizon reflections, but fault interpretation has been more subjective.

The Ant Tracking™ algorithm significantly accelerates the fault interpretation exercise. The technique results in a 3D volume that presents a superior delineation of faults and is used to automatically extract fault surfaces by using intelligent search algorithms, 3D visualization, and data analysis tools. It allows interpreters to spend time understanding fault and fracture trends and make correlations from automatically extracted fault patches instead of creating fault surfaces individually. The speed and accuracy of combined horizon and fault interpretation will reduce project cycle time, uncertainty, and risk.

### Workflow editing

An integral part of the seismic-to-simulation workflow, the Workflow Editor function captures data relationships and parameters, enabling you to do time-to-depth conversion with variable velocity models, analyze structural modeling uncertainty, or perform complex seismic attribute calculations. Overall, the editor reduces project cycle time and maximizes your productivity.

### Multitrace Attributes

The addition of new 3D seismic attributes



paves the way for new workflows for seismic interpretation. Seismic attributes help to condition conventional amplitude seismic data for better structural interpretation tasks. They also help isolate hidden seismic stratigraphic features that can be included in the modeling workflow. The attribute generation process in Petrel software contains a vast library of different seismic attributes for display and use with the innovative techniques in seismic interpretation and reservoir characterization workflows.

### Seismic Rendering

It is now possible to visualize gigabytes of seismic data on a single laptop or desktop CPU. For many volume-rendering technologies, a large volume is one gigabyte. Today, many datasets commonly exceed tens or even hundreds of gigabytes. These datasets easily exceed the available system memory, especially on 32 bit machines, and stretches or exceeds the available graphics capabilities of common hardware systems.

Petrel technology allows the rendering of extremely large datasets with reliable

interactive navigation even on relatively low-end machines. The user perceives that any portion of a seismic volume can be displayed immediately. The volumes can be navigated smoothly, slices and probes are responsive, and image quality is automatically managed to the best possible level.

Seismic data is the key enabler in the search for new oil and gas reserves. Whether you are in the early stages of exploration where only 2D seismic is available or carrying out a full-scale integrated geophysical study in a producing field, Petrel workflow tools are the technology of choice to help you extract the maximum value from your seismic data and reduce the risk of drilling a dry well.



www.sis.slb.com/petrel

# Schlumberger

© 2005 Schlumberger Information Solutions. All rights reserved. Petrel and Ant Tracking are trademarks of Schlumberger. The enabled and design are service marks of Schlumberger.

# Petrel

# Schlumberger

## RESERVOIR ENGINEERING

low predictions based on a static model provide good approximations of initial expected production rates and pressures during various field operations. However, these predictions are rarely accurate for long; significant changes occur as fluids are produced and injected into the reservoir. The ideal solution is to derive reservoir performance forecasts through the use of a dynamic earth model—one which evolves with the reservoir.

Petrel™ workflow tools bring the full power of the Living Model™ to bear on reservoir engineering. Changes in the seismic interpretation or the geological model easily cascade through to the simulation model, and back. The impact of the changes on production rates or reserves can then be evaluated in a fraction of the time previously achievable.

Petrel software allows reservoir simulation to be carried out based on current geological and geophysical earth models. You can history match up to today's production figures and then complete the results with economic and uncertainty analysis on expected outcomes. Compatible with the various simulators found within the ECLIPSE® reservoir simulation software family, Petrel software will enable as detailed an analysis as required by your business or operational issues.



### The Core

The Core module provides functionality to build ECLIPSE simulation models directly from your geological models, and add fluid properties, well completions, production history, and event scheduling. Organize your geological realizations and development scenarios into cases. Select and launch the appropriate ECLIPSE simulator and analyze your results all within your Petrel toolkit.

### Workflow editing

An integral part of the seismic-to-simulation workflow, the Workflow Editor function captures data relationships and parameters, enabling you to rapidly update simulation models as new data arrives, perform case and run management for detailed simulation history matching, or undertake uncertainty analysis during field development planning. Overall, the editor reduces project cycle time and maximizes your productivity.

### Advanced Gridding and Upscaling

A variety of upscaling techniques is provided to resample fine-scaled geological models to coarser-scale simulation models. Choose between an assortment of



averaging methods including a flexible tensor upscaling function for determining effective permeability in each simulation cell.

The gridding techniques include independent local grid refinement objects (LGRs) for solving

# Petrel

# RESERVOIR ENGINEERING

 enabled

problems associated with coning, horizontal wells, closely spaced wells and multilaterals and Stair Step (IJK) gridding, ensuring grid orthogonality when faults are highly inclined.

## History Match Analysis

The process of history matching can be time consuming and difficult when you have many simulation runs, many wells, and many properties to consider. With



the History Match Analysis module you can easily and quickly analyze multiple ECLIPSE reservoir simulation runs to isolate the most likely realization, or identify the area of the model that requires additional adjustment, allowing you to arrive at the best history match, sooner.

## Well Design

Design wells interactively by digitizing the path directly in the 3D window. Digitize on any type of data including raw seismic, property models, or simulation results. Edit well nodes in the 3D window or in the spreadsheet editor, or copy and paste into Windows® Excel® for editing. Data points describing the new well are easily passed on to Inside Reality® virtual reality technology, Osprey Risk™ drilling risk

prediction model, or Drilling Office™ integrated drilling software. Given a set of reservoir targets, the Well Cost Optimizer, part of the Well Design module, can automatically generate well trajectories and platform locations that minimize the total cost of your drilling program.

## Data and Results Viewer

The Data and Results Viewer provides easy access for viewing well and seismic data, reservoir interpretations, and simulation results. This lightweight tool is ideal for simulation engineers, managers, and stakeholders. The viewer provides viewing





access to all data items found in a project, without the overhead of learning individual Petrel software modules.

The difficulty in preparing input to and analyzing the results from reservoir simulation has historically created a gap between asset team members due to the need for many manual time-consuming data-transfer and data-formatting steps. Traditionally, only specialists use reservoir simulation, following a steep learning curve. As a result, reservoir simulation is not utilized in many business decisions where it would add tremendous value. The solution was to integrate the necessary workflows surrounding simulation, make the data flows transparent to the user, and the interface easy to learn. Petrel workflow tools provide the ideal solution.

www.sis.slb.com/petrel

# Schlumberger

© 2005 Schlumberger Information Solutions. All rights reserved. Petrel, Osprey Risk, and Drilling Office are trademarks of Schlumberger. The Living Model is a service mark of Schlumberger. ECLIPSE and Inside Reality are registered trademarks of Schlumberger.

# ECLIPSE

## Schlumberger

### RESERVOIR SIMULATION

he combination of Petrel™ workflow tools and ECLIPSE® reservoir simulation software eliminates the workflow issues that commonly exist between geology, geophysics, and reservoir engineering activities.

You can build simulation models directly from your geological models, and add fluid properties, well completion, production history, and event scheduling. You can prepare, run, and analyze any ECLIPSE family reservoir simulator run to understand the dynamic nature of your models.

You can organize your geological realizations and development scenarios into cases, select and launch the appropriate ECLIPSE simulator, and analyze the results and update your model all from within your Petrel toolkit.

The ECLIPSE reservoir simulation family, including FrontSim™ streamline reservoir simulation software as well as Blackoil™, Compositional™, and Thermal™ reservoir simulation software solutions, offers a full range of robust, accurate, and fast numerical simulation solutions for all kinds of reservoirs and all degrees of complexity.

By choosing from various add-on options —such as coal bed methane, gas field operations, calorific value-based controls, reservoir coupling, and surface networks —ECLIPSE simulators can be tailored to your needs, to greatly enhance the scope of your simulation studies.



**ECLIPSE FrontSim**

A three-phase, 3D simulator that models multiphase fluid flow along streamlines, ECLIPSE FrontSim streamline reservoir simulation software

allows you to visualize fluid flow in the reservoir. This offers more timely information than traditional simulators on key reservoir problems like model ranking and upscaling, water flood management, and initial history matching.





# ECLIPSE

# RESERVOIR SIMULATION



*enabled*

## ECLIPSE Blackoil

**ECLIPSE Blackoil reservoir simulation software is a fully implicit, three-phase,**



three-dimensional, general purpose black oil simulator and includes versatile well, group, and economic controls, and automated drilling and workflow features.

## ECLIPSE Compositional

An n-component compositional reservoir simulator with a cubic equation of state, pressure dependent K-value, and black oil fluid treatment, ECLIPSE Compositional reservoir simulation software is useful when the composition of the hydrocarbons is changing with regard to temperature and pressure.

## ECLIPSE Thermal

Thermal recovery methods are typically used in heavy oil reservoirs where the oil viscosity is high at reservoir temperatures; but reduces to a flowable viscosity with temperature increases. With ECLIPSE Thermal reservoir simulation software, the ECLIPSE Blackoil simulator is extended to study problems such as steam injection, hot fluid or gas injection, well bore heaters, simple combustion, and steam assisted gravity drainage (SAGD).

## ECLIPSE Parallel

Operating on multiple processor hardware enables reservoir simulation to be carried out in a shorter time than is possible with a single processor. Parallel technology may be applied to ECLIPSE Compositional, Thermal, and Blackoil simulators.



The parallel processing feature allows reservoir simulation to be distributed across a user-defined number of processors.



**ECLIPSE Parallel™ multiprocessor reservoir simulation software running on Intel® architecture typically cost one-fifth to one-tenth the price of Reduced Instruction Set Computing (RISC)-based systems.** This cost-effectiveness gives oil and gas companies the opportunity to make faster, better-informed decisions to optimize production while lowering cost and business risks. Customers also receive greater flexibility and on-demand scalability to respond to changing business conditions.

Reliable and timely reservoir decisions demand a robust and accurate reservoir simulator, the ability to investigate the impact of uncertainty, and a consistent, up-to-date reservoir model. Petrel workflow tools and ECLIPSE reservoir simulators work together to greatly enhance the scope and results of your simulation



**www.sis.slb.com/petrel**

# Schlumberger

© 2005 Schlumberger Information Solutions. All rights reserved. Blackoil, Compositional, FrontSim, Petrel, Parallel, and Petrel are trademarks of Schlumberger. ECLIPSE is a registered trademark of Schlumberger.

This is Exhibit "B" referred to in
the Affidavit of Keith Tushingham
sworn before me September $\mathcal{GL}$ , 2006

A Notary Public. etc

GWENLYN JEAN KING
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
JULY 21, 2007

# Schlumberger

# Ocean

## What is Ocean* ?

Ocean is an open software development framework being developed by Schlumberger to provide a fast moving unified Petrotechnical Desktop environment which will simplify and accelerate the development of software to support seismic to simulation, drilling and production workflows. Ocean will provide software development teams with an extensible framework to create user workflows which can leverage and extend the Petrel*, Osprey*, Merak* and Avocet* suite of applications

## Why is it important?

Ocean manages much of the plumbing for E&P software with this feature-rich set of APIs, thereby allowing software developers to focus on the business logic of their applications. This will facilitate an accelerated delivery of technological innovation and significantly reduce the time-to-market.

## Why would end-users be interested?

Ocean provides a set of interfaces (APIs) to support powerful software features such as graphical canvases (3D and 2D), data tree, process manager, unit and coordinate system services, federated data access, security, licensing and entitlement.

This extensible framework will facilitate us in moving from a single user environment towards an enterprise solution our clients have been requesting. It also allows for a common architecture in which domains can inter operate seamlessly.



Figure 1: Drilling data incorporated into Petrel on Ocean

## When will Ocean be available?

The Atlantic 2006.1 release will be available in April 2006 and the 2006.2 release will be available in September 2006. Details of the footprint are shown in Figure 2.

## Who is currently engaged with Ocean?

Software developers in SIS are using the Ocean framework to develop Seismic to Simulation, and Drilling software. Developers across Schlumberger are using it to develop Geomechanics, Structural Modeling, and Imaging to Interpretation software. R&D teams in major oil companies and major resource holders are evaluating Ocean to integrate their custom algorithms and proprietary technologies within Schlumberger products like Petrel. Several third party niche software vendors are considering Ocean to develop components, plug-ins, and applications that integrate with Schlumberger software.



# Schlumberger

# Ocean

|  | Create | Read | Update | Delete |
|---|---|---|---|---|
| Borehole | ✓ | ✓ | ✓ | ✓ |
| Well Logs | ✓ | ✓ | ✓ | ✓ |
| Well Markers | ✓ | ✓ | ✓ | ✓ |
| Seismic Data | ✓ | ✓ | ✓ | ✓ |
| Seismic Interpretation | ✓ | ✓ | ✓ | ✓ |
| Horizons, Faults, Zones | | ✓ | ✓ | ✓ |
| Basic Shapes | ✓ | ✓ | ✓ | ✓ |
| Pillar Grid | ✓(properties) | ✓ | ✓(geometry) | |
| Simulation | | ✓ | | |

Figure 2 : Data item footprint in Ocean 2006.1 release

## Well Domain

### Borehole
- Create with or without well deviation survey
- Geometrical transform of positions (MD, TVD, TVDSS, TWT, etc.)
- Append points to well deviation survey
- Time log used for time/depth conversion

### Well Logs
- Created with Property Version
- Read log values
- Samples may be modified
- Samples may be appended to log

### Well Markers
- Created with reference to horizon or fault
- Read per well or stratigraphy column
- Properties and X,Y,Z point may be retreived
- Can retrieve borehole from marker

## Seismic

### Data
- Create a copy of existing 3D cube
- Create 3D cube (2006.2)
- Create decimated sub cube (2006.2)
- Read virtual, cropped, SEG-Y, realized cubes
- Update cropped, SEG-Y, realized cubes
- Transform I,J,K to X,Y,Z transform

### Interpretation
- Read point set (x,y,z)
- Read domain (time, depth)
- Read type (horizon, fault)
- Write horizons as one point per bin
- Write faults picks as point in fault stick

## Stratigraphy

### Horizons, Faults, Zones
- Read horizons by name
- Find horizon from zone
- Find marker from horizon
- Read zones and sub-zones in collections
- Update horizon name, description, type
- Deleting horizon or fault will also delete dependent markers

## Structural Model

### Basic Shapes (Surface, polyiines, points)
- Read gridded surface
- Read enumerated points for polyline
- Read set of points for point set or surface
- Access properties for shapes
- Write back entire point set

## GeoModeling

### Pillar Grid
- Create property objects with property version
- Read geometry, properties, fault nodes, horizon K levels, zones, segments, fault properties
- Perform I,J,K to X,Y,Z transform and vice versa
- Find grid from structural elements
- Update properties
- Nudge horizon along pillar grid

## Simulation

### Cases
- Read properties for case definition and case runs

### Summaries
- Read properties for summary categories and results



Ocean, Petrel, Osprey, Avocet & Merak are Marks of Schlumberger   Copyright 2006   For more information email - KFrew@slb.com

This is Exhibit "C" referred to in
the Affidavit of Keith Tushingham
sworn before me September $\cancel{6}$, 2006

A Notary Public, etc

GWENLYN JEAN KING
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
JULY 21, 2007

This is Exhibit "C" referred to in
the Affidavit of Keith Tushingham
sworn before me ~~August~~ 6th , 2006
Sept

A Notary Public. etc.



## GEOMODELING

### Purchase Order

Geomodeling Technology Corp.
1100, 665 - 8 Street S.W.
Calgary, AB
T2P 3K7
403 262 9172
403 262 9171

#### P.O. issued to:
Schlumberger Canada Limited
600, 322 - 11 Avenue SW
Calgary, AB
T2R 0C5
Attention: Wendy Klein

| P.O. number: |
|---|
| 2005185 |
| Date: |
| 12/12/2005 |
| Ordered by: |
| Renjun Wen |
| Ship via: |
| |
| Ship to attn: |
| Renjun Wen |
| Ship by date: |
| |

| Item number or name | Quantity | Price/unit | | Total price |
|---|---|---|---|---|
| Software and Maintenance per Quotation 20238626 | | | $ | - |
| | | | $ | - |
| Software purchase | 1 | $22,000.00 | $ | 22,000.00 |
| Software maintenance | 12 | $367.00 | $ | 4,404.00 |
| | | | $ | - |
| | | | $ | - |
| | | | $ | - |
| US Dollars | | | | - |
| | | | $ | - |
| | | | $ | - |
| | | | $ | - |
| | | Subtotal | $ | 26,404.00 |
| | | GST Rate | % | 0.07 |
| | | GST | $ | 1,848.28 |
| | | Other | | |
| | | **TOTAL** | $ | 28,252.28 |
| | | | US Dollars | |

Authorized signature                    Date    12/12/2005

Purchase order number must appear on all invoices and correspondence.

## GENERAL TERMS AND CONDITIONS FOR PRODUCTS AND SERVICES

The following are the General Terms and Conditions under which Company sells, leases, and/or licenses Products and/or performs Services.

**1.0    Definitions**

1.1    "Agreement" shall mean Company's Quotation to Customer; these General Terms and Conditions for Products and Services, and applicable Supplemental Terms and Conditions and any addendum thereto.

1.2    "Documentation" refers to manuals, handbooks, maintenance libraries, and other publications in whatever form listed in Company's Price List or supplied in connection with Products or Services.

1.3    "Equipment" refers to computer-related hardware and other equipment that is listed in Company's Quotation to Customer.

1.4    "External Software" refers to stand-alone, off-the-shelf application software packages listed in Company's Quotation which are licensed or leased to Customer in accordance with the Agreement by the applicable third party software vendors. Such third party software vendors are third party beneficiaries to the Agreement with Customer and shall have the right to enforce the terms and conditions of the Agreement to the extent that they apply to External Software.

1.5    "Intellectual Property" means all trademarks or trade names (whether common-law or registered), patents, mask works, patents, patent applications, copyrights (whether published or unpublished), trade secrets, know-how, designs, methods, processes, work-flow, inventions, proprietary information and transferable rights under written agreements relating to the Products and Services.

1.6    "Party" refers to Company or Customer; "Parties" refers to Company and Customer.

1.7    "Products" refers to items listed in Company's Quotation to Customer, including but not limited to Software and Equipment.

1.8    "Proprietary Information" refers to, without limitation Software (including all enhancements, updates, corrections, derivative works and other modifications thereto), Documentation, diagnostic software, equipment or other materials used by Company in the performance of installation, warranty work or services; Equipment design information; Company supplied printed materials; visually transmitted information; and any modifications or components thereof, whether made by Company or Customer.

1.9    "Quotation" refers to Company's written quotation form or proposal or other document that lists the Products and/or Services to be provided to Customer by Company.

1.10    "Services" refers to Company software maintenance services, equipment maintenance services, customer support services, data services, work flow analysis services, site assessment services, customer site data management services, reservoir studies and interpretive services, educational services (including training), and any other services identified in Company's Quotation to Customer.

1.11    "Software" refers to software identified in Company's Quotation to Customer including, without limitation, application software, systems software, External Software, microcode and firmware; and where included, documentation and manuals related thereto. For Software, the term "purchase" or "sale" means "license" or "right to use".

1.12    "Software License" or "Software Use" refers to the software license or right to use granted by Company in accordance with Company's Software License or Software Use Terms and Conditions. A Software License or Software Use shall provide only a consistory right to the tangible media upon which the Software is transferred to Customer and a nonexclusive right to use the Software listed in Company's Quotation to Customer in accordance with the Software License or Software Use Terms and Conditions. Company and its licensors shall retain ownership to all intellectual-property rights in the Software, including patents and copyrights.

1.13    "Supplemental Terms and Conditions" shall mean any additional terms and conditions, or addendums thereto, that reference these General Terms and Conditions for Products and Services. Supplemental Terms and Conditions shall apply insofar as Company's Quotation involves the sale, lease, license or transfer of a particular Product or the performance of a particular Service as set forth in Company's Quotation.

**2.0    Orders**

Prices and fees for Products and Services will be as specified in accordance with Company's Quotation that is current at the time an order is accepted from Customer

or in the absence of a quotation, shall be at Company's then current standard prices and fees. Prices for Services provided under an accepted Quotation may be changed by Company effective January 1 of the next year, on thirty (30) days' written notice to Customer.

**3.0    Payment**

3.1    Purchase. For Product purchases, Customer shall make full payment within thirty (30) days after the date of shipment of the Products or within thirty (30) days of installation of Products where installation services have been requested by Customer, provided Customer maintains credit arrangements satisfactory to Company. Customer shall make full payment for Services and other items described herein for which no "shipment" is involved within thirty (30) days after receipt of invoice. All payments shall be made in the currency set forth on the quotation (or in U.S. dollars if no other currency is indicated). Company may charge interest on all overdue amounts in accordance with Article 3.4, below.

3.2    Lease. If the Quotation provides for a lease or rental to Customer of Products from Company, Company's standard Software Lease Terms and Conditions or Equipment Lease Terms and Conditions shall apply in addition to these General Terms and Conditions.

3.3    Obligations. Customer agrees that should any portion of an invoice be disputed, Customer shall promptly pay the non-disputed portion. Within thirty (30) days of receipt of an invoice, Customer shall promptly notify Company of the reasons for disputing all or part of that invoice and Company shall promptly produce such evidence as it may have in support of the disputed amount. Having due regard to all the facts, the parties shall seek to reach agreement as to how much, if any, of such disputed amount should be paid. Payment of fees on one invoice shall not be set off or withheld against fees payable in connection with any other matter. Should any outstanding invoice remain unpaid beyond the stipulated time period, Company shall be entitled to cancel or suspend the provision of the Products or Services without incurring liability to Customer and without prejudice to any of Company's other rights hereunder.

3.4    Interest on Late Payments. Company may at its absolute discretion charge interest, which Customer shall promptly pay, on all amounts not paid strictly in accordance with these Terms and the Service Order. Interest shall accrue at the maximum amount permitted by law. If unpaid amounts are collected through legal proceedings or by a collection agent, Customer shall pay reasonable costs and attorneys' fees.

3.5    Taxes

Prices listed do not include any local, state, provincial, federal or national sales, use, excise, personal property, value added, import/export, or other similar taxes or duties, which may be assessed in connection with the Products or the provision of the Services, and Customer agrees to pay all such assessments. In the event Company must initially pay such assessments, Customer agrees to reimburse Company within thirty (30) days after receipt of Company's invoice. Taxes based upon Company's income shall be the sole responsibility of Company.

**5.0    Shipment**

5.1    Shipment. Prices exclude shipping charges. Products will be shipped FOB point of origin. Title to Products shall pass to Customer in the country of origin; provided, however, where the Products are released to Customer title shall remain in the name of Company. Customer will be responsible for shipping charges and for procuring insurance, unless otherwise specified. Customer shall assume all risks of loss upon Company's delivery to the carrier.

5.2    Security Interest. Company retains title to and a security interest in Equipment as security for Customer's payment for the Equipment until the purchase price for the Equipment has been paid in full. Customer agrees to execute such documents as Company may reasonably require to perfect and further evidence this security interest.

**6.0    Installation**

6.1    Equipment. Company shall install Equipment if the price includes installation or if Customer separately purchases installation services.

6.2    Software. Software shall be installed onto Customer's servers and/or computers in accordance with the applicable Software License Terms and Conditions or Software Use Terms and Conditions or Software Lease Terms and Conditions. Unless Company installation services have been ordered, Customer shall perform such installation.

6.3    Customer Responsibilities. Customer shall provide the necessary environment and electrical power supply connections as specified by Company and

the equipment manufacturer and shall be responsible for transporting the Equipment to its location within Customer's facility.

**7.0   Cancellation Charges**

7.1   Equipment.   In the event Customer cancels an order for Equipment, Customer shall pay within thirty (30) days thereafter a cancellation and restocking charge in the amount of ten percent (10%) of the total price for the canceled Equipment. No cancellation by Customer will be accepted after the date of shipping, or for Equipment being specially developed for Customer, once development has commenced.   For Equipment ordered from Company suppliers on behalf of Customer, the "date of shipment" shall be the date Equipment is shipped from the Company supplier(s).

7.2   Services.   In the event Customer cancels an order for Services, Customer shall pay within thirty (30) days thereafter all previously unbilled costs and expenses incurred by Company (including labor and materials) prior to receipt of notice of cancellation, plus a cancellation charge in the amount of the lesser of: (a) ten percent (10%) of the total contract price for the Services; or (b) fifty percent (50%) of the difference between the total contract price for the Services less any amounts previously paid by Customer for the Services. No cancellation by Customer will be accepted after the date of completion of the Services. All amounts paid by Customer prior to notice of cancellation are non-refundable and are not subject to offset.

**8.0   Warranty**

8.1   Equipment Warranty

8.1.1   Equipment sold is warranted to be in good and serviceable condition. The warranty period for Equipment shall be as specified in Company's Quotation, or for a period of ninety (90) days if no such warranty period is specified. The warranty period begins on the date installation is completed or upon delivery if the Equipment is installed by Customer. If Company is prevented from installing the Equipment by causes beyond its control for more than thirty (30) days from the date of delivery, the warranty period will commence on the thirtieth (30th) day after delivery.

8.1.2   Equipment may also be warranted by the third party supplier. Company's sole liability and Customer's sole remedy for breach of this warranty is limited at Company's sole option to either: (a) the repair or replacement of the defective Equipment or part; or (b) the refund of the purchase price of the defective Equipment which is returned by Customer at Customer's cost to the location specified by Company.

8.2   Software Warranty.   Software is warranted in accordance with Company's Supplemental Software License or Software Use or Software Lease Terms and Conditions, as applicable.

8.3   Service Warranty. Where Services for Products are being purchased by Customer, as set forth in the Agreement, Company will use reasonable efforts to provide such Services pursuant to Article 9 below and the applicable Supplemental Terms and Conditions for the particular service(s) purchased by Customer, subject to Customer's fulfillment of its obligations under the Agreement.

8.4   Limitations;   Company's sole responsibility under these warranties shall be to provide the Products and/or Services described in the Agreement with Customer. Warranties do not apply to: (a) any products other than Products or Services listed in the Agreement with Customer; or (b) conditions resulting from improper use or storage of the Products or operation of the Products outside the specified environmental conditions; or (c) conditions resulting from causes external to the Products after delivery; or (d) conditions resulting from modifications to the Products other than modifications made by Company or Company's service vendor; or (e) conditions resulting from Customer's movement of the Products; or (f) Products from which Company's or Company's service vendor's serial numbers have been removed; or (g) use of Software with operating system software versions other than Company-designated versions.

8.5   Disclaimer of Warranties. Except as expressly stated herein, COMPANY MAKES NO WARRANTIES, EXPRESS, IMPLIED, OR STATUTORY, WITH RESPECT TO THE PRODUCTS OR SERVICES PROVIDED, INCLUDING, WITHOUT LIMITATION, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. Customer shall at all times be responsible for product(s) or results or interpretations produced by Customer and for providing back-up for all software applications and data files stored in the Products.

**9.0   Services**

Supplemental Terms and Conditions. To the extent the Agreement with Customer includes Customer's purchase of software maintenance, hardware maintenance, onsite support or other miscellaneous services, the applicable Supplemental Terms and Conditions for the particular service(s) shall apply to Company's performance of such services in addition to these General Terms and Conditions.

10.0   Ownership and Protection of Proprietary Information

10.1   Except for those limited licenses or rights to use that may be granted under applicable Supplemental Terms and Conditions, Company grants no title or license or right to use to Proprietary Information or Intellectual Property, which remains the exclusive property of Company and, where applicable, Company's third party licensors.   Customer agrees to secure properly such Proprietary Information and to keep it confidential and not to use the Proprietary Information or Intellectual Property in any manner, except as provided in these General Terms and Conditions or under applicable Supplemental Terms and Conditions, or make it available to third parties without Company's prior written consent. Customer shall disclose the Proprietary Information only to its employees on a need-to-know basis. Customer shall maintain adequate internal procedures, including appropriate binding agreements with Customer's employees, to protect the Proprietary Information in the same manner as Customer protects Customer's own confidential proprietary information. Upon any cancellation or termination of this Agreement, Customer agrees to return or destroy, at Company's direction all such Proprietary Information. The provisions of this Article 10.1 shall survive any cancellation or termination of this Agreement.

10.2   Nothing in these General Terms and Conditions shall impose an obligation of confidentiality on Customer with respect to Proprietary Information which is:   (a) rightfully in Customer's possession in a substantially complete and tangible form prior to the time it is received from Company; (b) hereafter furnished to others by Company without restrictions on disclosure and use; (c) hereafter furnished to Customer by a third party as a matter of right and without restriction on disclosure or use; or (d) independently developed by Customer without breach of these Terms and Conditions.

10.3   While providing Products or Services to Customer, Company may develop additional expertise, know-how and other intellectual property which are Company's exclusive property and which Company may freely utilize in providing services for its other customers. Except where expressly and specifically indicated in writing, and in exchange for appropriate payment, Company does not develop any intellectual property (including copyrights, patents, know-how, and expertise) for ownership by Customer under this Agreement with Customer, and Company retains sole ownership of any such items created during the course of providing Products and/or Services hereunder.

**11.0   Default and Remedies**

11.1   Customer Default

11.1.1   Customer shall be in default for failure to meet its payment obligations. Customer shall have thirty (30) days to cure such default after notice by Company. However, Company has the right to charge Customer interest in accordance with Article 14 above. Company's right to require interest shall not foreclose Company, from any other remedy provided by these General Terms and Conditions, any applicable Supplemental Terms and Conditions or applicable law.

11.1.2   Customer shall be in default for its failure to perform any material obligation under, or for any material breach of, the Agreement, these General Terms and Conditions, or any applicable Supplemental Terms and Conditions. In the event of such breach, Company may, at its option, suspend the provision of any goods or services to Customer and/or for by this Agreement or, upon written notice to Customer, terminate this Agreement and/or any Supplemental Terms and Conditions that are applicable to the goods and/or services being provided to Customer under this Agreement.

11.1.3   The parties agree that a default caused by an unauthorized disclosure or use of the Proprietary Information could cause Company irreparable harm. Accordingly, the parties agree that Company will be entitled to seek timely injunctive relief to prevent Customer from completing any unauthorized disclosure or use.

11.2   Company Default.   Should Company default under these Terms and Conditions, Customer shall give Company thirty (30) days' written notice to enable Company to cure such default.   If Company fails to cure such default within said thirty (30) day period, Customer shall have the right to pursue all available remedies at law or equity.   Any action brought against Company under these Terms and Conditions must be brought within twelve (12) months after the cause of action arises.

**12.0   Patent and Copyright Indemnity**

12.1   Company shall defend, or at its option settle, any claim, proceeding or action brought against Customer based upon a claim that a Product supplied by Company or a Service performed by Company constitutes a direct infringement of a patent or copyright issued under the laws of the country of original delivery or intended destination (as identified by Customer in the Agreement), and Company shall pay those costs and damages finally awarded against Customer in any such action or proceeding which result from any such claim, provided always that Company shall have no liability under this Article: (a) unless Company is notified promptly in writing by Customer of each notice and communication regarding such claim, is given the complete authority, information and assistance necessary for such defense, and is given sole control of the defense of any action on such claim and of all negotiations for its settlement or compromise; or (b) if Customer makes any admission regarding infringement.

12.2  Should a Product or Service become, or in Company's opinion be likely to become, the subject of a claim of infringement or the like under such patent or copyright laws, Customer shall permit Company, at Company's option, to either: (a) procure for Customer the right to continue using the Product or Service; (b) replace or modify the Product or Service so that it becomes non-infringing (provided the same level of functionality is maintained); or (c) accept the return of the Product and grant Customer a credit for the then depreciated value of the infringing Product, which for the purposes of this Article shall be presumed to depreciate by one-fifth (1/5) of its purchase price per year. If the infringing Product is leased or rented to Customer, or is a Service subject to a service agreement, Company may terminate the lease or rental or service agreement and Customer's sole remedy in such case shall be the return by Company of any payments made by Customer for periods after such termination.

12.3  Company shall have no liability or obligation to Customer under this Article 12 for any patent or copyright infringement or claim thereof based upon: (a) Company's compliance with Customer's specifications, where such specifications require Company to modify a Product or Service; (b) the combination of the Product or Service with other items or services not furnished or approved in writing by Company; (c) any unauthorized addition to or modification of the Product, or alteration of the Services at the request of Customer; or (d) any use of the Product in the performance of a method or process (practice of a process), except where such practice is solely completed by or within the Product. Customer shall defend and hold Company harmless against any expense, judgment or loss for alleged infringement of any patent, copyright or other proprietary right which results from a claim based upon (a), (b), (c), or (d).

12.5  Limitations on Liabilities and Remedies

Company's liability for any breach of the Agreement with Customer and these General Terms and Conditions and any applicable Supplemental Terms and Conditions, or for personal injury (including death) or property damage arising from the use or installation of the Products or the performance of Services, shall not exceed the aggregate purchase price or license or usage fees paid, or lease payments made, for the Products or Services and IN NO EVENT SHALL COMPANY BE LIABLE FOR SPECIAL, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING ANY DAMAGES RESULTING FROM LOSS OF USE, LOSS OF DATA, LOSS OF PROFIT, OR LOSS OF BUSINESS WHETHER ARISING OUT OF OR IN CONNECTION WITH THE PERFORMANCE OF THE PRODUCTS OR SERVICES OR ANY OTHER MEANS, AND REGARDLESS OF THE FORM OF ACTION UPON WHICH A CLAIM FOR SUCH DAMAGES MAY BE BASED, WHETHER IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT PRODUCT LIABILITY OR ANY OTHER LEGAL OR EQUITABLE THEORY. THESE LIMITATIONS SHALL APPLY EVEN IF ANY LIMITED REMEDY FAILS IN ITS ESSENTIAL PURPOSE. CUSTOMER SHALL PROTECT, INDEMNIFY, HOLD HARMLESS AND DEFEND COMPANY OF AND FROM ANY LOSS, COST, DAMAGE, OR EXPENSE, INCLUDING ATTORNEYS' FEES, ARISING FROM ANY CLAIM ASSERTED AGAINST COMPANY THAT IS IN ANY WAY ASSOCIATED WITH THE MATTERS SET FORTH IN THIS ARTICLE 13.

14.0  Force Majeure

Neither party shall be responsible for delays or failures in performance resulting from events or circumstances beyond the control of such party. Such events shall include but not be limited to acts of God, strikes, lockouts, riots, acts of war, epidemics, governmental acts of regulations, fires, communication line failures, power failures, and earthquakes. Force Majeure cannot be used to excuse or delay any payment obligation.

15.0  Arbitration

Any controversy or claim arising out of or relating to the Products or Services covered in the Agreement with Customer, or any breach thereof, shall be settled by arbitration to be held in the English language at a mutually agreeable location in accordance with the commercial arbitration Rules of the American Arbitration Association (for contracts entered into in the United States) or the International Chamber of Commerce (for contracts outside the United States). The law of the jurisdiction specified in the Quotation (or, if no jurisdiction is identified in the Quotation, the law of the state, province or country where Company is incorporated) shall govern the construction and interpretation of the Agreement and the rights of the parties thereunder. Any judgment upon the award rendered by the Arbitrator(s) may be entered in any court having jurisdiction thereover. Any award rendered by the Arbitrator(s) may include costs against either Party, but under no circumstances are the Arbitrator(s) authorized or empowered to award special, punitive or multiple damages against either Party.

16.0  Assignment

No rights or obligations under the Agreement with Customer shall be assigned by Customer without the express written consent of Company (such consent not to be unreasonably withheld by Company), and provided that the assignee is identified to Company and that the assignee agrees to strictly abide by all the terms and conditions of the Agreement. Company may assign its rights and obligations under this Agreement to any Schlumberger affiliated company or to its successor in interest in the event of a merger, corporate reorganization, or sale of all or substantially all of its assets relating to its business to which the Agreement pertains.

17.0  Export Administration Act

Regardless of any disclosure by Customer to Company of the contemplated ultimate destination of the Products, Customer shall not export or re-export, directly or indirectly, any Product (or the "direct product" of any Software Product) without first obtaining an export (or re-export) license from the Department of Commerce or other agency of the United States Government, as required.

18.0  Publicity and Public Disclosures

Customer shall not, without obtaining Company's prior written approval, use any Company or Schlumberger trade names, trade marks, service marks, company names or other trade designations in any Customer press releases, advertising literature, or corporate information disclosures (including without limitation financial reports and government regulated information disclosures).

19.0  Miscellaneous Provisions

Company's acceptance of Customer's order will form an agreement subject only to Company's Quotation, these General Terms and Conditions, and any Supplemental Terms and Conditions and is expressly conditional on Customer's assent to this Agreement, the General Terms and Conditions and applicable Supplemental Terms and Conditions. This Agreement supersedes any previous or contemporaneous communications, representations, or agreements by either Company or Customer whether verbal or written, including any terms and conditions on Customer's order. Customer has not relied upon any representations, oral or written, except as are made in this agreement. Any modification or amendment to this Agreement must be in writing and signed by the authorized representatives of Company and Customer. The unenforceability of any provision hereunder shall have no effect upon the remaining provisions which shall continue in full force and effect.

End of General Terms and Conditions for Products and Services

SOFTWARE LICENSE TERMS AND CONDITIONS

These Terms and Conditions are in addition to the General Terms
and Conditions entered into between Company and Customer.

#### 1.0   License.

Company grants to Customer a nonexclusive, nontransferable license ("License") to use Software and its associated Proprietary Information as set forth in Company's written Quotation to Customer, in accordance with these Software License Terms and Conditions.  This License shall commence upon Company's delivery of Software to Customer and shall continue unless terminated by default or cancellation. Company (and/or Company's licensor(s)) when applicable) shall at all times retain title to all rights to Intellectual Property in and to the Software and Proprietary Information, including all components, additions, modifications and updates. Where title to Intellectual Property of certain Software is retained by Company's licensors, Company represents that it has the authority to license such Software to Customer. Company shall own and have title to the tangible media in which the Software is delivered. Title to the media shall pass to Customer in the country of origin.

#### 2.0   License Termination.

Subject to Customer's right to cure for non-payment, Company shall have the right, immediately upon any default by Customer, to pursue all available remedies at law or equity, and may terminate the Agreement and/or this License with Customer. Upon termination of this License, Customer shall discontinue all use of the Software and return the Software and Proprietary Information to Company, including all copies, if Customer ceases to operate for any reason, including but not limited to bankruptcy or dissolution, and the Software is not transferred in accordance with Article 16 of the Company's General Terms and Conditions, Customer shall return the Software to Company. Customer shall, upon Company's request, certify that all such Software, Proprietary Information and copies have been returned to Company.

#### 3.0   Use.

3.1    For purposes of this License, the term "use" shall be limited to the processing of information and the process of copying, recording, or transcribing Software.  Use does not include modifying Software in any way, creating derivative versions thereof, reverse assembling, reverse compiling, or reverse engineering Software or distributing it to other parties or making it available for any use, directly or indirectly, by another person, any such utilization of Software being hereby expressly prohibited.

3.2    Customer shall identify in writing the computers, servers, and workstations, and locations where the Software will be used. Software shall be used solely in conjunction with the foregoing computers, servers, and workstations, at authorized locations, and accessed by only the agreed number of seats for which Customer is authorized as set forth in the Quotation to Customer.  A Customer-designated computer or server is the processor or equipment configuration on which the Software is first installed pursuant to the license grant. Once installed, Software may be moved from one Customer-designated computer or server to a different computer or server within the same authorized location only after giving notice to Company and receiving approval in writing to do so.  A Customer-designated workstation includes all workstations on a Local Area Network that are physically located within one thousand (1000) meters of a Customer-designated server.  Customer understands that the Software will only operate properly on the types of computer equipment using the operating system version(s), as identified by Company in its published technical specifications. Customer is solely responsible for ensuring that its computer systems comply with such technical specifications.

3.3    Licensed use of the Software shall be restricted to the processing or interpretation by Customer of geoscience, reservoir, and production-related data owned or licensed by Customer in connection

with: (a) oil, gas and other natural resource development ventures where Customer is active as operator or partner; and (b) evaluations for Customer's internal use of such ventures in which Customer contemplates becoming active as operator or partner.

3.4    Storage media that Customer receives from Company may contain certain software that is not covered in Company's Quotation. If Customer desires to obtain a license for such separate software, Customer must obtain the appropriate licenses from Company and pay the appropriate fees.  Customer agrees to comply with and not deliberately modify or make inoperable any feature that is incorporated in the Software to prevent access to unlicensed software.  Customer acknowledges that Software and Equipment may now or in the future contain security devices for the protection of Software,.

3.5    COMPANY DOES NOT GUARANTEE RESULTS.  ALL INTERPRETATIONS USING THE PRODUCTS, AND ALL RECOMMENDATIONS OR RESERVOIR DESCRIPTIONS BASED UPON SUCH INTERPRETATIONS, ARE OPINIONS BASED ON INFERENCES FROM MEASUREMENTS AND, EMPIRICAL RELATIONSHIPS AND ON ASSUMPTIONS, WHICH INFERENCES AND ASSUMPTIONS ARE NOT INFALLIBLE, AND WITH RESPECT TO WHICH COMPETENT SPECIALISTS MAY DIFFER, IN ADDITION, SUCH INTERPRETATIONS, RECOMMENDATIONS AND RESERVOIR DESCRIPTIONS MAY INVOLVE THE OPINION AND JUDGMENT OF CUSTOMER.  CUSTOMER HAS FULL RESPONSIBILITY FOR ALL INTERPRETATIONS, RECOMMENDATIONS AND RESERVOIR DESCRIPTIONS UTILIZING THE PRODUCTS. COMPANY CANNOT AND DOES NOT WARRANT THE ACCURACY, CORRECTNESS OR COMPLETENESS OF ANY INTERPRETATION, RECOMMENDATION OR RESERVOIR DESCRIPTION.  UNDER NO CIRCUMSTANCES SHOULD ANY INTERPRETATION, RECOMMENDATION OR RESERVOIR DESCRIPTION BE RELIED UPON AS THE SOLE BASIS FOR ANY DRILLING, COMPLETION, WELL TREATMENT, PRODUCTION, OR OTHER FINANCIAL DECISION, OR ANY PROCEDURE INVOLVING ANY RISK TO THE SAFETY OF ANY DRILLING VENTURE, DRILLING RIG OR ITS CREW OR ANY OTHER INDIVIDUAL.  CUSTOMER HAS FULL RESPONSIBILITY FOR ALL SUCH DECISIONS AND FOR ALL DECISIONS CONCERNING OTHER PROCEDURES RELATING TO THE DRILLING OR PRODUCTION OPERATION. CUSTOMER AGREES THAT COMPANY SHALL HAVE NO LIABILITY TO CUSTOMER OR TO ANY THIRD PARTY FOR ANY ORDINARY, SPECIAL, OR CONSEQUENTIAL DAMAGES OR LOSSES WHICH MIGHT ARISE DIRECTLY OR INDIRECTLY BY REASON OF CUSTOMER'S USE OF THE PRODUCTS.  CUSTOMER SHALL PROTECT, INDEMNIFY, HOLD HARMLESS AND DEFEND. COMPANY OF AND FROM ANY LOSS, COST, DAMAGE, OR EXPENSE, INCLUDING ATTORNEYS' FEES, ARISING FROM ANY CLAIM ASSERTED AGAINST COMPANY THAT IS IN ANY WAY ASSOCIATED WITH THE MATTERS SET FORTH IN THIS SOFTWARE LICENSE.

3.6    Software is licensed for use in the country where first delivered and may not be transferred outside such country without Company's prior written consent.

#### 4.0   Copying Software.

Customer is encouraged to duplicate Software and Customer's data maintained by such Software FOR BACKUP PURPOSES ONLY to protect against the loss of Customer's data.  Customer may make archival copies of the Software as provided by applicable national copyright law and under international treaties.  Customer agrees not to copy or reproduce Software or any portion thereof for any other purpose. Customer shall reproduce all copyright, patent and proprietary rights notice(s) as a part of the informational content of any copy of the

Software in any form. In the case of disk, tape, or other storage media, Customer shall reproduce such notice(s) in a visually legible form on the exterior of the media or first page of the printed volume. Customer is hereby granted the right to make a reasonable number of printed copies of user documentation and help files contained in the distribution media with the Software for its own internal use only, provided that such printed copies bear Company's original copyright notice. Customer's use of such printed copies shall be subject always to the terms and conditions of the Agreement and this Software License.

5.0     Software Warranty

5.1     The warranty period for Software shall be (a) ninety (90) days from the date of delivery of the Software, or (b) one hundred twenty (120) days from the date of shipment to Customer, whichever occurs first;

5.2     Subject in all cases to Articles 5.4 and 5.5, below, during the warranty period, Company warrants that when operated on computer systems that comply with Company's published technical specifications (a) the Software shall function substantially in accordance with published Company product specifications at the time the order is accepted; and (b) the Software will recognize, process, and use dates properly both before, during and after 31st December 1999.

5.3     Company shall make its good faith efforts to correct defects in the Software that prevent the substantial use of the Software in accordance with Company's product specifications where such defects are brought to its attention during the warranty period. Due to the complex nature of Software, Company does not warrant that Software is error free or that all errors will be corrected.

5.4     The warranty provisions contained herein shall not apply to the extent that any error or failure in the Software is caused, directly or indirectly, by failures in hardware, software, or firmware products, or data supplied by:

(a)  Customer;
(b)  A third-party; or
(c)  Company, unless such hardware, software, or firmware is the subject of a current warranty from Company;

5.5     External Software. Company does not warrant the form or content of External Software or related documentation, which Company provides "as is". Any applicable third party vendor's warranties for External Software (including any applicable century date compliance warranty) supplied by Company to Customer hereunder will be passed through to the Customer as the end user.

End of Software License Terms and Conditions

## SOFTWARE MAINTENANCE TERMS AND CONDITIONS

These Terms and Conditions are in addition to the General Terms
and Conditions entered into between Company and Customer.

### 1.0   Maintenance

1.1   Company shall provide Maintenance Services for the Software so long as Customer has paid Company its then current annual maintenance fee for the Software and Customer is not otherwise in default under the Agreement or Software License or Software Right to Use. Maintenance Services for the Software include:

Company's good-faith efforts to correct errors in program codes and procedural documents supplied with the Software where such errors are brought to Company's attention during the term of this Maintenance Agreement;

Company designated standard Software release enhancements and improvements;

One set of the appropriate documentation and/or Updates and one set of media with each Software release; and

Telephone access to Company's Customer Support staff for reporting Software malfunctions and to obtain assistance in the use of the Software.

1.2   All maintenance modifications made to the Software shall be in computer readable form which will be sent to Customer via mail or courier or electronically, such shipment method to be selected by Company.  Customer will be responsible for loading such media according to Company's instructions.

1.3   All Software maintenance performed by Company will be made without regard for any modifications made to the Software or Equipment by Customer.

### 2.0   Termination

2.1   Either Party may terminate this Agreement at any time, for breach by the other party not cured within thirty (30) days after written notice thereof.

2.2   Notwithstanding the foregoing, this Agreement and/or these Supplemental Terms and Conditions are subject to immediate termination if Customer fails to make any payment due Company or if Customer becomes bankrupt or insolvent.

2.3   The anniversary date for maintenance shall be January 1. Either party may elect to terminate the Software Maintenance Agreement for any reason upon any anniversary by giving at least thirty (30) days prior written notice during the sixty (60) day period prior to said anniversary date.

2.4   This Agreement shall automatically terminate upon termination of the license(s) or rights to use the Software.

### 3.0   Maintenance Charges

3.1   Company reserves the right to update software maintenance to current rates by submitting a letter agreement to customer during the sixty (60) day period prior to said anniversary date.

3.2   Should the customer wish to reinstate maintenance after a period of termination, all back maintenance must be paid before service will resume, plus a restoration fee equal to five percent (5%) of the back maintenance fees.

---

End of Software Maintenance Terms and Conditions

## SOFTWARE DEVELOPER'S KIT
## ADDENDUM TO SOFTWARE LICENSE TERMS AND CONDITIONS

These Terms and Conditions are in addition to the General Terms
and Conditions and the Software License Terms and Conditions
Entered into between Company and Customer.

---

### 1.0    Definitions

1.1    As used herein "Software Developer's Kit" shall mean software and related documentation identified in Company's Quotation or proposal that enables a party to develop software applications for use with Company's Software products, such as the Charisma Developer's Kit, the IESX Developer's Kit, the GeoFrame Developer's Kit (GFDK), OpenEclipse, and the Finder Enterprise data model registration tools, or other such Software Developer's Kits as the Company may choose to market.

1.2    As used herein "Developer" shall be synonymous with "Customer"

### 2.0    Relationship to Software License Terms and Conditions

Company's General Terms and Conditions and Software License Terms and Conditions shall apply to the licensing and use by Developer of the Software Developer's Kit and related documentation, except as specifically amended by this Addendum.

### 3.0    License

3.1    Upon payment of the Fee specified in Company's Quotation, Company grants Developer a limited and non-exclusive license under the Software Developer's Kit object code to:

(a)  Use, modify, and prepare derivative works of the Software Developer's Kit at Developer's site for the purpose of developing applications that directly access the data model specific to the Software Developer's Kit licensed to Developer hereunder. Developer can use the Software Developer's Kit to query, read, write, create, and delete data used by Company's Software products addressed by the Software Developer's Kit licensed to Developer hereunder; and

(b)  Perform or display the Software Developer's Kit at Developer's site; and

(c)  Use the Software Developer's Kit on any computer(s) or networks located at Developer's site for the purpose of providing technical support to sublicensees.

3.2    After creation of applications, Company grants Developer a limited and non-exclusive right and license to market, sublicense, and distribute executable versions of the applications linked to one or more of Company's Software products, or portions thereof for use with Developer's computer programs.

3.3    Company hereby grants Developer run time and other application licenses for testing, data loading data model validation and integration testing in conjunction with Software Developer's Kit which licenses shall be governed by Article 1 of Company's Software License Terms and Conditions. Use of such application licenses for non-development commercial or competitive analysis use is strictly prohibited.

3.4    Upon the written request of Developer, Company may provide limited use demonstration copies of Company's Software for use by Developer in demonstrating the capabilities of derivative works prepared using the Software Developer's Kit. Developer's use of such demonstration copies shall at all times be subject to Company's Software License Terms and Conditions and this Addendum.

### 4.0    Use

Notwithstanding any provisions to the contrary contained in Company's General Terms and Conditions for Products and Services and in Company's Software License Terms and Conditions, Developer may use the Software Developer's Kit to create and use derivative works based on the Software Developer's Kit and to distribute, sell and sublicense such derivative works to third parties.

### 5.0    Termination

Any cancellation or termination of the licenses granted to the Software Developer's Kit under this Addendum shall be in accordance with Article 3 of Company's Software License Terms and Conditions, provided that

(a)  Developer may complete any work in process involving the use of the Software Developer's Kit that is specifically identified in a contract with a third party  and

(b)  All sublicenses granted by Developer to third parties for use of applications prepared by Developer using the Software Developer's Kit shall remain in full force and effect: and

(c)  Developer shall be allowed to grant sublicenses to third parties identified in paragraph (a), above.

### 6.0    Publicity

Developer hereby authorizes Company to use Developer's company name and logo in Company promotional materials identifying Developer as a Software Developer's Kit development partner.

---

End of Addendum to Software License Terms and Conditions for Software Developer's Kit

This is Exhibit "D" referred to in
the Affidavit of Keith Tushingham
sworn before me September _6th_, 2006

A Notary Public. etc.

GWENLYN JEAN KING
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
JULY 21, 2007







This is Exhibit "E" referred to in
the Affidavit of Keith Tushingham
sworn before me September ⎛↗↘⎞ , 2006

A Notary Public. etc.

GWENLYN JEAN KING
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
JULY 21, 2007

**About Petrel** 

# PETREL™



## a Schlumberger product group

Name:   Petrel

Made by:   Schlumberger Information Solutions

Version:   2007 Developer's Release

Build date:   Mar 31 2006 17:44

Changelist:   0

http://www.slb.com/content/services/software/geo/petrel/

Copyright 1998, 2006

This version of Petrel is not intended for
commercial use. It is a snapshot that indicates the
status of the Ocean API, and may be used by
Ocean application developers. The use of this
baseline is at the risk of the end user. It may not be
possible to load data (including Petrel projects)
saved with this version in later versions of Ocean
and Petrel, and it may not be possible to load data
in other formats than that saved with the Petrel
2004 release.

System
Components

OK





Inside Petrel 2007,
Menu Help/About
Petrel and the
release description
of the Software

About Petrel

**PETREL**™

Name:        Petrel

Made by:     Schlumberger Information Solutions

Version:     2007 Developer's Release

Build date:  May 2 2006 15:29

Changelist:  0

http://www.slb.com.au/products/software.company/petrel/

Copyright 1998, 2005

This version of Petrel is not intended for commercial use. It is a snapshot that indicates the status of the Ocean API, and may be used by Ocean application developers. The use of this baseline is at the risk of the end user. It may not be possible to load data (including Petrel projects) saved with this version in later versions of Ocean and Petrel, and it may not be possible to load data in other formats than that saved with the Petrel 2004 release.

System Components

OK

# Petrel 2007 Developer's Release

The intention with this Developer's release of Petrel is not to provide end users with a feature rich version of Petrel. Rather, the goal has been to provide a stable Ocean API for the application development community. The applications developed can only be commercially deployed on a commercial version of Petrel.

Petrel is still in a pre-alpha state. It will exhibit defects as a result of recently having been ported to .NET, as well as to Visual Studio 2005. This means that custom workflows may not be fully testable if these workflows rely on end-user features in Petrel that are currently non-functional.

It is illegal to re-distribute Petrel 2007 Developer's Release, or to deploy any custom modules on top of it in any commercial setting.

The license of the Petrel 2007 Developer's Release expires on 01.07.2007. Application developers should upgrade to a commercial version of Petrel by then.

## Compatibility with Previous and Future Versions

This version of Petrel is not intended for commercial use. It is a snapshot that indicates the status of the Ocean API, and may only be used by Ocean application developers. The use of this baseline is at the risk of the end user. It may not be possible to load data (including Petrel project) saved with this version in later versions of Petrel, and it may not be possible to load data in other formats than that saved with the Petrel 2004 release. It is wise to keep a Petrel 2004 project in parallel, which can be used to import data via secondary project mechanism into the Petrel 2007 Developer's release version.

Extract of the Release Notes shipped with SDK. Included in the OD media.

Court File No.

# FEDERAL COURT

**BETWEEN:**

## SCHLUMBERGER CANADA LTD.

Plaintiff

- and -

## GEOMODELING TECHNOLOGY CORP.

Defendant

### AFFIDAVIT OF KEITH TUSHINGHAM

BAKER & McKENZIE LLP
Barristers & Solicitors
BCE Place, Suite 2100
181 Bay Street
Toronto, Ontario
M5J 2T3

Jim Holloway (343074)
jim.holloway@bakernet.com
(416) 865-1221 - telephone
(416) 863-6275 – facsimile

Carlos M. de Vera
carlos.m.devera@bakenet.com

(416) 865-2339 – telephone
(416) 863-6275 – facsimile

Solicitors for the Plaintiff

# TAB 5

Court File No.

## FEDERAL COURT

BETWEEN:

### SCHLUMBERGER CANADA LTD.

Plaintiff

- and -

### GEOMODELING TECHNOLOGY CORP.

Defendant

## AFFIDAVIT OF THOMAS COX
### Sworn on September 26, 2006

I, THOMAS COX, of the City of Calgary, in the Province of Alberta, MAKE OATH
AND SAY:

1. I am employed by Schlumberger Canada Ltd. ("Schlumberger Canada") as a
   Senior Marketing Geoscientist. As such, I am familiar with my company's
   products, including the seismic-to-simulation software PETREL software
   application (the "PETREL Program"). I have personal knowledge of my
   evidence, unless otherwise stated. In those cases where my evidence is based on
   information I have received from others, I have identified the source of my
   information and, in each such case, I verily believe it to be true.

2. By way of introduction, Schlumberger Canada is engaged in carrying on activities
   in the Canadian oil and gas industry, including software development for oil and
   gas related applications. In the course of its activities, Schlumberger Canada
   markets and supports the PETREL Program used by companies in the oil and gas

industry, which is available for license in North America for approximately US $160,000 per copy.

3.   Over the past 3-4 years, I have had occasion to meet and deal with representatives of Geomodeling Technology Corp. ("GTC"), which is a Schlumberger Canada competitor in the Canadian market. I understand that GTC also has global operations.

4.   Approximately 3-4 years ago, I met Renjun Wen of GTC at a Calgary convention where I was managing the Schlumberger Canada booth. Mr. Wen said that he was familiar with Schlumberger software applications, and that he had extensively used our GeoFrame product in China. As I recall, he was interested in learning more about how the application worked. The next day, he returned with a colleague and, together, they spent a considerable amount of time studying the GeoFrame application, which was running on a demonstration machine we had set up.

5.   At subsequent industry conventions, Mr. Wen and GTC representatives spent a great deal of time at our booths studying and trying to learn more about our PETREL Program, which we run at conventions for demonstration purposes.

6.   I am advised by Oscar Skold of Schlumberger Canada that, at one point, he asked Mr. Wen and his GTC colleagues to leave the "academy sessions" that we offer at industry conventions for our customers and potential customers who are interested in learning more about our PETREL Program. Since GTC is not a Schlumberger Canada customer (except vis-à-vis our OCEAN developer's kit), he did not believe that it was appropriate for the company to be attending these sessions.

3.   On the afternoon of May 16, 2006, I was managing a Schlumberger booth at a convention operated by the Canadian Society of Exploration of Geophysicists ("CSEG"), the Canadian Society of Petroleum Geologists ("CSPG") and the Canadian Well Logging Society ("CWLS") in Calgary, Alberta.   During this

2

event, a individual who appeared to be Chinese approached me and asked several detailed questions regarding PETREL functionality, which suggested that he was working with a pre-2005 version of the PETREL Program. During this conversation, I suggested that he upgrade to the 2005 version of the PETREL Program. This individual later acknowledged that he was a student working as a software programmer for GTC.

4. Based on the above, I concluded that GTC had and was using a pre-2005 version of the PETREL Program which it is not licensed or authorized to have or to use. While I know that GTC has a license to use our OCEAN developer's kit, this license includes a later version of the PETREL Program (version 2007) which is only to be used for certain non-commercial purposes.

SWORN BEFORE ME in the
City of Calgary, in the Province of Alberta,
this 26 day of September 2006.

_____
Commissioner, Notary Public, etc.

SIGRUN L. SNOWDON
Barrister & Solicitor
A Notary Public in and for
the Province of Alberta
No expiry

_____
THOMAS COX

3

Court File No.

# FEDERAL COURT

**BETWEEN:**

## SCHLUMBERGER CANADA LTD.

Plaintiff

- and -

## GEOMODELING TECHNOLOGY CORP.

Defendant

### AFFIDAVIT OF THOMAS COX

BAKER & McKENZIE LLP
Barristers & Solicitors
BCE Place, Suite 2100
181 Bay Street
Toronto, Ontario
M5J 2T3

Jim Holloway (343074)
jim.holloway@bakernet.com
(416) 865-1221 - telephone
(416) 863-6275 – facsimile

Carlos M. de Vera
carlos.m.devera@bakenet.com

(416) 865-2339 – telephone
(416) 863-6275 – facsimile

Solicitors for the Plaintiff

# TAB 6

Court File No:

# FEDERAL COURT

BETWEEN:

## SCHLUMBERGER CANADA LTD.

Plaintiff

- and -

## GEOMODELING TECHNOLOGY CORP.

Defendant



# STATEMENT OF CLAIM

TO THE DEFENDANT:

A LEGAL PROCEEDING HAS BEEN COMMENCED AGAINST YOU by the plaintiff. The claim made against you is set out in the following pages.

IF YOU WISH TO DEFEND THIS PROCEEDING, you or a solicitor acting for you are required to prepare a statement of defence in Form 171B prescribed by the *Federal Court Rules, 1998*, serve it on the plaintiff's solicitor or, where the plaintiff does not have a solicitor, serve it on the plaintiff, and file it, with proof of service, at a local office of this Court, WITHIN 30 DAYS after this statement of claim is served on you, if you are served in Canada.

If you are served in the United States of America, the period for serving and filing your statement of defence is forty days. If you are served outside Canada and the United States of America, the period for serving and filing your statement of defence is sixty days.

STATEMENT OF CLAIM page 2

Copies of the *Federal Court Rules, 1998,* information concerning the local offices of the Court and other necessary information may be obtained on request to the Administrator of this Court at Ottawa (telephone 613-992-4238) or at any local office.

IF YOU FAIL TO DEFEND THIS PROCEEDING, JUDGMENT MAY BE GIVEN AGAINST YOU IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU.

Date: October , 2006

Issued by: ...............................................................

Registry Officer

Address of Local Office:

180 Queen Street West
Suite 200
Toronto, Ontario
M5V 3L6

TO:     GEOMODELING TECHNOLOGY CORP
        1100, 665-8th Street SW
        Calgary, Alberta, Canada, T2P 3K7.

## CLAIM

1.  The plaintiff claims:

    (a)  A declaration that the defendant has infringed the copyright in the Petrel software Program, as herein described;

    (b)  $4,500,000 in damages for copyright infringement and/or an accounting of the defendant's profits derived from any acts of infringement, which election the plaintiff shall be entitled to make after discovery of the defendant with respect to its revenue and profits;

    (c)  An interim, interlocutory and permanent injunction restraining the defendant, any corporation in which it has an interest or which it controls, any affiliated corporations, and its and their shareholders, officers, directors, employees, agents, servants and assigns, any other person or entity acting on its or their behalf, and any person having knowledge of any injunction this Honourable Court may cause to be issued, from, directly or indirectly, having, making, using, copying, reproducing, transferring, selling or offering for sale any unauthorized copies of the Petrel Program or any infringing parts or copies thereof;

    (d)  An Order requiring the defendant to deliver up for custody by this Honourable Court, or by the plaintiff's solicitors, all infringing copies of the Petrel Program in its possession, power or control, wherever located;

    (e)  $1,000,000 in punitive and/or exemplary damages;

    (f)  Pre-judgment and post-judgment interest as applicable;

    (g)  Any GST payable under Part IX of the *Excise Tax Act (Canada)*, and any other taxes payable on any amounts awarded hereunder;

    (h)  Its legal costs associated with this action on the highest allowable scale;

    (i)  Such further relief as the nature of this case may require and this Honourable Court may deem just.

### *Brief Summary of Claims*

2.  These claims arise from the defendant's infringement of the plaintiff's copyright in the proprietary Petrel software program, which is an integrated, Windows-based software

solution that enables users in the oil and gas industry to capture and manage subsurface information and data, such as seismic interpretation and reservoir simulation (the "Petrel Program"). The plaintiff's claims are brought under section 27(1) and 27(2) of the *Copyright Act*, RSC 1985, chapter C-42, as amended.

### The Parties to the Litigation

3.  Schlumberger Canada Ltd. ("Schlumberger Canada") is a corporation with a head office in Calgary, Alberta, Canada. Its business includes, amongst other things, marketing technology and related services to the oil and gas industry, including proprietary software applications like the Petrel Program.

4.  Geomodeling Technology Corp. ("GTC") a corporation with a head office in Calgary, Alberta, Canada. It too is in the business of selling software applications to companies in the oil and gas industry, in Canada and elsewhere.

### The Petrel Program

5.  In December 1998, employees of Technoguide wrote the original version of the Petrel Program (Version 1.0) in the course of their employment. This version of the Petrel Program was first published in Norway (a *Berne Convention* country) in 1998 and, subsequently, elsewhere.

6.  In 2002, Schlumberger Information Systems ("SIS"), a division of Schlumberger Technology Corporation ("STC"), acquired all rights to the Petrel Program, including all copyright.

7.  In 2003, SIS released version 2003 of the Petrel Program (Version 2003), which incorporated earlier works and contained new and original elements, written by its employees in the course of their employment. Again, this version of the Petrel Program was first published in Norway and, subsequently, elsewhere.

8.    In 2004, SIS released version 2004 of the Petrel Program (Version 2004), which incorporated earlier works and contained new and original elements, written by its employees in the course of their employment. Again, this version of the Petrel Program was first published in Norway and, subsequently, elsewhere.

9.    The Petrel Program is an original literary work in which copyright subsists in the following elements: (a) the literal elements of the work (i.e. the original source code comprising the works); and (b) the non-literal elements of the works (i.e. the original user interface, the design and lay-out of the display screens, the logical structure of the programs, the program sequence of menus and menu options, etc.).

10.   The Petrel Program is licensed in Canada for approximately $180,000 per license, depending on the number of modules acquired.

11.   In Canada, Schlumberger Canada is the owner of all right, title and interest in all versions of the Petrel Program, including copyright. On August 25, 2006, it obtained Canadian copyright registrations no. 1040833 and 1040834 over the works comprising the PETREL Program (Versions 1.0 and Version 2003). A true copy of these registrations is attached as Appendix A to the statement of claim.

12.   By virtue of section 3(1) of the *Copyright Act*, Schlumberger Canada has the sole right to produce or reproduce the protected works, or any substantial part of the protected works, in any material form whatever, and to authorize such acts.

### The Defendant's Infringing Activities

13.   In June 2006, Schlumberger Canada learned that GTC had, without license or authority, acquired unauthorized copies of Version 2003 and Version 2004 (which incorporate protected elements of Version 1.0 and Version 2003) of the Petrel Program in China. In acquiring these copies, GTC knew or should have known that they were not authorized copies and that they infringed the copyright therein.

14.   GTC brought these pirated copies to Canada, made further unauthorized copies, and installed these on computers used by its software developers in Calgary and Beijing, to assist these persons in developing a competitive product with similar functionality, a similar interface and the same logical structure. These activities, which are prohibited by the terms and conditions covering the lawful use of these protected works, will prejudicially affect Schlumberger Canada as the copyright owner.

15.   GTC, by virtue of acquiring and reproducing unauthorized copies of the Petrel Program via the installation of these copies on the computers of its employees, has infringed Schlumberger Canada's copyright therein contrary to section 27(1) of the *Copyright Act*.

16.   GTC, by virtue of importing, possessing and distributing infringing copies of the Petrel Program in the manner aforesaid, has infringed Schlumberger Canada's copyright therein contrary to section 27(2) of the *Copyright Act*.

17.   While GTC has a single license to the SIS Ocean Program (Dongle ID 1-7Q1PP4/151F), which includes version 2007 of the Petrel Program for limited purposes, this is not the version of the Petrel Program referred to above.

18.   GTC's infringing activities will cause Schlumberger Canada significant damages, including lost licensing fees and lost control over its intellectual property.

19.   With the sole exception of the version of the Petrel Program referred to in paragraph 17 above, all copies of the Petrel Program in the defendant's possession are infringing copies and thus recoverable under section 38 of the *Copyright Act*.

20.   GTC knew of Schlumberger Canada's rights when it undertook the activities herein described. Nonetheless, it undertook these activities with a view to obtaining an unfair competitive advantage, in flagrant disregard of Schlumberger Canada's rights. In the circumstances, an award of punitive or exemplary damages is appropriate.

21. The plaintiff will rely generally on sections 2, 3(1), 5(1), 13, 27 and Part IV of the *Copyright Act,* R.S.C. 1985, chapter C.42, as amended.

22. The plaintiff proposes that this action be tried in the City of Toronto, Ontario.

Date: October 5, 2006

<div style="margin-left:50%">

**BAKER & McKENZIE LLP**
Barristers & Solicitors
BCE PLACE
181 Bay Street, Suite 2100
P.O. Box 874
Toronto, Ontario
M5J 2T3

Jim Holloway
jim.holloway@bakernet.com

(416) 865-6914 - telephone
(416) 863-6275 - facsimile

Carlos M. de Vera
carlos.m.vera@bakernet.com

(416) 865-2339 - telephone
(416) 863-6275 - facsimile

Solicitors for the Plaintiff

</div>

## APPENDIX A – COPYRIGHT REGISTRATIONS



**Office de la propriété intellectuelle du Canada**

Un organisme d'Industrie Canada

**Canadian Intellectual Property Office**

An Agency of Industry Canada

*Certificate of Registration of*

*Copyright*

*Certificat d'enregistrement du*

*Droit d'auteur*

*This Certificate of Registration is issued pursuant to section 49 and 53 of the Copyright Act. The copyright in the work described below was registered on the date of registration as follows:*

*Ce certificat d'enregistrement est émis conformément aux articles 49 et 53 de la Loi sur le droit d'auteur. Le droit d'auteur sur l'œuvre décrite ci-dessous, a été enregistré à la date d'enregistrement comme suit:*

*Date of Registration - Date d'enregistrement :*    August 25, 2006

*Registration No. - Numéro d'enregistrement :*    1040833

*First Publication - Première publication :*    December 1998
                                                 Norway

*Title - Titre :*    Petrel Version 1.0

*Category - Catégorie :*    Literary

*Owner(s) - Titulaire(s) :*    Schlumberger Canada Limited
                               Eau Clair Place I, 525 3rd Avenue SW, 7th Floor
                               Calgary, Alberta
                               Canada, T2G 0P4

                               Jan Pihl Grimnes

*Author(s) - Auteur(s) :*    Sven Vik

                             Anders Kihlberg

                             Oscar Skold

                             Nils Petter Fremming

                             Robert Schmidt





(CIPO 00250)
GT-01-05



**Office de la propriété
intellectuelle
du Canada**

Un organisme
d'Industrie Canada

**Canadian
Intellectual Property
Office**

An Agency of
Industry Canada

Per Sverre  Kristensen

*Date of Issuance of Certificate - Date d'émission du certificat :*     August 25, 2006

Monique Laurin

Registrar of Copyrights — des droits d'auteur
Copyright Office — Bureau du droit d'auteur



1040833

CIPO 002501
31-01-06





**Office de la propriété intellectuelle du Canada**

Un organisme d'Industrie Canada

**Canadian Intellectual Property Office**

An Agency of Industry Canada

*Certificate of Registration of*

*Copyright*

*Certificat d'enregistrement du*

*Droit d'auteur*

*This Certificate of Registration is issued pursuant to sections 49 and 53 of the Copyright Act. The copyright in the work described below was registered on the date of registration as follows:*

*Ce certificat d'enregistrement est émis conformément aux articles 49 et 53 de la Loi sur le droit d'auteur. Le droit d'auteur sur l'œuvre décrite ci-dessous, a été enregistré à la date d'enregistrement comme suit:*

Date of Registration - Date d'enregistrement :     August 25, 2006

Registration No. - Numéro d'enregistrement :     1040853

First Publication - Première publication :     June 2003
                        Norway

Title - Titre :     Petrel Version 2003

Category - Catégorie :     Literary

Owner(s) - Titulaire(s) :     Schlumberger Canada Limited
Eau Clair Place 1, 525 3rd Avenue SW, 7th Floor
Calgary, Alberta
Canada, T2G 0P4

Author(s) - Auteur(s) :     Paal Hovdenak

Vivek Jain

Nils Petter Fremming

Date of Issuance of Certificate - Date d'émission du certificat :     August 25, 2006

*Marguie Laurin*

Registrar of Copyrights    Registraire des droits d'auteur
Copyright Office         Bureau du droit d'auteur





(CIPO 60200)
01-01-06

Court File No.

# FEDERAL COURT

BETWEEN:

## SCHLUMBERGER CANADA LTD.

Plaintiff

- and -

## GEOMODELING TECHNOLOGY CORP.

Defendant

## STATEMENT OF CLAIM

BAKER & McKENZIE LLP
Barristers & Solicitors
BCE Place, Suite 2100
181 Bay Street
Toronto, Ontario
M5J 2T3

Jim Holloway (343074)
jim.holloway@bakernet.com
(416) 865-1221 - telephone
(416) 863-6275 – facsimile

Carlos M. de Vera
carlos.m.devera@bakenet.com

(416) 865-2339 – telephone
(416) 863-6275 – facsimile

Solicitors for the Plaintiff

# TAB 7

Court File No:

# FEDERAL COURT

THE HONOURABLE M               )          Monday, the    day of October, 2006
JUSTICE                        )

BETWEEN:

## SCHLUMBERGER CANADA LTD.

Plaintiff

- and -

## GEOMODELING TECHNOLOGY CORP.

Defendants



# ORDER

THIS MOTION, made by the Plaintiff without notice for an order granting certain interim and interlocutory injunctive relief and for an *Anton Piller* Order granting the Plaintiff the right to enter certain premises for the purposes of locating and seizing evidence, was heard this day at Toronto, Ontario, Canada.

ON READING the Plaintiff's motion record, including the affidavits of Sarah Wilson, Keith Tushingham, Thomas Cox, Laura Rogers and John Doe, and on being advised of the Plaintiff's undertaking as to damages, and on hearing the submissions of Plaintiff's counsel,

IT IS HEREBY ORDERED THAT:

## Preliminary Matters

1. The Plaintiff is granted leave to bring this motion *ex parte*.

2. This Order shall become effective on the day that it is served and shall remain in effect for 14 days thereafter, unless otherwise extended by the Court.

## The Independent Supervising Solicitor

3. For the purpose of supervising the execution of this Order and reporting to the court, R. Billington of MacPherson Leslie Tyerman LLP is appointed as the independent supervising solicitor ("ISS").

## Explanation of Search and Seizure Authority

4. The ISS shall explain the nature and effect of this Order to anyone served with the Order, including the information set forth in Appendix A. In the event that any person's actions make this impossible or impracticable, a reasonable attempt to provide that explanation will be sufficient.

## Right to Legal Advice

5. The Defendant and any person served with this Order shall be entitled to seek legal advice at the time of service, and prior to disclosing the information and material required to be disclosed under the terms of this Order. In this event: (a) the Authorized Persons shall be entitled to immediately enter, secure and monitor the Location including all computer equipment and storage devices while such advice is being taken; and (b) this shall not delay the search for a period of more than 2 hours.

## The Location

6. The premises to be searched pursuant to this Order are those located at 1100, 665-8th Street SW, Calgary, Alberta, Canada, T2P 3K7, or such parts thereof as the

defendant corporation may occupy or use (the "Location"). In the event that any person served with this Order identifies another location where any Petrel Evidence is located, that location shall be deemed to be part of the Location for the purposes of this Order.

### The Authorized Persons

7. The following persons are entitled to enter the Location and any vehicles owned by the defendant and located at the Location, to carry out this Order (collectively the "Authorized Persons"):

   (a) the ISS;

   (b) not more than two representatives of Schlumberger Canada Ltd., which may include representatives of Schlumberger Information Systems;

   (c) one lawyer from Baker & McKenzie ("B&M");

   (d) computer technicians from Deloitte & Touche Forensic and Investigative Services Inc. ("D&T"), who shall attend for the purpose of searching, examining, retrieving and reproducing electronic data; and

   (e) such members of the Calgary Police Services as may be required for the purpose of keeping the peace during the execution of this Order.

### Search for and Seizure of Petrel Evidence

8. The Defendant and any person in charge of the Location are ordered to allow the Authorized Persons to enter the Location between the hours of 7 a.m. and 8 p.m. to search for, examine, copy and seize all information and material, including electronic data and records, however stored, relating in any way to the defendant's acquisition and use of unlicensed or unauthorized copies of the PETREL software program described in Appendix B, including, without limitation, computer files and records, data, drives, discs, software, applications, correspondence, memoranda, sales records, customer lists, e-mail communications, purchase orders, invoices, shipping documentation, bills of lading, customs documentation, contracts, notes, undertakings, drawings, diagrams, pricing lists and all other

material evidencing the defendant's unauthorized use of the PETREL software (collectively hereinafter the "Petrel Evidence").

9. Once the Authorized Persons have entered the Location and started their search, they shall be entitled to remain at the Location without interruption until the terms of this Order are carried out.

10. The Defendant and any person in charge of the Location shall: (a) disclose their full names and addresses; (b) disclose the location of all Petrel Evidence; and (c) do all lawful things necessary to allow the Authorized Persons access to any location or storage system where there may be Petrel Evidence.

The Electronic Records

11. The Authorized Persons shall have the right to search all of the Defendant's systems, programs and files that may contain Petrel Evidence, including, without limitation, all computer records, discs, drives, databases, backup tapes, archives, CD-ROMs, external hard drives, USB memory sticks and personal digital assistants, such as Palm Pilot or Blackberry devices (hereinafter "Electronic Records").

12. To facilitate the search of Electronic Records, the Defendant and any person served with this Order shall grant the Authorized Persons full access to the Defendant's computer systems, computer software, backup tapes, log files, archives and similar devices, including via the provision of the following:

    (a) a network configuration diagram for its systems if one exists at the present time;

    (b) all necessary computer passwords, encryption tools, access codes or other information as may be required to allow them to access the computers to be searched or to convert any data, file or information on the computers into a readable form;

    (c) all stored electronic mail of any kind sent to, from and through all e-mail

addresses used directly or indirectly by the Defendant or its employees for the purposes of business, including email address as established with any Internet Service Provider ("ISP");

(d) any screen names and subscriber information used with any Instant Messaging or Internet Rely Chat services by the Defendant or its employees for the purposes of business.

13. For the purposes of searching for and copying Electronic Records, D&T shall be entitled to connect to the Defendant's systems or devices any search, retrieval and reproduction equipment that it may deem necessary.

14. With the Defendant's consent, or if necessary because the Defendant's fail or refuse to cooperate in identifying Petrel Evidence, D&T shall be entitled to take a mirror image or bit-stream image of all of the Defendant's hard drives, servers and other electronic repository media that contain Electronic Records, including, without limitation, computer hardware or related equipment capable of creating or storing information in electronic or magnetic form, computer software, documentation, operating logs and instruction manuals, electronically stored communications or messages, and all other computer data storage mediums, including, without limitation, computer discs, CD-ROMs, external hard drives or USB memory sticks.

15. If the Defendant or any person served with this Order fails or refuses to grant Authorized Persons access to the Electronic Records, the ISS shall be entitled to remove from the Location any equipment or device that may contain Electronic Records, which it shall hold pending further Order of this Court or an agreement between the parties to this action.

16. The Defendant and its shareholders, directors, officers, employees and agents, and any other person having knowledge of this Order, shall not delete, modify, or destroy any Petrel Evidence, and shall not transfer or transmit any Petrel Evidence out of the jurisdiction of this Honorable Court, in a manner that defeats this Order.

17.    The Authorized Persons shall be entitled to photograph or videotape the Location
       to the extent necessary to monitor the execution or enforcement of this Order.

## Solicitor-Client & Confidential Material

18.    In the event that the Defendant asserts that any document is protected by solicitor-
       client privilege or contains confidential and proprietary information that is
       unconnected to any Petrel Evidence (collectively "Protected Information"), or if
       the ISS independently ascertains that this is the case, the following shall occur:

       (a)    In the event that all parties agree that the document is Protected
              Information, it shall not be read, reviewed, copied or seized; or

       (b)    In the event that all parties do not agree that the document is Protected
              Information, the ISS shall place that document in an envelope marked
              *CONFIDENTIAL - ALLEGEDLY PROTECTED INFORMATION* without
              further review, and shall seal that envelope at the conclusion of the search
              and maintain that sealed envelope in its possession. The ISS shall not
              disclose this information to anyone without the Defendant's prior written
              consent or further Order of this Court.

19.    In the event that the Defendant asserts that any Electronic Records contain
       Protected Information, or if the ISS independently ascertains that this is the case,
       the following shall occur:

       (a)    In the event that all parties agree that the files are Protected Information,
              they shall not be read, reviewed, downloaded, copied or seized, other than
              as permitted in subparagraph (b) below:

       (b)    In the event that all parties do not agree that the files are Protected
              Information or if it is impossible or impracticable to determine this during
              the search, D&T may copy these files but shall ensure that they are not
              provided or disclosed to anyone other than in strict accordance herewith;

       (c)    In the event that any alleged Protected Information is copied pursuant to
              subparagraph (b), D&T shall, within 14 days of the search, afford the
              Defendant and/or its legal counsel an opportunity to review all copied files
              to identify any privileged or confidential material.

       (d)    In the event that the Defendant and/or its legal counsel do not identify
              information or material as Protected Information pursuant to subparagraph

(c), it shall be produced in accordance with this Order. In the event that the Defendant and/or its legal counsel identify Protected Information pursuant to subparagraph (c), D&T shall move the files to a separate disc marked *CONFIDENTIAL – ALLEGEDLY PROTECTED INFORMATION* and put that disc in a sealed envelope marked *CONFIDENTIAL - ALLEGEDLY PROTECTED INFORMATION* and deliver that envelope to the ISS, which shall deal with it pursuant to subparagraph 18(b).

## Non-Disclosure of Order

20.    Every person on whom this Order is served or who has notice of the service of this Order is prohibited: (a) for a period of 72 hours after such service from disclosing to or discussing with any third party (other than legal counsel) the existence of these proceedings or this Order; and (b) from informing or warning any other party that the Plaintiff might execute this Order against that party.

## Custody and Use of Materials Seized

21.    Within 45 days of the search, the ISS shall make a list of all the items and records that are copied or seized pursuant to this Order and shall serve a copy of that list on all parties and file it with the Court. In the case of multiple items of physical product, a photograph of one item and an inventory of the specific numbers of that item seized will suffice.

22.    Within 60 days of the search, the ISS shall provide all parties with a copy of all Petrel Evidence, except any Protected Information.

23.    In the event that the Plaintiff requires physical access to any Petrel Evidence for the purposes of inspection and analysis, the ISS shall provide that access.

24.    To the extent that any records are seized rather than copied at the Location, the Authorized Persons shall forthwith conduct any necessary analysis and copying and return those records to the Defendant.

25. The information, items or records copied, seized or delivered up pursuant to this Order shall be preserved and utilized solely for the purpose of these proceedings.

## Assistance in Enforcing the Order

26. Counsel for the Plaintiff may engage the assistance of the appropriate local police or peace authorities for the sole purpose of keeping the peace during the execution of this Order.

## Injunction Restraining Infringement

27. The Defendant is hereby enjoined for a period of 14 days, subject to any extension granted, from:

    (a) individually or collectively conducting or carrying out any activities that infringe the copyright in the Petrel software program, including via the unlicensed use, exploitation, reproduction, installation or transmission of that program other than in accordance with the terms of any valid license(s) they hold;

    (b) moving, transferring or relinquishing the possession, custody or control of any Petrel Evidence, other than pursuant to this Order; and

    (c) ordering, aiding, abetting, authorizing or assisting others to do any of the above acts.

28. Notwithstanding paragraph 27, the Defendant may continue to utilize any licensed Petrel software that is lawfully installed on its computers (i.e. version 2007, Developer's Release) for the limited purpose of its continued business operations in the ordinary course.

## Effect of This Order

29. Any individual who is ordered not to do something by this Order must not do it himself or herself or indirectly via some other entity, including via giving instructions to any other person or entity. Any corporation that is ordered not to do

something by this Order must not do it itself or by its shareholders, directors, officers, employees or agents or in any other way.

## Court Review of Execution of the Order

30. The persons enforcing this Order shall serve on the Defendant: (a) a true copy of this Order; (b) the Motion Record; (c) the Statement of Claim; and (d) a Notice of Motion providing for the review by the Court of the execution of this Order and its continuation and amendment (the "Review Motion). Unless the parties agree otherwise, the Review Motion shall be returnable on or before January 30, 2006, or so soon thereafter as it is possible to have the matter heard.

31. In the event that the Defendant's actions make service pursuant hereto reasonably impossible, the persons enforcing this Order shall be entitled to leave a copy of the noted documents at the Location, which shall be deemed to be proper service on the Defendant.

32. The Plaintiff shall seek at the Review Motion an Order confirming that this Order was executed in accordance with its terms, supported by an affidavit from the ISS reporting on the execution and listing the Petrel Evidence copied or seized. The Plaintiff may also seek an Order if necessary extending any interim injunction granted or requested, without the need to serve or file a new Motion Record.

33. The Defendant may seek an earlier hearing of the Review Motion for the purpose of having this Order reviewed, set aside or varied, by Notice of Motion served on the Plaintiff in accordance with the *Federal Court Rules*.

34. The Defendant is not required to attend at the Review Motion and may, instead, consent in writing to any Order proposed by the Plaintiff in respect of that motion.

## Confidential Evidence

35. The affidavits of John Doe dated October , 2006 and Laura Rogers dated October 4, 2006 (the "Confidential Affidavits") shall be treated as confidential. The Confidential Affidavits shall be segregated from other materials filed with the court in this matter in a sealed envelope provided by Plaintiff's counsel on which the words "Confidential Evidence" are clearly marked.

36. Access to the Confidential Affidavits shall only be granted to: (a) a Prothonotary or Judge adjudicating matters in this proceeding, together with their respective judicial assistant(s) and law clerk(s); (b) court registry officers necessarily handling such file or files; and (c) any person or party designated upon further order of the court or on the prior written consent of all the parties.

37. Any person who is privy to the contents of the Confidential Affidavits shall not release or disclose that evidence or information in any manner to anyone except those permitted to see or know of it pursuant hereto.

38. The Defendant shall have the right to apply to the court on notice to the Plaintiff for an order lifting or modifying the restrictions on disclosure imposed hereby, in which case the Plaintiff shall have the burden of proof.

## Plaintiff's Undertaking

39. This Order is issued on the Plaintiff's undertaking to obey promptly any Order of the Court with respect to damages that may later issue arising out of any unauthorized execution of this Order or upon the setting aside of the Order.

## Miscellaneous

40. The Statement of Claim, this Order, and any other Orders and all documents received or filed in support of this motion shall be held in sealed envelopes in the custody of the Court until counsel for the Plaintiff notifies the Court that the Order and the Statement of Claim in this action have been served on the Defendant.

41.     The costs associated with this motion shall be determined by the Judge who hears
        the Review Motion.

_____

## *Appendix A To Court Order - Notice To The Defendants*

While the lawyer who serves you with this Order will explain it to you in everyday language, you should also read the terms of the Order yourself very carefully and seek legal advice. While you can and should consult a lawyer as soon as possible, this cannot unreasonably delay compliance with the Order. Also, you must nonetheless allow the authorized persons to enter the premises in order to ensure that no relevant information or material is moved or destroyed while you seek advice.

This Order directs you to allow the persons mentioned herein to enter the premises described in the Order to search for, examine and copy or remove the specified articles and information, on any day of the week at any time between 7:00 a.m. and 8:00 p.m. The Order also requires you to provide certain material and information to the authorized persons, subject to certain restrictions.

It is very important to note that those authorized to enter the premises are not entitled to see any communications the Defendant has had with its lawyer and this Order does not require anyone to disclose these communications. The Order contains certain protections designed to avoid the inadvertent disclosure of such privileged information.

You are directed to provide the persons enforcing this Order with your name and address, and to cooperate with the persons enforcing this Order in all matters related to its enforcement. Beyond that, you are entitled to remain silent and to refuse to answer any questions other than as specifically directed in the Order.

The Order prohibits the Defendant from doing certain acts in the future. In particular, it must immediately stop using or dealing with any unauthorized copies of the Petrel Program, and cannot alter, erase, destroy, or dispose of any related information or records.

In the event that you disobey this Order, you could be found guilty of contempt of Court and subject to a fine or even a term of imprisonment. Also, the court may draw adverse inferences against the Defendant for failing to cooperate and refusing to allow the authorized persons entry into the premises to carry out the terms of this Order.

In the event that the Defendant fails to defend these proceedings, you may be subject to an award of damages, an award of costs and, further, any materials seized pursuant to this Order may be destroyed.

The Defendant may bring a motion to the Court at any time, upon notice to the Plaintiff's lawyer, to contest the issuance, service or execution of this Order.

### *Appendix B to Court Order – list of Petrel Software*

Petrel Version 1.0

Petrel Version 2002

Petrel Version 2002SE

Petrel Version 2003FE

Petrel Version 2003SE

Petrel Version 2004

Petrel Version 2005

Court File No.

# FEDERAL COURT

BETWEEN:

## SCHLUMBERGER CANADA LTD.

Plaintiff

- and -

## GEOMODELING TECHNOLOGY CORP.

Defendant

### ORDER

BAKER & McKENZIE LLP
Barristers & Solicitors
BCE Place, Suite 2100
181 Bay Street
Toronto, Ontario
M5J 2T3

Jim Holloway (343074)
jim.holloway@bakernet.com
(416) 865-1221 - telephone
(416) 863-6275 – facsimile

Carlos M. de Vera
carlos.m.devera@bakenet.com

(416) 865-2339 – telephone
(416) 863-6275 – facsimile

Solicitors for the Plaintiff

Court File No.

# FEDERAL COURT

**BETWEEN:**

## SCHLUMBERGER CANADA LTD.

Plaintiff

- and -

## GEOMODELING TECHNOLOGY CORP.

Defendant

### PLAINTIFF'S MOTION RECORD
(Re: ex-parte injunction)

BAKER & McKENZIE LLP
Barristers & Solicitors
BCE Place, Suite 2100
181 Bay Street
Toronto, Ontario
M5J 2T3

Jim Holloway (343074)
jim.holloway@bakernet.com
(416) 865-1221 - telephone
(416) 863-6275 – facsimile

Carlos M. de Vera
carlos.m.devera@bakenet.com

(416) 865-2339 – telephone
(416) 863-6275 – facsimile

Solicitors for the Plaintiff