# Exhibit 20

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| DYNAMIC 3D GEOSOLUTIONS LLC, | CASE NO.: 1:14-CV-00112-LY |
| Plaintiff, | DECLARATION OF W. AMON BURTON, JR. |
| v. | |
| SCHLUMBERGER LIMITED (SCHLUMBERGER N.V.); SCHLUMBERGER HOLDINGS CORPORATION; AND SCHLUMBERGER TECHNOLOGY CORPORATION, | |
| Defendants. | |

**DECLARATION OF W. AMON BURTON, JR.**

1.      My name is W. Amon Burton, Jr.  I am over the age of eighteen, have never been convicted of a crime, and I am competent to make this Declaration.

2.      I have based my opinions set forth below on facts or data of a type reasonably relied on by experts in my field in forming opinions on the subjects of the professional duties and responsibilities of lawyers, including conflicts of interest and motions to disqualify lawyers.

3.      I have been retained by the law firm of Latham & Watkins on behalf of Schlumberger Limited, Schlumberger Holdings Corporation, and Schlumberger Technology Corporation (collectively "Schlumberger"), to formulate and provide my opinions as an expert witness in certain litigation styled *Dynamic 3D Geosolutions LLC v. Schlumberger Limited, Schlumberger Holdings Corporation, and Schlumberger Technology Corporation* in the United States District Court for the Western District of Texas, Austin Division (the "Lawsuit") with

regard to the duties and responsibilities of lawyers, conflicts of interest and motions to disqualify lawyers.

## I.     QUALIFICATIONS

4.      I am an attorney licensed to practice law in Texas (Bar Card No. 03484000) and my office is located at 98 San Jacinto Blvd. Suite 1200, Austin, Texas.  I was licensed to practice law in Texas in 1968, and since then I have actively and continuously practiced law in Texas.

5.      Since January 1988, I have served as an Adjunct Professor of Law at The University of Texas School of Law.  I also have been an Adjunct Professor of Law for three semesters at St. Mary's University School of Law in San Antonio, Texas.  In September 1995, I was a KECK Visiting Lecturer in Legal Ethics at Cornell Law School in Ithaca, New York.  In such capacities, I have taught classes and seminars on the duties and responsibilities of lawyers, the ethical rules governing the conduct of lawyers, and the law governing lawyers.

6.      I am a member of the American Law Institute ("ALI") and served on the ALI's consultative group in drafting the RESTATEMENT OF THE LAW THIRD: THE LAW GOVERNING LAWYERS (2000).

7.      I was appointed by the National Conference of Bar Examiners in 2001 to serve as a member of the seven-member committee that drafts the Multistate Professional Responsibility Examination (MPRE) used by most states, including Texas, as a part of the bar examination for the licensing of lawyers.  I served on the MPRE drafting committee from 2001 through 2008.

8.      From 1993 to September 2005, I served on the Texas Supreme Court's Professional Ethics Committee, which issues ethics opinions interpreting the Texas Disciplinary Rules of Professional Conduct.  I also have served as a member of the State Bar's Standing Committee on the Texas Disciplinary Rules of Professional Conduct.  During 1993 and 1994, I served as the Adviser/Reporter for the Texas Supreme Court's Task Force on Judicial Ethics that

drafted the revised Texas Code of Judicial Conduct, and from 2003 to 2005 served as the reporter and ex-officio member of the Committee on Judicial Ethics of the Judicial Section of the State Bar of Texas.

9.      I have been a speaker or panelist at legal conferences and have made presentations at such conferences on the professional duties, responsibilities and ethics of lawyers.  I have published papers in numerous conference publications of the State Bar of Texas, The University of Texas at Austin, the University of Houston, and the American Bar Association, and have published law review articles.  I have co-authored with Professor John S. Dzienkowsk a book of case studies of lawyer liability issues entitled *Ethical Dilemmas in the Practice of Law:  Case Studies and Problems* (Thompson/West 2006).  One of my law review articles addressed the topic of conflicts of interest issues when lawyers move from one firm to another firm: *Migratory Lawyers and Imputed Conflicts of Interest*, 16 REV. LITIG. 665 (1997). That law review article was quoted in a Fifth Circuit Court of Appeals opinion styled *In re ProEducation Int'l., Inc.*, 587 F.3d 296 (5th Cir. 2009).  I consult regularly with law firms on professional ethics issues and have served as an expert witness in litigation involving the duties and responsibilities of lawyers.

10.      A copy of my current curriculum vitae is attached hereto as Exhibit A, and a listing of testimony that I have given during the past four years in court as an expert witness is attached hereto as Exhibit B.  I am being compensated at the rate of $600 per hour for my services as an expert witness, including any testimony that I might give at a court hearing or trial.

## II.      DOCUMENTS REVIEWED

11.      In connection with my retention as an expert witness in this Lawsuit and in forming the opinions expressed herein, I have been provided with and have read or reviewed documents, agreements, letters, public filings, depositions and exhibits thereto pertaining to the

3

Lawsuit (the "Documents").  A listing of the Documents I have read or reviewed in connection with forming my opinions in this Lawsuit is attached hereto as Exhibit C.

## III.    SUMMARY OF FACTS

12.    The following constitutes a summary of facts and assumptions that I have been provided and relied upon as being true and correct in forming the opinions stated in this Declaration.

a.    Charlotte H. Rutherford is an attorney who has been actively licensed since 1988 to practice law in Texas and currently practices law in Houston, Texas.  She is licensed to practice law in the states of New York and New Jersey, and has an active license to practice law before the U.S. Patent and Trademark Office.  From July 2006 to May 31, 2013, Ms. Rutherford was employed at Schlumberger in Houston as an in-house attorney and executive managing Schlumberger's intellectual property.  From 2006 to 2009, Ms. Rutherford was Schlumberger's Senior Counsel, Licensing and Litigation, and in 2009 she was promoted to be Schlumberger's Director of Intellectual Property.  Later, her title was changed to Deputy General Counsel for Intellectual Property.

b.    As Director of Intellectual Property for Schlumberger, and then subsequently as Deputy General Counsel for Intellectual Property, Ms. Rutherford was responsible for "developing and implementing . . . [Schlumberger's] worldwide IP strategy."  In that role she developed, implemented and oversaw Schlumberger's intellectual property programs, including monetization, enforcement (including litigation), and operation of Schlumberger's business segments.  Ms. Rutherford was also "[r]esponsible for protecting and preserving . . . [Schlumberger's] IP assets including patents, trademarks and trade secrets by establishing and maintaining best practices and procedures."

c.    In her role as Schlumberger's senior counsel for intellectual property, Ms. Rutherford received on a regular basis attorney-client privileged information, as well as Schlumberger's confidential, secret, proprietary and trade secret information.  This included communications regarding Schlumberger's patents, the coverage of patents, and the company's efforts to expand protection for its intellectual property.  In that regard, Ms. Rutherford learned how Schlumberger analyzes and reviews intellectual property challenges and litigation instituted by third parties, including litigation strategies and the company's decision-making process regarding settlement of patent infringement claims.

d.    As Schlumberger's attorney, Ms. Rutherford directly participated in and was involved in numerous legal matters pertaining to Schlumberger's Petrel product ("Petrel"). Petrel is the sole Schlumberger product that is accused of patent infringement in this Lawsuit.

e.    In 2007, Ms. Rutherford led or coordinated a team of lawyers and engineers charged with the responsibility of conducting an intellectual property assessment (referred to as a "Goldstar" assessment) of Schlumberger's Petrel product.  During that Goldstar assessment, Ms. Rutherford participated in at least six meetings with other Schlumberger attorneys that involved: (1) a strategy session to define the strategy map and prepare for the filing of patent applications; (2) finalization of Petrel Goldstar documents; and (3) the review and revision of the Petrel patent application, with specific focus on expanding disclosures, refining claims, and preparing for filing.  She also participated in Schlumberger's retention of outside counsel to perform patent strategy analysis for the Petrel product.

f.    During the Petrel Goldstar assessment, Ms. Rutherford received written reports from other Schlumberger in-house lawyers during each phase of the Petrel Goldstar intellectual property assessment.  One of the reports that Ms. Rutherford received discussed

Schlumberger's competitors' products including the RECON product owned by Austin GeoModeling, Inc. ("Austin GeoModeling").   RECON is the predecessor to the RECON 3.0 product, which Plaintiff claims is covered by U.S. Patent No. 7,986,319 ("the '319 Patent"). Acacia Research Group LLC ("Acacia") acquired the '319 Patent in August 2013 from Austin GeoModeling.   Acacia then transferred and conveyed the '319 Patent to its wholly owned subsidiary, Dynamic 3D Geosolutions LLP ("Dynamic 3D" or "Plaintiff").   Acacia then caused Dynamic 3D to file this Lawsuit claiming that the RECON 3.0 product is covered by the '319 patent, and that Schlumberger's Petrel product infringes the '319 Patent.

        g.      The written reports that Ms. Rutherford received during the Petrel Goldstar assessment included: (1) a memo analyzing the patent portfolio, competitive landscape, and business/IP strategies of Petrel and Petrel's competitor products; (2) a document discussing business and technology plans for the Petrel product from 2007 to 2012, issued in February 2007 by Schlumberger Information Systems ("SIS"), the business unit responsible for Petrel; (3) a chart reflecting the intellectual property rights occupied by Petrel and Petrel's competitor products; (4) a plan to strengthen intellectual property coverage for Petrel, including filing new patent applications and/or acquiring technology via licensing and acquisitions; and (5) a document mapping Petrel as it existed, Petrel as it was expected to exist after addition of database functions, and Petrel's competitor products.

        h.      One of Ms. Rutherford's responsibilities at Schlumberger was to develop Schlumberger's patent enforcement and licensing programs.   In that capacity, Ms. Rutherford directed intellectual property enforcement lawsuits and provided input on intellectual property litigation strategies, including Schlumberger's patent litigation in the energy sector.   Ms.

Rutherford also advised on important intellectual property enforcement actions brought by Schlumberger's various business units, including SIS, the business unit responsible for Petrel.

      i.    For example, in 2007, Ms. Rutherford managed a copyright infringement case Schlumberger filed in Canada over the unlicensed copying of software in Schlumberger's Petrel product.  According to Jim Hollway's Declaration outside counsel for Schlumberger in that Petrel-related Canadian copyright litigation, this included "explain[ing] to [trial counsel] the nature of the Petrel software, and deliver[ing] to [trial counsel] information regarding its authorship and [Schlumberger]'s ownership."  Ms. Rutherford reviewed and approved the "statement of claim (i.e., complaint) . . . which asserts [Schlumberger]'s ownership of the Petrel software and the nature of damages [Schlumberger] would suffer."  Ms. Rutherford also reviewed and approved materials disclosing: (1) "a description of the Petrel software and [Schlumberger]'s standard licensing terms"; (2) "the value of the Petrel software (e.g., licensing rates and streams)"; and (3) "the likely and extensive harm to [Schlumberger] flowing from the defendant's alleged infringing activities."  Jim Holloway has stated:

> On virtually every important matter, Ms. Rutherford was directly and personally involved.  In virtually every case where anyone else at [Schlumberger] communicated with me, Ms. Rutherford was copied on those communications.  In addition to providing instructions, Ms. Rutherford was very involved in assessing the strength of [Schlumberger]'s case, formulating our litigation strategy, and formulating settlement goals and discussions.

Ms. Rutherford also worked with Mr. Holloway on other patent and trademark cases, and, according to Mr. Holloway, "Ms. Rutherford was also personally involved in formulating litigation and in some cases settlement strategy" in those cases as well.

      j.    Ms. Rutherford also directed Schlumberger's effort to monetize its patents and other intellectual property assets.  She supervised monetization efforts taken by Schlumberger's business units, and participated in efforts to strengthen Schlumberger's patent

portfolio.   Ms. Rutherford received at least two presentations about the desirability of strengthening patents covering products managed by the SIS unit at Schlumberger, including its Petrel product.

k.   Throughout her employment with Schlumberger, Ms. Rutherford represented Schlumberger in matters relating to versions of the Petrel product that are not materially different than the versions of Petrel accused of infringement in this case.   This is based on Martyn Beardsell's Declaration which states, in relevant part, that "[t]he features and functionality identified by [Plaintiff] as allegedly infringing existed in versions 2005, 2007, 2008, 2009, 2010, 2011, 2012, and 2013 of Petrel."

l.   When Ms. Rutherford was hired as an in-house attorney at Schlumberger, she signed a Patent and Confidential Information Agreement effective July 24, 2006 (the "Confidentiality Agreement").   In the Confidentiality Agreement, Ms. Rutherford (then known by her former name, Charlotte Copperthite) agreed "not to disclose to anyone outside of Company or its Affiliates, or use in other than Company's business, any trade secrets or confidential technical or business information or material of Company or its Affiliates either during or after employment by Company."   The Confidentiality Agreement specifically states that valuable trade secrets and other confidential information belonging to the Company, and to be entrusted to Ms. Rutherford, included "the design and production of methods and apparatus particularly useful in the business of: (i) developing, evaluating, treating and/or testing earth formations and boreholes, both cased and uncased; and (ii) interpreting the characteristics of earth formations and the application of those interpretations . . . ."

m.   Ms. Rutherford terminated her employment at Schlumberger effective May 31, 2013.   Three days later, on June 3, 2013, Ms. Rutherford started work at Acacia as its

Senior Vice President and Associate General Counsel.   Acacia hired Rutherford to direct Acacia's efforts to "monetize" energy technologies.   Ms. Rutherford opened Acacia's Houston office, which directs Acacia's energy practice.   Among others, Acacia's Houston office employs: (1) Gary Fischman, an intellectual property attorney responsible for the strategy and conduct of all '319 Patent litigation; and (2) Phillip Mitchell, an engineer who works on '319 Patent matters at the direction of Mr. Fischman and Acacia's outside counsel, the private law firm of Collins, Edmonds, Pogorzelski, Schlather & Tower PLLC ("Collins Edmonds").   Ms. Rutherford is the most senior member of Acacia's Houston office, and both Mr. Fischman and Mr. Mitchell report directly to her.   Until May 2014, Mr. Fischman only reported to Ms. Rutherford.   In May 2014, approximately four months after the Lawsuit was filed against Schlumberger, Mr. Fischman also began reporting to Jamie Siegel, Acacia's Executive Vice President of Licensing and Litigation, in addition to Ms. Rutherford.

n.     Shortly after being hired by Acacia, Ms. Rutherford participated in two meetings in Austin, Texas with the named inventors of the '319 Patent for the purpose of assessing whether Acacia should acquire the '319 Patent for possible assertion against companies in the energy sector, including Schlumberger.   Other members of Acacia's legal and engineering departments were present, including Mr. Fischman, who participated in the second meeting.   Ms. Rutherford admits that she was acting as a lawyer for Acacia at both of these meetings.   Ms. Rutherford has further acknowledged that Schlumberger and its Petrel product were mentioned and Schlumberger was identified as a potential infringer for assertion of the '319 Patent at both meetings.   Ms. Rutherford did not excuse herself from either meeting even though Schlumberger and Petrel were mentioned and Schlumberger was identified as a potential infringer of the '319

Patent.  Ms. Rutherford has also admitted that the decision by Acacia to acquire the '319 Patent and sue for patent infringement "was part of the same review process."

      o.     After her meetings with Austin GeoModeling, Ms. Rutherford directly participated in Acacia's decision to acquire and file suit against Schlumberger on the '319 Patent.  This included a one-hour telephone conference call with: (1) Mr. Fischman; (2) Michael Collins, of the Collins Edmonds firm; (3) Matthew Vella, Acacia's Chief Executive Officer ("CEO") and President; (4) possibly Mr. Mitchell; and (5) the named inventors of the '319 Patent.  Ms. Rutherford acknowledges that this call was conducted in anticipation of litigation.

      p.     After the call, Ms. Rutherford received recommendations from Messrs. Fischman, Collins, and Mitchell that Acacia acquire and file suit against Schlumberger on the '319 Patent.  Mr. Collins and possibly others from the Collins Edmonds firm then presented Ms. Rutherford with a PowerPoint presentation referencing Schlumberger.  Subsequently, Ms. Rutherford approved the recommendations to acquire and file suit against Schlumberger on the '319 Patent.  Ms. Rutherford admits that she was acting as Acacia's lawyer when she reviewed and approved those recommendations.  Ms. Rutherford approved the recommendations with knowledge that Acacia had identified Schlumberger as a potential infringer for a patent infringement suit based on the '319 Patent.

      q.     With Ms. Rutherford's recommendation in-hand, Mr. Fischman and Mr. Collins, of the Collins Edmonds firm, made the same presentation to Mr. Vella, Acacia's CEO. With the benefit of Ms. Rutherford's approval, Mr. Vella authorized the plan to acquire the '319 Patent and file suit against Schlumberger.

      r.     In August 2013, Acacia and Austin GeoModeling entered into an agreement wherein Acacia agreed to license and enforce the '319 Patent.  In connection

therewith, Austin GeoModeling assigned to Acacia "all right, title and interest" in and to the '319 Patent, including all rights to sue for past and present infringement of the '319 Patent.  In December 2013, Acacia assigned all its right, title and interest in the '319 Patent to its wholly owned subsidiary, Dynamic 3D, which is the Plaintiff in this Lawsuit against Schlumberger.

      s.     Plaintiff is a wholly-owned Acacia subsidiary.  Plaintiff appears to depend entirely on Acacia's in-house attorneys for its strategy and conduct in this litigation.  Ms. Rutherford has indicated that Plaintiff has no employees.  Plaintiff's Corporate Disclosure Statement further provides that Acacia Research Group LLC is Plaintiff's parent—the very entity that employs both Ms. Rutherford and Mr. Fischman.  Acacia Research Corporation, in turn, owns 100% of Acacia Research Group LLC.  Plaintiff's Certificate of Formation also states that Plaintiff will not have managers, but rather will be governed by its members.  The Certificate lists Acacia Research Group LLC as its sole governing member.  Mr. Fischman, a member of Acacia's in-house legal team, has been introduced to the Court by Mr. Collins, Plaintiff's counsel of record, as Plaintiff's "representative."

      t.     Ms. Rutherford has admitted that she was involved in the acquisition of the '319 Patent and planning for litigation against parties in the energy market, including Schlumberger.  This included:

      i.     In the Summer of 2013, Ms. Rutherford reviewed the '319 Patent in anticipation of litigation.

      ii.     Ms. Rutherford then participated in meetings and a conference call in anticipation of litigation, and Ms. Rutherford then approved recommendations to acquire the '319 Patent and file suit against Schlumberger.

11

iii.     Ms. Rutherford and Mr. Fischman jointly made the decision to retain the Collins Edmonds law firm to serve as Plaintiff's counsel of record in all '319 Patent litigation.

iv.     Ms. Rutherford reviewed a draft of the complaint that Plaintiff later filed against Halliburton alleging infringement of the '319 Patent.  The Halliburton complaint was filed on the same day as the complaint Plaintiff filed against Schlumberger in this Lawsuit, and Ms. Rutherford has acknowledged that the Halliburton and Schlumberger complaints are similar.

v.     After this Lawsuit was filed against Schlumberger, Ms. Rutherford requested that Mr. Fischman provide her with a copy of the complaint filed against Schlumberger so that she could review it.

vi.     Mr. Fischman is responsible for the strategy and conduct of all '319 Patent litigation, working in conjunction with the Collins Edmonds firm.  Until May 2014, Mr. Fischman only reported to Ms. Rutherford.  In May 2014, approximately four months after the Lawsuit was filed against Schlumberger, Mr. Fischman also began reporting to Jamie Siegel, Acacia's Executive Vice President of Licensing and Litigation, in addition to Ms. Rutherford.

vii.     Ms. Rutherford admits that she had discussions with Mr. Fischman regarding protection of Plaintiff's patent rights both before and after Plaintiff acquired the '319 Patent, and those discussions continued even after Plaintiff filed its complaint against Schlumberger.  Ms. Rutherford admits that she was acting as a lawyer during those discussions, but she has refused to disclose the substance of those communications.

u.     On February 4, 2014, Dynamic 3D, as Plaintiff, filed a complaint alleging that Schlumberger's Petrel product wilfully infringes the '319 Patent.  Ms. Rutherford has acknowledged that she approved recommendations to file the Lawsuit against Schlumberger.

v.     On the same day that Plaintiff sued Schlumberger, Plaintiff also filed a similar patent infringement lawsuit against Halliburton.  Plaintiff has since filed complaints against four other parties alleging infringement of the '319 Patent by other companies in the energy sector.

w.     Michael Collins, one of Plaintiff's counsel of record in the Lawsuit, has claimed that Ms. Rutherford was screened from matters related to the '319 Patent and the Lawsuit against Schlumberger.  For example, in a letter to Defendant's counsel dated May 5, 2014, Mr. Collins represented: "Since the time of her arrival at Acacia, Ms. Rutherford has been screened and will continue to be screened from any discussion that involves Schlumberger, or any of its products or technology."

x.     According to Robin Nava, a current employee in Schlumberger's in-house legal department, Schlumberger has not received any written notice from Acacia or Plaintiff stating that Ms. Rutherford was screened after she began her employment, on June 3, 2013, as Senior Vice President and Acacia's Associate General Counsel, nor has Schlumberger received any certifications of compliance from Acacia or Plaintiff regarding those purported screening procedures.

## IV.     OPINIONS

13.     The opinions I have formed in this matter as an expert witness are based upon the facts and assumptions as set forth above in the Summary of Facts, my reading of the Documents, my understanding of applicable law with respect to motions to disqualify counsel, and my

experience in teaching the ethical duties and responsibilities of lawyers and in consulting with lawyers and law firms about professional ethics issues.

14.     Throughout the seven years that Ms. Rutherford was employed as an in-house attorney for Schlumberger, it is my opinion that Ms. Rutherford clearly had an attorney-client relationship with Schlumberger.  As that company's Senior Counsel, Licensing and Litigation, and later its Deputy General Counsel for Intellectual Property, Schlumberger was her client. Accordingly, when Ms. Rutherford terminated her employment with Schlumberger on May 31, 2013, Schlumberger became her former client.

15.     It is my opinion that during the time Ms. Rutherford was employed as an in-house attorney and represented Schlumberger, she directly participated in and personally represented Schlumberger on intellectual property legal matters pertaining to its Petrel product. The basis of that opinion is as follows:

        a.      In 2007, Ms. Rutherford led or coordinated a team of lawyers and engineers charged with the responsibility of conducting an intellectual property assessment (referred to as a "Goldstar" assessment) of Schlumberger's Petrel product.  During that Goldstar assessment, Ms. Rutherford participated in at least six meetings with other Schlumberger attorneys that involved: (1) a strategy session to define the strategy map and prepare for the filing of patent applications; (2) finalization of Petrel Goldstar documents; and (3) the review and revision of the Petrel patent application, with specific focus on expanding disclosures, refining claims, and preparing for filing. She also participated in Schlumberger's retention of outside counsel to perform patent strategy analysis for the Petrel product.

        b.      During the Petrel Goldstar assessment, Ms. Rutherford received written reports from other Schlumberger in-house lawyers during each phase of the Petrel Goldstar

intellectual property assessment.  One of the reports that Ms. Rutherford received discussed Schlumberger's competitors' products included the RECON product owned by Austin GeoModeling.  RECON is the predecessor to the RECON 3.0 product, which Plaintiff claims is covered by the '319 Patent.  Acacia acquired the '319 Patent in August 2013 from Austin GeoModeling.  Acacia then transferred and conveyed the '319 Patent to its wholly owned subsidiary, Dynamic 3D.  Acacia then caused Dynamic 3D to file this Lawsuit claiming that the RECON 3.0 product is covered by the '319 patent, and that Schlumberger's Petrel product infringes the '319 Patent.

        c.     The written reports that Ms. Rutherford received during the Petrel Goldstar assessment included: (1) a memo analyzing the patent portfolio, competitive landscape, and business/IP strategies of Petrel and Petrel's competitor products; (2) a document discussing business and technology plans for the Petrel product from 2007 to 2012, issued in February 2007 by SIS, the business unit responsible for Petrel; (3) a chart reflecting the intellectual property rights occupied by Petrel and Petrel's competitor products; (4) a plan to strengthen intellectual property coverage for Petrel, including filing new patent applications and/or acquiring technology via licensing and acquisitions; and (5) a document mapping Petrel as it existed, Petrel as it was expected to exist after addition of database functions, and Petrel's competitor products.

        d.     One of Ms. Rutherford's responsibilities at Schlumberger was to develop Schlumberger's patent enforcement and licensing programs.  In that capacity, Ms. Rutherford directed intellectual property enforcement lawsuits and provided input on intellectual property litigation strategies, including Schlumberger's patent litigation in the energy sector.  Ms. Rutherford also advised on important intellectual property enforcement actions brought by Schlumberger's various business units, including SIS, the business unit responsible for Petrel.

e.      For example, in 2007, Ms. Rutherford managed a copyright infringement case Schlumberger filed in Canada over the unlicensed copying of software in Schlumberger's Petrel product.  According to Jim Hollway's Declaration outside counsel for Schlumberger in that Petrel-related Canadian copyright litigation, this included "explain[ing] to [trial counsel] the nature of the Petrel software, and deliver[ing] to [trial counsel] information regarding its authorship and [Schlumberger]'s ownership."  Ms. Rutherford reviewed and approved the "statement of claim (i.e., complaint) . . . which asserts [Schlumberger]'s ownership of the Petrel software and the nature of damages [Schlumberger] would suffer."  Ms. Rutherford also reviewed and approved materials disclosing: (1) "a description of the Petrel software and [Schlumberger]'s standard licensing terms"; (2) "the value of the Petrel software (e.g., licensing rates and streams)"; and (3) "the likely and extensive harm to [Schlumberger] flowing from the defendant's alleged infringing activities."  Jim Holloway has stated:

> On virtually every important matter, Ms. Rutherford was directly and personally involved.  In virtually every case where anyone else at [Schlumberger] communicated with me, Ms. Rutherford was copied on those communications.  In addition to providing instructions, Ms. Rutherford was very involved in assessing the strength of [Schlumberger]'s case, formulating our litigation strategy, and formulating settlement goals and discussions.

Rutherford also worked with Mr. Holloway on other Schlumberger patent and trademark cases, and, according to Mr. Holloway, "Ms. Rutherford was also personally involved in formulating litigation and in some cases settlement strategy" in those cases as well.

f.      Ms. Rutherford also directed Schlumberger's effort to monetize its patents and other intellectual property assets.  She supervised monetization efforts taken by Schlumberger's business units, and participated in efforts to strengthen Schlumberger's patent portfolio.  Ms. Rutherford received at least two presentations about the desirability of

strengthening patents covering products managed by the SIS unit at Schlumberger, including its Petrel product.

16.     When Ms. Rutherford terminated her position as Deputy General Counsel for Intellectual Property at Schlumberger and commenced her employment with Acacia on June 3, 2013, it is my opinion that she had a duty as an attorney to comply with all ethical standards of professional conduct governing the conduct of lawyers, as well as all contractual obligations she had with Schlumberger.  In particular, Ms. Rutherford had: (1) a duty to avoid any conflicts of interest as a result of her prior representation of Schlumberger; and (2) a duty not to reveal her former client's confidential information, or use any confidential information of her former client to its disadvantage unless Schlumberger gave its prior consent or such confidential information had become generally known.

### A.     CHOICE OF LAW

17.     The Fifth Circuit Court of Appeals has repeatedly stated that a "[d]istrict [c]ourt is obliged to take measures against unethical conduct occurring in connection with any proceeding before it." *In re ProEducation Int'l.*, 587 F.3d at 296 (quoting *In re Am. Airlines, Inc.*, 972 F.2d 605, 611 (5th Cir. 1992)).  Motions to disqualify counsel are "substantive motions affecting the rights of the parties and are determined by applying standards developed under federal law."  *In re Am. Airlines*, 972 F.2d at 610 (citing *In re Dresser Indus., Inc.*, 972 F.2d 540, 543 (5th Cir. 1992)).

18.     The Fifth Circuit has held that district courts may adopt the Texas Disciplinary Rules of Professional Conduct ("Texas Disciplinary Rules") or the American Bar Association's Model Rules of Professional Conduct (the "ABA Model Rules") as their ethical standards, but the Texas Disciplinary Rules are not the sole authority governing a motion to disqualify.  A reviewing court also "consider[s] the motion governed by the ethical rules announced by the

national profession in light of the public interest and the litigants' rights." *In re Dresser*, 972 F.2d at 543. And the Fifth Circuit has recognized the ABA Model Rules as the national standards to consider in reviewing motions to disqualify. Accordingly, both the Texas Disciplinary Rules and the ABA Model Rules are considered in addressing motions to disqualify. However, whether and how those rules are applied are questions of federal law.

19.    In accordance with Fifth Circuit standards, the Local Rules for the District Court for the Western District of Texas, Austin Division, provide that lawyers must comply with the Texas Disciplinary Rules of Professional Conduct (the "Texas Disciplinary Rules"). Local Rule AT-7, Discipline of Attorneys. Local Rule AT-7 also provides that the Texas Disciplinary Rules are "not exhaustive of the standards of professional conduct. For matters not covered by the Texas rules, the American Bar Association's Model Rules of Professional Conduct should be consulted."

### B.    THE "SUBSTANTIAL RELATIONSHIP" TEST

20.    The "substantially related" standard for determining former client conflicts of interest was developed at common law. *T.C. Theatre Corp. v. Warner Bros. Pictures, Inc.*, 113 F. Supp. 265 (S.D.N.Y. 1953). And this common law "substantially related" standard was subsequently adopted and incorporated into both the Texas Disciplinary Rules and ABA Model Rules.

21.    The Fifth Circuit's "substantial relationship" test requires that a party seeking to disqualify opposing counsel on the ground of a former representation establish two elements: (1) an actual attorney-client relationship between the moving party and the attorney he seeks to disqualify; and (2) a substantial relationship between the subject matter of the former and present representations. *In re Am. Airlines*, 972 F.2d at 614 (citing *Johnston v. Harris Cnty. Flood Control Dist.*, 869 F.2d 1565, 1569 (5th Cir. 1989); *In re Corrugated Container Antitrust Litig.*,

659 F.2d 1341, 1345 (5th Cir. 1981), *abrogated on other grounds*, *Gibbs v. Paluk*, 742 F.2d 181 (5th Cir. 1984); *Duncan v. Merrill Lynch, Pierce, Fenner & Smith*, 646 F.2d 1020, 1028 (5th Cir.), *cert. denied*, 454 U.S. 895 (1981)).

a. The "substantially related" standard has been interpreted broadly by the Fifth Circuit to protect both a lawyer's former client and the attorney-client relationship. The Fifth Circuit made it clear beginning in the 1960s that the substantial relationship test cannot be reduced only to a confidentiality rule because it encompasses more than the mere protection of a former client's confidential information. *E.F. Hutton & Co. v. Brown*, 305 F. Supp. 371, 375 (S.D. Tex. 1969) ("If courts protect only a client's disclosures to his attorney, and fail to safeguard the attorney-client relationship itself—a relationship which must be one of trust and reliance—they can only undermine the public's confidence in the legal system as a means for adjudicating disputes."), As the Court later explained in *In re American Airlines*: "That is, because the substantial relationship test is concerned with both a lawyer's duty of confidentiality *and* his duty of loyalty, a lawyer who has given advice in a substantially related matter must be disqualified, whether or not he has gained confidences." (italics in the opinion.) *In re American Airlines*, 972 F.2d at 619. The test is not only necessary to ensure the fairness of a trial, "but also to safeguard the integrity of the attorney-client relationship." *Id.*

b. Pursuant to the Fifth Circuit's holdings in *In re American Airlines, Inc.* and *In re Corrugated Container Antitrust Litigation*, the subject matter between the former and current representations does not need to be relevant in the evidentiary sense to be "substantially related." Rather, the subject matter of the former representation "need only be akin to the present action in a way reasonable person would understand as important to the issues involved." *In re Am. Airlines*, 972 F.2d at 623 (quoting *In re Corrugated Container*, 659 F.2d at 1346).

c.      It is my opinion that the Fifth Circuit's standard for a "substantially related" matter, which is articulated above in subparagraphs (a) and (b), is the basis for determining whether two matters are substantially related in district courts within the Fifth Circuit, and not the different basis used in a district court opinion styled *Soverain Software LLC v. CDW Corp.*, No. 6:07-CV-511, 2010 WL 1038731, at *2 (E.D. Tex. 2010), relied upon by Dynamic 3D in the Joint Report dated July 29, 2014, provided to this Court.

22.     The common law "substantially related" standard was adopted by and incorporated into the ABA Model Rules.  ABA Model Rule 1.9(a) provides:

> "A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."

23.     The Texas Disciplinary Rules also use the "substantially related" standard in Rule 1.09(a)(3) to define former client conflicts of interest.  However, the Texas Disciplinary Rules include additional language to clarify that certain other conduct adverse to a former client described in Rule 1.09(a)(1) and (a)(2) also create a prohibited conflict of interest. Texas Disciplinary Rule 1.09(a) provides:

> "(a) Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client:
>
> (1)      in which such other person questions the validity of the lawyer's services or work product for the former client;
>
> (2)      if the representation in reasonable probability will involve a violation of Rule 1.05; or
>
> (3)      if it is the same or a substantially related matter."

24.     It is my opinion that the "substantially related" standard has been interpreted by the Texas Supreme Court to mean that for two matters to be deemed substantially related "the

moving party must prove the existence of a prior attorney-client relationship in which the factual matters involved are so related to the facts in the pending litigation that it creates a genuine threat that confidences revealed to his former counsel will be divulged to his present adversary." *NCNB Texas National Bank v. Coker*, 765 S.W.2d 398 (Tex. 1989). An actual disclosure of confidences need not be proven. The issue is the existence of a genuine threat of disclosure because of the similarity of the matters. *Texaco, Inc. v. Garcia*, 891 S.W.2d 255, 257 (Tex. 1995).

25. It is my opinion that an analysis of the facts pertaining to Ms. Rutherford's prior representation of Schlumberger with respect to its Petrel product, as described in Paragraph 15 above, when compared to the facts of her representation of Acacia after June 3, 2013 with respect to the '319 Patent, reveal with specificity that Ms. Rutherford's representation of Acacia was "substantially related" to her prior representation of Schlumberger and the Petrel Product, as that "substantially related" standard has been articulated by the Fifth Circuit and the Texas Supreme Court. The facts pertaining to Ms. Rutherford's representation of Acacia that, in my opinion were adverse and substantially related to her prior representation of Schlumberger, including matters regarding the Petrel product, are as follows:

a. Ms. Rutherford terminated her employment at Schlumberger effective May 31, 2013. Three days later, on June 3, 2013, Ms. Rutherford started work at Acacia as its Senior Vice President and Associate General Counsel. Acacia hired Rutherford to direct Acacia's efforts to "monetize" energy technologies. Ms. Rutherford opened Acacia's Houston office, which is responsible for "monetizing" Acacia's energy related patents. Among others, Acacia's Houston office employs: (1) Gary Fischman, an intellectual property attorney responsible for the strategy and conduct of all '319 Patent litigation; and (2) Phillip Mitchell, an

21

engineer who works on '319 Patent matters at the direction of Mr. Fischman and Acacia's outside counsel, the Collins Edmonds law firm.  Ms. Rutherford is the most senior member of Acacia's Houston office, and both Mr. Fischman and Mr. Mitchell report directly to her.   Until May 2014, Mr. Fischman only reported to Ms. Rutherford.  In May 2014, approximately four months after the Lawsuit was filed against Schlumberger, Mr. Fischman also began reporting to Jamie Siegel, Acacia's Executive Vice President of Licensing and Litigation, in addition to Ms. Rutherford.

    b.  Soon after being employed by Acacia in June 2013 to "monetize" energy technologies, it is my opinion that Ms. Rutherford engaged in the practice of law by providing legal services and advice to Acacia and, as such, was a member of the in-house law firm or department of Acacia.   Ms. Rutherford is not merely an executive officer at Acacia who happened to be a licensed Texas lawyer and licensed to practice before the U.S. Patent and Trademark Office.  Intellectual property law is a highly complex and specialized area of law. She is an experienced lawyer who has practiced intellectual property law for many years including "managing the global intellectual property departments at Schlumberger, Colgate-Palmolive and Conoco for 12 years."   Upon joining Acacia, its CEO commented, "Ms. Rutherford's extensive experience in managing intellectual property issues at leading U.S. companies makes her a great addition to Acacia's management team as we continue to build the country's leading patent licensing company."

    c.  Under Section 81.101 of the Texas Government Code, the "practice of law" is defined to include "a service rendered out of court, including the giving of advice or the rendering of any service requiring the use of legal skill or knowledge, such as preparing a will,

contract, or other instrument, the legal effect of which under the facts and conclusions involved must be carefully determined."

        d.    Based on my review of the Documents, there is no indication that Ms. Rutherford was providing business advice related to the '319 Patent divorced from its legal implications.  It is my opinion that a lawyer who is personally involved on behalf of a person in the process of deciding whether or not that person will acquire a patent for the purpose of filing litigation claims against other companies that are allegedly infringing that patent is unavoidably dealing with issues that require legal skill and knowledge; and that work, which included Ms. Rutherford making a recommendation to Acacia's CEO about whether the company should acquire that particular patent and file litigation, constitutes in my opinion the rendering of legal services and the practice of law.

        e.    Shortly after being hired by Acacia, Ms. Rutherford participated in two meetings in Austin, Texas with the named inventors of the '319 Patent for the purpose of assessing whether Acacia should acquire the '319 Patent for possible assertion against companies in the energy sector, including Schlumberger.  Other members of Acacia's legal and engineering departments were present, including Mr. Fischman, who participated in the second meeting.  Ms. Rutherford admits that she was acting as a lawyer for Acacia at both of these meetings.  Ms. Rutherford has further acknowledged that Schlumberger and its Petrel product were mentioned and Schlumberger was identified as a potential infringer for assertion of the '319 Patent at both meetings.  Ms. Rutherford did not excuse herself from either meeting even though Schlumberger and Petrel were mentioned and Schlumberger was identified as a potential infringer of the '319 Patent.  Ms. Rutherford has also admitted that the decision by Acacia to acquire the '319 Patent and sue for patent infringement "was part of the same review process."

f.      After her meetings with Austin GeoModeling, Ms. Rutherford directly participated in Acacia's decision to acquire and file suit against Schlumberger on the '319 Patent.  This included a one-hour telephone conference call with: (1) Mr. Fischman; (2) Michael Collins, of the Collins Edmonds firm; (3) Matthew Vella, Acacia's CEO and President; (4) possibly Mr. Mitchell; and (5) the named inventors of the '319 Patent. Ms. Rutherford acknowledges that this call was conducted in anticipation of litigation.

g.      After the call, Ms. Rutherford received recommendations from Messrs. Fischman, Collins, and Mitchell that Acacia acquire and file suit against Schlumberger on the '319 Patent.  Mr. Collins and possibly others from the Collins Edmonds firm then presented Ms. Rutherford with a PowerPoint presentation that referenced Schlumberger.  Subsequently, Ms. Rutherford approved the recommendations to acquire and file suit against Schlumberger on the '319 Patent.  Ms. Rutherford admits that she was acting as Acacia's lawyer when she reviewed and approved those recommendations.

h.      With Ms. Rutherford's recommendation in-hand, Mr. Fischman and Mr. Collins, of the Collins Edmonds firm, made the same presentation to Mr. Vella, Acacia's CEO. With the benefit of Ms. Rutherford's approval, Mr. Vella authorized the plan to acquire the '319 Patent and file suit against Schlumberger.

i.      In August 2013, Acacia and Austin GeoModeling entered into an agreement wherein Acacia agreed to license and enforce the '319 Patent.  In connection therewith, Austin GeoModeling assigned to Acacia "all right, title and interest" in and to the '319 Patent, including all rights to sue for past and present infringement of the '319 Patent.  In December 2013, Acacia assigned all its right, title and interest in the '319 Patent to its wholly owned subsidiary, Dynamic 3D, which is the Plaintiff in this Lawsuit against Schlumberger.

j.      Plaintiff is a wholly-owned Acacia subsidiary.  Plaintiff appears to depend entirely on Acacia's in-house legal department for its strategy and conduct in this litigation.  Ms. Rutherford has indicated that Plaintiff has no employees.   Plaintiff's Corporate Disclosure Statement further provides that Acacia Research Group LLC is Plaintiff's parent—the very entity that employs both Ms. Rutherford and Mr. Fischman.  Acacia Research Corporation, in turn, owns 100% of Acacia Research Group LLC.  Plaintiff's Certificate of Formation also states that Plaintiff will not have managers, but rather will be governed by its members.  The Certificate lists Acacia Research Group LLC as its sole governing member.  Mr. Fischman, a member of Acacia's in-house legal team, has been introduced to the Court by Mr. Collins, Plaintiff's counsel of record, as Plaintiff's "representative."

k.      Ms. Rutherford has admitted that she was involved in the acquisition of the '319 Patent and planning for litigation against parties in the energy market, including Schlumberger.

i.      In the Summer of 2013, Ms. Rutherford reviewed the '319 Patent in anticipation of litigation.

ii.      Ms. Rutherford then participated in meetings and a conference call in anticipation of litigation, and Ms. Rutherford then approved recommendations to acquire the '319 Patent and file suit against Schlumberger.

iii.      Ms. Rutherford and Mr. Fischman made the decision to retain the Collins Edmonds law firm to serve as Plaintiff's counsel of record in all '319 Patent litigation.

iv.      Ms. Rutherford reviewed a draft of the complaint that Plaintiff later filed against Halliburton alleging infringement of the '319 Patent.  The Halliburton

complaint was filed on the same day as the complaint Plaintiff filed against Schlumberger in this Lawsuit, and Ms. Rutherford has acknowledged that the Halliburton and Schlumberger complaints are similar.

v.      After this Lawsuit was filed against Schlumberger, Ms. Rutherford requested that Mr. Fischman provide her with a copy of the complaint filed against Schlumberger so that she could review it.

vi.      Mr. Fischman is responsible for the strategy and conduct of all '319 Patent litigation, working in conjunction with the Collins Edmonds firm.  Until May 2014, Mr. Fischman only reported to Ms. Rutherford.  In May 2014, approximately four months after the Lawsuit was filed against Schlumberger, Mr. Fischman also began reporting to Jamie Siegel, Acacia's Executive Vice President of Licensing and Litigation, in addition to Ms. Rutherford.

vii.      Ms. Rutherford admits that she had discussions with Mr. Fischman regarding protection of Plaintiff's patent rights both before and after Plaintiff acquired the '319 Patent, and those discussions continued even after Plaintiff filed its complaint against Schlumberger.  Ms. Rutherford admits that she was acting as a lawyer during those discussions, but she has refused to disclose the substance of those communications.

l.      On February 4, 2014, Dynamic 3D, as Plaintiff, filed a complaint alleging that Schlumberger's Petrel product wilfully infringes the '319 Patent.  Ms. Rutherford has acknowledged that she approved recommendations to file the Lawsuit against Schlumberger.

m.      On the same day that Plaintiff sued Schlumberger, Plaintiff also filed a similar patent infringement lawsuit against Halliburton.  Plaintiff has since filed complaints

against four other parties alleging infringement of the '319 Patent by other companies in the energy sector.

n.    The Original Complaint for Patent Infringement filed by the Plaintiff against Schlumberger claims in Count II, entitled "Inducing Infringement of U.S. Patent No. 7,986,319," which is the '319 Patent, that: (1) Schlumberger has had actual knowledge of the '319 Patent since at or about the time of its issuance on July 26, 2013; (2) since that date, Schlumberger has visited Austin GeoModeling's website over fifty times; and (3) since August 8, 2011, Austin GeoModeling's website has prominently displayed a link to an announcement of the issuance of the '319 Patent.  Furthermore, in Count III of the Original Complaint, Plaintiff claims that Schlumberger has willfully infringed the '319 Patent because it has studied the claims made in the '319 Patent and must have been aware of the objectively high likelihood of infringement "because of the similarity of the key features of Defendant's Petrel E&P Software Platform and AMG's [Austin GeoModeling's] patented RECON software."  From August 8, 2011, to May 31, 2013, while Schlumberger's was allegedly willfully infringing the '319 Patent, Ms. Rutherford was serving in Schlumberger's in-house legal department as Deputy General Counsel for Intellectual Property.

o.    In view of the foregoing factual analysis, it is my opinion that the subject matters involved in Ms. Rutherford's prior representation of Schlumberger, including matters pertaining to Schlumberger's Petrel product, and her subsequent representation of Acacia in considering whether to acquire and file patent infringement claims on the '319 Patent against parties in the energy market, despite Ms. Rutherford having known that Schlumberger was a target of those claims, are clearly "akin to each other in a way reasonable persons would

understand" and thus are "substantially related" as that term has been defined by the Fifth Circuit.

p.     Likewise, the factual matters of her prior representation of Schlumberger, including matters pertaining to Schlumberger's Petrel product, are so specifically related to the factual circumstances of her representation of Acacia in considering whether to acquire and file patent infringement claims on the '319 Patent against parties in the energy market, despite Ms. Rutherford having known that Schlumberger was a target of those claims, that it creates a genuine threat that Schlumberger's confidential information would be or has been revealed to Acacia, and thus the representations are "substantially related" as that test has been defined by the Texas Supreme Court's standard.

26.     It is my opinion that Ms. Rutherford's representation of Acacia in a matter adverse to Schlumberger with respect to its Petrel product involved more than a former client conflict because the two matters are "substantially related."  In the alternative, Ms. Rutherford's representation of Acacia in that regard also constituted in my opinion a violation of Texas Disciplinary Rule 1.09(a)(1), which prohibits a lawyer from engaging in a representation that involves questioning the validity of that lawyer's prior services or work product for a former client.  *See In Re Epic Holdings, Inc.*, 985 S.W.2d 41 (Tex. 1998); *Woolley v. Sweeney*, No. 3:01CV1331-BF, 2003 WL 21488411 (N.D. Tex. May 13, 2003); *In re Basco*, 221 S.W.3d 637, 638-39 (Tex. 2007).  The basis of that opinion is as follows:

a.     Texas Disciplinary Rule 1.09(a)(1) was included in the former client conflict rules to prevent a lawyer from representing one client and then subsequently representing another client whose representation involves the lawyer questioning or challenging the validity of the prior legal services or work product the lawyer did for her former client. Any

28

such representation is prohibited because it would constitute a breach of loyalty to the former client and violate the fiduciary nature of the attorney-client relationship.

      b.      Ms. Rutherford has testified that Schlumberger was identified as a potential infringer for assertion of the '319 Patent at her first meeting with the owners of Austin GeoModeling, and that the decision to acquire the '319 Patent and sue "was part of the same review process." And, according to Ms. Rutherford, the names Schlumberger and its Petrel product were mentioned and Schlumberger was identified as a potential infringer for assertion of the '319 Patent at each of the two meetings that she attended at Austin GeoModeling with the owners of the '319 Patent.

      c.      Ms. Rutherford was not merely one of the approximately 100 in-house attorneys at Schlumberger. Ms. Rutherford served in Schlumberger's in-house legal department for a period of seven years, first as Schlumberger's Senior Counsel, Licensing and Litigation, and then the last three years of her employment at Schlumberger as Deputy General Counsel for Intellectual Property. In those roles, Ms. Rutherford's legal services for Schlumberger included being "[r]esponsible for protecting and preserving . . . [Schlumberger's] IP assets including patents, trademarks and trade secrets by establishing and maintaining best practices and procedures."

      d.      More specifically, Ms. Rutherford's representation of Schlumberger included developing Schlumberger's patent enforcement and licensing programs. That specifically included Petrel. As more fully described in Paragraph 15 above, while representing Schlumberger Ms. Rutherford led a team of lawyers and engineers to assess its Petrel product— the Petrel "Goldstar" assessment. During the Petrel Goldstar assessment, Ms. Rutherford received written reports from others at Schlumberger for each phase of the Petrel Goldstar

intellectual property assessment.  One of the reports discussed Schlumberger's competitors' products, including Austin GeoModeling's RECON product—a predecessor to Plaintiff's RECON 3.0 product, which Plaintiff claims is covered by the '319 Patent.

### C.   IMPUTATION OF MS. RUTHERFORD'S CONFLICT TO ACACIA'S IN-HOUSE ATTORNEYS

27.     It is my opinion that under federal law, as well as Texas law, once two matters are deemed to be substantially related and adverse to a lawyer's former client, that former client is entitled to a conclusive and irrebuttable presumption that it conveyed relevant confidential information and secrets to its lawyer during the prior representation.  *In re Am. Airlines*, 972 F.2d at 614.  The principal reason for this presumption is that the former client should not be placed in a position where it has to reveal its confidential information in order to prove that its former lawyer has a conflict of interest.  Accordingly, Ms. Rutherford is conclusively presumed to have received Schlumberger's confidential information related to Petrel.

28.     Once an irrebuttable presumption exists that a lawyer received confidential information from her former client in a substantially related matter, it is my opinion that a second conclusive and irrebuttable presumption exists that the conflicted lawyer shares her former client's confidential information with all other lawyers who are then associated with her.  *Id.*; *In re Corrugated Container*, 659 F.2d at 1346.

29.     It is my opinion that Ms. Rutherford had a conflict of interest at least from the time she attended the first meeting with Austin GeoModeling where Schlumberger was mentioned and identified as a potential infringer of the '319 Patent.   As a result all in-house lawyers at Acacia were thereupon presumed to possess the same confidential information about Schlumberger as Ms. Rutherford.  And Acacia's in-house attorneys had by imputation a conflict

of interest that prohibited them from being adverse to Schlumberger on matters relating to the '319 Patent.  The basis of this opinion is as follows:

        a.     ABA Model Rule 1.10(a) is the rule of imputed disqualification and provides: "While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9 unless."  Certain exceptions apply to ABA Rule 1.10(a) that, in my opinion, are not applicable, as is explained in Paragraph 32 below.

        b.     Likewise, Texas Disciplinary Rule 1.09(b) provides: "[W]hen lawyers are or have become members of or associated with a firm, none of them shall knowingly represent a client if any one of them practicing alone would be prohibited from doing so by paragraph (a) [of Rule 1.09]."  This rule protects a former client's interests in confidentiality and loyalty.  How that applies to attorneys in a firm who become associated with a newly-hired attorney who has a conflict of interest is explained in Comment 5 to Rule 1.09(b):

> "[I]f a lawyer severs his or her association with a firm and that firm retains as a client a person whom the lawyer personally represented while with the firm, that lawyer's ability thereafter to undertake a representation against that client is governed by paragraph (a) [of Rule 1.09]; *and all other lawyers who are or become members of or associates with that lawyer's new firm are treated in the same manner by paragraph (b).*"

Tex. Disciplinary Rules, Rule 1.09(b) cmt. 5 (emphasis added).

        c.     The Texas Supreme Court held in *National Medical Enterprises, Inc. v. Godbey*, 924 S.W.2d 123 (Tex. 1996), that if one lawyer in a firm is disqualified by a former client conflict of interest then:

> [That] attorney's knowledge is imputed by law to every other attorney in the firm. There is an irrebuttable presumption that an attorney in a law firm has access to the confidences of the clients and former clients of other attorneys in the firm. One reason for this presumption is that it would always be virtually impossible for a former client to prove that attorneys in the same firm had not shared confidences.

*Id*. at 131.

        d.      ABA Model Rule 1.10(a) provides that "[w]hile lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing along would be prohibited from doing so by Rules 1.7 or 1.9."

        e.      Under both the Texas Disciplinary Rules and the ABA Model Rules, a "firm" or "law firm" includes the legal department of a corporation or other organization.

        i.      The Terminology section of the Texas Disciplinary Rules defines a "Firm" or "Law Firm" to include "a lawyer or lawyers employed in the legal department of a corporation, . . . or other organization."

        ii.      Likewise, Rule 1.0(c) of the ABA Model Rules defines a "Firm" or "law firm" to include "lawyers employed in a legal services organization or the legal department of a corporation or other organization."

        f.      It is my opinion that a "firm" or "law firm" of in-house attorneys in a corporation or other organization does not depend on what title or office they hold in the organization or whether they refer to the lawyers being in a "legal department."  If a lawyer-employee is providing legal services to the corporation or organization, he or she is a member of that in-house "firm" or "law firm" under the ethics rules.

        g.      On June 3, 2013, when Ms. Rutherford joined Acacia as its Senior Vice President and Associate General Counsel, she became a member of the "firm" or "law firm" of in-house attorneys at Acacia.  As Ms. Rutherford has testified, she wears two hats at Acacia, a business development manager hat, and also a lawyer hat.

        h.      Shortly after being hired by Acacia, Ms. Rutherford participated in two meetings in Austin, Texas with the named inventors of the '319 Patent for the purpose of

assessing whether Acacia should acquire the '319 Patent for possible assertion against companies in the energy sector, including Schlumberger.  Other members of Acacia's legal and engineering departments were present, including Mr. Fischman, who participated in the second meeting.  Ms. Rutherford admits that she was acting as a lawyer for Acacia at both of these meetings.  Ms. Rutherford has further acknowledged that Schlumberger and its Petrel product were mentioned and Schlumberger was identified as a potential infringer for assertion of the '319 Patent at both meetings.  Ms. Rutherford did not excuse herself from either meeting even though Schlumberger and Petrel were mentioned and Schlumberger was identified as a potential infringer of the '319 Patent.  Ms. Rutherford has also admitted that the decision by Acacia to acquire the '319 Patent and sue for patent infringement "was part of the same review process."

       i.     After her meetings with Austin GeoModeling, Ms. Rutherford directly participated in Acacia's decision to acquire and file suit against Schlumberger on the '319 Patent.  This included a one-hour telephone conference call with: (1) Mr. Fischman; (2) Michael Collins, of the Collins Edmonds firm; (3) Matthew Vella, Acacia's CEO and President; (4) possibly Mr. Mitchell; and (5) the named inventors of the '319 Patent. Ms. Rutherford acknowledges that this call was conducted in anticipation of litigation.

       j.     Ms. Rutherford and Mr. Fischman jointly made the decision to retain the Collins Edmonds law firm to serve as Plaintiff's counsel of record in all '319 Patent litigation.

       k.     Ms. Rutherford admits that she had discussions with Mr. Fischman regarding protection of Plaintiff's patent rights both before and after Plaintiff acquired the '319 Patent, and those discussions continued even after Plaintiff filed its complaint against Schlumberger.  Ms. Rutherford admits that she was acting as a lawyer during those discussions, but she has refused to disclose the substance of those communications.

30.     It is my opinion that when Acacia created Dynamic 3D, which is a separate business entity (a limited liability company) that is a wholly owned subsidiary of Acacia, and Acacia then transferred all right, title, and interest in the '319 Patent to Dynamic Geo, and then caused Dynamic 3D to file this patent infringement Lawsuit against Schlumberger, the fact that Dynamic 3D is a separate entity does not, under applicable law, avoid Ms. Rutherford's conflict or avoid imputation of Ms. Rutherford's conflict to all other attorneys at Acacia.  The basis of this opinion is as follows:

a.     For conflict of interest purposes involving a parent corporation and its wholly owned subsidiary, when the parent corporation's in-house attorneys are controlling the litigation it makes no difference whether the wholly owned subsidiary or its parent owns the patent and/or files the complaint alleging patent infringement.  At least since the 1980s, federal courts have recognized that for representation purposes involving a motion to disqualify, when a parent corporation controls the legal representation of a wholly-owned subsidiary, the corporate parent's attorneys are deemed to represent both the parent and the subsidiary for disqualification purposes.  *Hartford Accident and Indem. Co. v. RJR Nabisco, Inc.*, 721 F. Supp. 534 (S.D.N.Y. 1989).  In that opinion, the district court stated:

> [T]he Court concludes that RJR Nabisco, through its subsidiary Reynolds Tobacco, was a client of LeBoeuf. Certain aspects of their separate corporate identities notwithstanding, the parent attached considerable importance to the product liability litigation against its subsidiary and, accordingly, supervised the subsidiary's litigation.  *See, e.g.,* Wood Aff. ¶ 2 ("I have, for the most part, received assignments requesting legal representation from an officer or attorney of RJR Nabisco even though the services were to be performed for [its subsidiary Reynolds Tobacco].")  The Office of the General Counsel at RJR Nabisco thus had the right to steer the products liability litigation as it saw fit, and did so.  If the parent and subsidiary were in fact distinct and separate entities for representation purposes, then there would have been no need for the parent's general counsel to have retained this supervisory role.

*Id.* at 540.

34

b.      Ms. Rutherford has testified that Gary Fischman, a member of Acacia's in-house legal department, is responsible for the strategy and conduct of this Lawsuit against Schlumberger.

i.      Mr. Fischman works with Dynamic 3D's outside counsel, the Collins Edmonds firm, namely Michael Collins, a shareholder at the Collins Edmonds firm who serves as counsel of record in this Lawsuit.

ii.      Mr. Fischman reported solely to Ms. Rutherford until May 2014—approximately four months after the Lawsuit was filed—and still reports to her and to Jaime Siegel, Executive Vice President for Licensing and Litigation.  Ms. Rutherford has testified that, since May 2014, both Mr. Fischman and Mr. Siegel are responsible for working with Collins Edmonds regarding the strategy and conduct of all '319 Patent litigation.

iii.      Ms. Rutherford admits that she had discussions with Mr. Fischman regarding protection of Plaintiff's patent rights both before and after Plaintiff acquired the '319 Patent, and those discussions continued even after Plaintiff filed its complaint against Schlumberger.  Ms. Rutherford admits that she was acting as a lawyer during those discussions, but she has refused to disclose the substance of those communications.

c.      Accordingly, actions taken on behalf of Dynamic 3D in this Lawsuit are under the control and direction of Acacia's in-house legal department, namely Mr. Fischman and Mr. Siegel.  In my opinion, Dynamic 3D is a client of both Acacia's in-house legal staff and the Collins Edmonds firm.

d.      In cases involving attorney-client privilege issues between a parent corporation and its wholly owned subsidiary, the rule is that the parent and subsidiary share a

community of interest and either the two entities are treated as one client, or the attorney is considered to be jointly representing both entities for conflict of interest purposes.  *Teleglobe Communications Corp. et al. v. BCE, Inc.*, 493 F.3d 345 (3rd Cir. 2007); *see also Honeywell Int'l, Inc. v. Philips Lumileds Lighting Co.*, No. 2:07-CV-463-CE, 2009 WL 256831 (E.D. Tex. Jan. 6, 2009).

31.     Ms. Rutherford has stated that she excused herself from only one part of a single conference call when Schlumberger's name was mentioned and Acacia has claimed that Ms. Rutherford was timely "screened" from the litigation against Schlumberger.  Michael Collins, one of Plaintiff's counsel of record in this Lawsuit, has also claimed that Ms. Rutherford was screened from matters related to the '319 Patent and the Lawsuit against Schlumberger.  For example, in a letter to Defendant's counsel dated May 5, 2014, Mr. Collins represented: "Since the time of her arrival at Acacia, Ms. Rutherford has been screened and will continue to be screened from any discussion that involves Schlumberger, or any of its products or technology." It is my opinion that Ms. Rutherford excusing herself from one part of a conference call relating to litigation against Schlumberger, and Mr. Collins' statements to the effect that Ms. Rutherford has been "screened," do not eliminate or avoid the conflict of interest arising from her prior substantially related representation of Schlumberger and do not vitiate the irrebuttable presumption that all other in-house attorneys at Acacia vicariously possess the same confidential information as Ms. Rutherford.  Likewise, all the other in-house attorneys at Acacia are imputed to have a conflict of interest with respect to any involvement in the '319 Patent litigation against Schlumberger.  The basis of this opinion is as follows:

a.     Ms. Rutherford participated in multiple meetings with other Acacia lawyers and co-counsel in anticipation of litigation where Schlumberger and its Petrel product

were identified as a potential infringer of the '319 Patent.  Ms. Rutherford did not excuse herself from those meetings.  Her conflict of interest existed at least by the time she attended her first meeting at Austin GeoModeling.

   b. Under the Texas Disciplinary Rules and Texas case law, "screens" are not permitted to avoid a lawyer's conflict of interest and the imputation of knowledge to other lawyers, except in limited circumstances involving successive government and private employment or employment involving adjudicatory officials or law clerks.  Neither of those exceptions are applicable to Ms. Rutherford and the other in-house attorneys at Acacia.  A screen is also permitted in Texas to avoid conflicts of interest when a non-lawyer staff person transfers employment to another firm.

   c. In 2009, ABA Model Rule 1.10 was amended by adding Rule 1.10(a)(2) to allow limited screening of an attorney who transfers to a different firm and has a disqualifying conflict arising out of such lawyer's association with a prior firm in order to avoid imputing that lawyer's conflict of interest to all other lawyers in his new firm.  That amended rule, entitled "Imputation of Conflicts of Interest," addresses conflicts of interest when a lawyer moves from one firm to another firm and has a conflict of interest because of her representation of a former client at her previous firm.  Model Rule 1.10(a), as amended, provides:

> (a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9, unless
>
> > (1) the prohibition is based on a personal interest of the disqualified lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm; or
> >
> > (2) the prohibition is based upon Rule 1.9(a) or (b) and arises out of the disqualified lawyer's association with a prior firm, and
> >
> > > (i) the disqualified lawyer is timely screened from any participation in the matter and is apportioned no part of the fee

therefrom;

(ii) written notice is promptly given to any affected former client to enable the former client to ascertain compliance with the provisions of this Rule, which shall include a description of the screening procedures employed; a statement of the firm's and of the screened lawyer's compliance with these Rules; a statement that review may be available before a tribunal; and an agreement by the firm to respond promptly to any written inquiries or objections by the former client about the screening procedures; and

(iii) certifications of compliance with these Rules and with the screening procedures are provided to the former client by the screened lawyer and by a partner of the firm, at reasonable intervals upon the former client's written request and upon termination of the screening procedures.

     d.    ABA Model Rule 1.10(a) follows the general rule that when lawyers are associated in a firm, if any one of the lawyers has a conflict of interest with a current or former client, then that conflict is imputed to all other lawyers in the firm who then are also prohibited from being involved in the representation.   However, Model Rule 1.10(a) has two limited exceptions, neither of which are applicable in Ms. Rutherford's situation.   First, the imputation rule does not restrict lawyers who are associated with the disqualified lawyer from engaging in a representation if the disqualifying conflict is based merely on a personal interest of the disqualified lawyer (such as, for example, a moral objection to representing a person accused of murder) and there is no significant risk of materially limiting the representation.   Second, the imputation rule does not restrict lawyers associated with a disqualified lawyer because of a former client conflict arising from work at a previous firm if the disqualified lawyer is timely screened and apportioned no part of the fee, a detailed written notice is given to the former client with a description of the screening procedures, and certificates of compliance are provided to the former client at reasonable intervals.

32.     It is my opinion that, even if courts in the Fifth Circuit were to adopt the screening standard set forth at ABA Model Rule 1.10(a), the two exceptions that permit screening in ABA Model Rule 1.10(a) are not applicable in this case.

a.     First, Ms. Rutherford's prohibited conflict of interest, based on her prior representation of Schlumberger, was certainly not based on a personal interest.

b.     Second, even if screening were permitted to avoid imputation of conflicts of interest in this case, neither Acacia nor Plaintiff have complied with the requirements of ABA Model Rule 1.10(a)(2).

i.     Ms. Rutherford was not timely screened either on the first day of her employment at Acacia nor prior to any meetings at Austin GeoModeling where Schlumberger and its Petrel product were identified as a potential infringer of the '319 Patent.  If Acacia had created an effective screen, Ms. Rutherford would not have: (1) attended those two meetings at Austin GeoModeling; (2) participated in a one hour conference call with Messrs. Vella, Fischman, and Collins in anticipation of litigation; (3) be the recipient of a PowerPoint presentation from Mr. Collins recommending that Acacia acquire the '319 Patent and sue Schlumberger; and (4) approved the recommendations of Messrs. Collins, Fischman, and Mitchell to acquire the '319 Patent and sue Schlumberger.

ii.     Moreover, according to Robin Nava, a current employee in Schlumberger's in-house legal department, Schlumberger has not received any written notice from Acacia or Plaintiff stating that Ms. Rutherford was screened after she began her employment, on June 3, 2013, as Senior Vice President and Acacia's Associate

General Counsel, nor has Schlumberger received any certifications of compliance from Acacia or Plaintiff regarding those purported screening procedures.

33.     It is my opinion that even if Acacia had complied fully with the screening provisions of ABA Model Rule 1.10, when a conflict exists between the ABA Model Rules and the Texas Disciplinary Rules, the federal courts within the Fifth Circuit apply the more stringent standard.  For example, in *In re Dresser Industries, Inc.*, 972 F.2d at 540, the district court ruled that a law firm could sue an existing client without its consent on a matter that was not substantially related to its current representation of the client because that was permitted under Texas Disciplinary Rule 1.06.  The Fifth Circuit reversed stating that the more stringent ABA Model Rule standard that requires client consent prevails over the Texas Disciplinary Rules.  In this case, the more stringent rule is the absence of any screening procedures in the Texas Disciplinary Rules and, therefore, the Texas Disciplinary Rules should govern imputation of a lawyer's conflict in Ms. Rutherford's situation.

### D.     IMPUTATION OF MS. RUTHERFORD'S CONFLICT TO CO-COUNSEL AT THE COLLINS EDMONDS FIRM

34.     When Acacia's in-house attorneys began working on the potential acquisition of the '319 Patent from Austin GeoModeling, they consulted with the outside law firm of Collins Edmonds.  By that time, Schlumberger had already been identified at meetings with Austin GeoModeling as a potential infringer of the '319 Patent.

a.     After Ms. Rutherford's second meeting with Austin GeoModeling, which was also attended by in-house attorney Gary Fischman, Ms. Rutherford and Mr. Fischman had direct and substantive contact and communications with the Collins Edmonds firm during the decision-making process to acquire and file litigation based on the '319 Patent:

b.      Ms. Rutherford and Mr. Fischman attended a meeting at Austin GeoModeling with the inventors of the '319 Patent where Schlumberger and its Petrel product were mentioned and Schlumberger was identified as a potential infringer for assertion of the '319 Patent at both meetings.  Ms. Rutherford did not excuse herself from either meeting, even though Schlumberger and Petrel were mentioned and Schlumberger was identified as a potential infringer of the '319 Patent.  Ms. Rutherford has also admitted that the decision by Acacia to acquire the '319 Patent and sue for patent infringement "was part of the same review process."

c.      After that second meeting with Austin GeoModeling, Ms. Rutherford and Mr. Fischman participated in a one-hour telephone conference call that included: (1) Mr. Fischman; (2) Michael Collins, of the Collins Edmonds firm; (3) Matthew Vella, Acacia's CEO and President; (4) possibly Mr. Mitchell; and (5) the named inventors of the '319 Patent. Ms. Rutherford acknowledges that this call was conducted in anticipation of litigation.

d.      After the call, Ms. Rutherford received recommendations from Messrs. Fischman, Collins, and Mitchell that Acacia acquire and file suit against Schlumberger on the '319 Patent.

e.      Mr. Collins and possibly others from the Collins Edmonds firm then presented Ms. Rutherford with a PowerPoint presentation referencing Schlumberger. Subsequently, Ms. Rutherford approved the recommendations to acquire and file suit against Schlumberger on the '319 Patent.  Ms. Rutherford admits that she was acting as Acacia's lawyer when she reviewed and approved those recommendations.   Ms. Rutherford approved the recommendations with knowledge that Acacia had identified Schlumberger as a potential infringer for a patent infringement suit based on the '319 Patent.

41

f.      At some point in this process, Ms. Rutherford and Mr. Fischman made the decision to retain the Collins Edmonds law firm to serve as Plaintiff's counsel of record in all '319 Patent litigation.

35.     It is my opinion that Michael Collins and other attorneys at the Collins Edmonds law firm are considered to be co-counsel for conflicts of interest analysis in this Lawsuit because they have never represented Schlumberger, are not employed as in-house attorneys of Acacia, but rather are outside counsel working with in-house attorneys at Acacia in prosecution of the Lawsuit and also serve as the attorney of record for the Plaintiff in the Lawsuit.  *See Advanced Messaging Techs., Inc. v. EasyLink Servs. Int'l Corp.*, 913 F. Supp. 2d 900 (C.D. Cal. 2012) (co-counsel for defendant disqualified as a result of working on the case with defendant's "outside in-house attorney" who had a conflict of interest because of his prior representation of one of the plaintiffs).

36.     I am aware of only three Fifth Circuit opinions, which were issued in the 1970s, that have discussed the issue of whether co-counsel is disqualified because it has been working with another lawyer or law firm that has a disqualifying conflict of interest.  *American Can Co. v. Citrus Feed Co*., 436 F.2d 1125 (5th Cir. 1971); *Wilson P. Abraham Constr. Corp. v. Armco Steel Corp. et al.*, 559 F.2d 250 (5th Cir. 1977); *Brennan's, Inc. v. Brennan's Restaurants, Inc. et al.* 590 F.2d 168 (5th Cir. 1979).   In the *American Can Company* case, the court refused to "double impute" to co-counsel the imputed conflict of interest of a lawyer in another firm. The *Wilson P. Abraham Construction Corp* case did not involve a former client conflict situation, but rather co-defendants of a former client.   In the *Brennan's, Inc. v. Brennan's Restaurants, Inc.* case, the court discussed the "appearance of impropriety" standard that is no longer included in

the ABA Model Rules or the Texas Disciplinary Rules.  Both of those last two cases were remanded to the trial court for factual findings.

37.     There is one recent Texas federal district court case and two Texas state cases dealing with disqualification of co-counsel. *Ledwig v. Cuprum S.A.*, No. SA-03-CA-542-RF, 2004 WL 573650 (W.D. Tex. Jan 28, 2004); *In re Am. Home Products Corp.*, 985 S.W.2d 68 (Tex. 1998); *In re CMH Homes*, No, 04-13-00050-CV, 2013 WL 2446724 (Tex. App. June 5, 2013) (Tex.App. - San Antonio 2013).

38.     In *Ledwig v. Cuprum S.A.*, 2004 WL 573650, Federal District Judge Furgeson stated that he was guided by the Texas Supreme Court's opinion in the *American Home Products Corporation* case, 985 S.W.2d at 68.  The court held that the party seeking disqualification of co-counsel must first demonstrate "that there were substantive conversations between disqualified counsel and co-counsel, joint preparation for trial by those counsel, or the apparent receipt by co-counsel of confidential information."  Once that is shown, a rebuttable presumption arises that disqualified counsel shared confidential information with co-counsel.  Then, the party resisting disqualification of co-counsel may attempt to rebut the presumption by providing "probative and material evidence" that confidential information was not disclosed to co-counsel.  The district court found that the movants only made conclusory statements that substantive conversations occurred between disqualified counsel and co-counsel, and the claim that disqualified counsel and co-counsel conferred on the case was based on emails about scheduling and filing but not the substance of the case.  Under those circumstances, the court disqualified plaintiff's counsel, but did not disqualify co-counsel.

39.     In the *American Home Products Corporation* case, 985 S.W.2d at 68, the Texas Supreme Court analyzed and discussed at great length the issue of disqualification of co-counsel.

That case involved a non-lawyer staff employee who possessed confidential information of a defendant in a lawsuit who changed employment and began working for the plaintiff's attorney in that same lawsuit.  The plaintiff's attorney did not timely screen the staff employee, which is permitted under Texas law for non-lawyer staff employees of a law firm.  Since the non-lawyer was not timely screened when she was hired by the plaintiff's attorney, she stood in the same position as a lawyer for conflicts of interest purposes.  The plaintiff's attorney who hired the non-lawyer was imputed to have the confidential information of the adverse party possessed by her non-lawyer employee, and hence plaintiff's attorney and his firm were disqualified.

    a.    The court then addressed the applicable standard for disqualification of co-counsel who had worked on this case with the plaintiff's attorney: (1) first, from the standpoint of communications between co-counsel and the plaintiff's attorney who was only imputed to have such confidential information; and (2) second, from the standpoint of direct communications between co-counsel and the disqualified non-lawyer employee who actually possessed confidential information of the adverse party.  Depending on the facts and circumstances, either could result in the disqualification of co-counsel.

    b.    The court held that where co-counsel had communications with the plaintiff's attorney who was only imputed to have the confidential information of her disqualified non-lawyer employee, the party seeking disqualification of co-counsel must

> first demonstrate that there were substantive conversations between disqualified counsel and co-counsel, joint preparation for trial by those counsel, or the apparent receipt by co-counsel of confidential information. A rebuttable presumption then arises that disqualified counsel shared confidential information with co-counsel." Once that requisite showing has been made, then the burden shifts to the party resisting disqualification to rebut the presumption by providing "probative and material evidence that the tainted person…did not disclose confidential information of his adversary.

    c.    On the other hand, if the party seeking disqualification of co-counsel:

establishes that there was contact or communication between the tainted nonlawyer [the person who actually possessed the adverse party's confidential information] and co-counsel, the burden shifts to the party resisting disqualification of co-counsel to offer evidence that "there was no reasonable prospect that the opposing party's confidential information was disclosed and that it was not in fact disclosed.

        d.      The Court also held "[t]hat disqualification of co-counsel is required if the nonlawyer and co-counsel worked so closely together or the nature of their communications was such that there is a substantial likelihood that confidential information was shared."  Likewise, disqualification is required if there has been an actual disclosure of confidential information to co-counsel.

        40.      In the recent case of *In re CMH Homes, Inc. and Vanderbilt Mortgage and Finance, Inc*., 2013 WL 2446724, a Texas Court of Appeals disqualified co-counsel for being associated with a lawyer who actually possessed confidential information of a former client in a same or substantially related matter. Co-counsel argued that no confidential information was exchanged and that the name of the lawyer who possessed the confidential information of the adverse party was merely listed as counsel on the petition as a formality because he had recently been elected County Attorney and that particular county had become a plaintiff in the lawsuit. However, the Court of Appeals disqualified co-counsel because the lawyer who possessed the adverse party's confidential information actually negotiated and hired co-counsel to file the lawsuit against his former client and thus the presumption of shared knowledge applied.

        a.      The court also addressed the scope of the term "members of or associated with a firm" who are disqualified under Texas Disciplinary Rule 1.09(b) and deemed that term "to include not only partners, employees and associates within the same firm, but individuals working together on a case or issue regardless of their actual status as a member of the firm, of-counsel or co-counsel."

b.      That holding is consistent with §123, Comment c(iii) of the *Restatement (Third) of the Law Governing Lawyers* entitled "Associated lawyers or law firms."   That Comment explains:

> Two or more lawyers or law firms might associate for purpose of handling a particular case. . . . Similarly, when a lawyer consults with other lawyers in specialized areas of the law, the consultant lawyer may not personally represent clients with conflicting interests.  However, the normal consulting relationship is essentially an association for purposes of the matter in question between lawyers otherwise practicing separately.  Hence the rule of this Comment applies.

41.     It is my opinion that the facts and circumstances of this case establish that substantive communications and conversations occurred between Ms. Rutherford and co-counsel Michael Collins in connection with the planning of the Lawsuit; there has been joint preparation for trial by co-counsel and in-house counsel, Gary Fischman and certain other in-house Acacia attorneys; and the apparent receipt by co-counsel of Schlumberger's confidential information as a result of the joint work by co-counsel and in-house Acacia attorneys in preparation for, filing, and ongoing prosecution of the Lawsuit.  The basis of this opinion is as follows.

a.      Ms. Rutherford had direct contact and substantive communications with Michael Collins of the Collins Edmonds law firm with respect to the Lawsuit and worked with that firm in recommending that Acacia acquire the '319 Patent for the purpose of filing patent infringement litigation against Schlumberger and other energy companies.  The presently known contacts and substantive communications between Ms. Rutherford and the Collins Edmonds law firm include:

i.      Ms. Rutherford directly participated in Acacia's decision-making process in which it decided to acquire and file the Lawsuit based on the '319 Patent.

ii. After her meetings with Austin GeoModeling, Ms. Rutherford directly participated in Acacia's decision to acquire and file suit against Schlumberger on the '319 Patent. This included a one-hour telephone conference call with: (1) Mr. Fischman; (2) Michael Collins, of the Collins Edmonds firm; (3) Matthew Vella, Acacia's CEO and President; (4) possibly Mr. Mitchell; and (5) the named inventors of the '319 Patent. Ms. Rutherford acknowledges that this call was conducted in anticipation of litigation.

iii. After the call, Ms. Rutherford received recommendations from Messrs. Fischman, Collins, and Mitchell that Acacia acquire and file suit against Schlumberger on the '319 Patent. Mr. Collins and possibly others from the Collins Edmonds firm then presented Ms. Rutherford with a PowerPoint presentation referencing Schlumberger. Subsequently, Ms. Rutherford approved the recommendations to acquire and file suit against Schlumberger on the '319 Patent. Ms. Rutherford admits that she was acting as Acacia's lawyer when she reviewed and approved those recommendations. Ms. Rutherford approved the recommendations with knowledge that Acacia had identified Schlumberger as a potential infringer for a patent infringement suit based on the '319 Patent.

iv. With Ms. Rutherford's recommendation in hand, Mr. Fischman and Mr. Collins, of the Collins Edmonds firm, made the same presentation to Mr. Vella, Acacia's CEO. With the benefit of Ms. Rutherford's approval, Mr. Vella authorized the plan to acquire the '319 Patent and file suit against Schlumberger.

v.      Ms. Rutherford and Mr. Fischman made the decision to retain the Collins Edmonds law firm to serve as Plaintiff's counsel of record in all '319 Patent litigation.

vi.      Ms. Rutherford reviewed a draft of the complaint that Plaintiff later filed against Halliburton alleging infringement of the '319 Patent.  The Halliburton complaint was filed on the same day as the complaint Plaintiff filed against Schlumberger in this Lawsuit, and Ms. Rutherford has acknowledged that the Halliburton and Schlumberger complaints are similar.

b.      In addition to the known direct and substantive communications between Ms. Rutherford and Michael Collins, Ms. Rutherford has testified that Acacia in-house attorney Gary Fischman (who is disqualified because of his association at Acacia with Ms. Rutherford) has been actively involved in planning and prosecuting this Lawsuit together with the Collins Edmonds firm.  The presently known contacts and substantive communications between Mr. Fischman and the Collins Edmonds law firm include:

i.      Ms. Rutherford and Mr. Fischman participated in a meeting in Austin, Texas with the named inventors of the '319 Patent for the purpose of assessing whether Acacia should acquire the '319 Patent for possible assertion against companies in the energy sector, including Schlumberger.  Ms. Rutherford admits that she was acting as a lawyer for Acacia at both of these meetings.  Ms. Rutherford has further acknowledged that Schlumberger and its Petrel product were mentioned and Schlumberger was identified as a potential infringer for assertion of the '319 Patent at both meetings.  Ms. Rutherford did not excuse herself from either meeting even though Schlumberger and Petrel were mentioned and Schlumberger was identified as a potential

infringer of the '319 Patent.  Ms. Rutherford has also admitted that the decision by Acacia to acquire the '319 Patent and sue for patent infringement "was part of the same review process."

        ii.      After that meeting with Austin GeoModeling, Ms. Rutherford directly participated in Acacia's decision to acquire and file suit against Schlumberger on the '319 Patent.  This included a one-hour telephone conference call with: (1) Mr. Fischman; (2) Michael Collins, of the Collins Edmonds firm; (3) Matthew Vella, Acacia's CEO and President; (4) possibly Mr. Mitchell; and (5) the named inventors of the '319 Patent. Ms. Rutherford acknowledges that this call was conducted in anticipation of litigation.

        iii.      Thereafter, Ms. Rutherford and Mr. Fischman jointly made the decision to retain the Collins Edmonds law firm to serve as Plaintiff's counsel of record in all '319 Patent litigation.

        iv.      The assignment of the '319 Patent to the Plaintiff, Dynamic 3D, was handled by Gary Fischman.

        v.      Ms. Rutherford has testified that Mr. Fischman is responsible for the strategy and conduct of the '319 litigation on behalf of Acacia.

        vi.      Mr. Fischman reported solely to Ms. Rutherford until May 2014—approximately four months after the Lawsuit was filed—and still reports to her and to Jaime Siegel at Acacia. Ms. Rutherford has testified that, since May 2014, both Mr. Fischman and Jaime Siegel are responsible for working with Collins Edmonds regarding the strategy and conduct of all '319 Patent litigation.

42.     The definition of "confidential information" is extremely broad.  Under Texas Disciplinary Rule 1.05(a), the term includes both privileged information and unprivileged client information.  Unprivileged client information means "all information relating to a client or furnished by the client, other than privileged information, acquired by the lawyer during the course of or by reason of the representation of the client."

43.     At the time of the above-described contacts and communications between Michael Collins and Ms. Rutherford, Mr. Collins and his law firm knew or reasonably should have known that Ms. Rutherford possessed confidential information of Schlumberger.

a.     On December 9, 2013, Acacia's press release that announced the hiring of Ms. Rutherford stated that she had managed the global IP practice of Schlumberger.

b.     In addition, Ms. Rutherford has testified that she participated in the one-hour telephone conference with Mr. Collins and others "up to the point there was a discussion of Schlumberger, and I removed myself from the call."  So, at least since that conference call, Mr. Collins had to have known about Ms. Rutherford's prior attorney-client relationship with Schlumberger.

c.     Thereafter, Ms. Rutherford received recommendations from Messrs. Fischman, Collins, and Mitchell that Acacia acquire and file suit against Schlumberger on the '319 Patent.  Mr. Collins and possibly others from the Collins Edmonds firm then presented Ms. Rutherford with a PowerPoint presentation referencing Schlumberger.  Subsequently, Ms. Rutherford approved the recommendations to acquire and file suit against Schlumberger on the '319 Patent.  Ms. Rutherford admits that she was acting as Acacia's lawyer when she reviewed and approved those recommendations.

d.      With Ms. Rutherford's recommendation in hand, Mr. Fischman and Mr. Collins, of the Collins Edmonds firm, made the same presentation to Mr. Vella, Acacia's CEO. With the benefit of Ms. Rutherford's approval, Mr. Vella authorized the plan to acquire the '319 Patent and file suit against Schlumberger.

e.      In view of the confidential information Ms. Rutherford possessed with respect to Schlumberger's intellectual property, including the Petrel product, it is my opinion that Ms. Rutherford's communication to Mr. Collins and the CEO of Acacia that she concurred in the recommendation that Acacia acquire the '319 Patent and file a lawsuit against her former client for patent infringement carried more weight than a typical recommendation. Her recommendation was, in my opinion, an implied communication of confidential information.  Comment 4 to ABA Model Rule 1.6(a) states in part:

> This prohibition [of revealing information relating to the representation of a client] also applies to disclosures by a lawyer that do not in themselves reveal protected information but could reasonably lead to the discovery of such information by a third person.  A lawyer's use of a hypothetical to discuss issues relating to the representation is permissible so long as there is no reasonable likelihood that the listener will be able to ascertain the identity of the client or the situation involved.

An outside attorney such as Mr. Collins or the CEO of Acacia who received or knew about Ms. Rutherford's recommendation could, in my opinion, reasonably believe that if someone with Ms. Rutherford's experience (and who, until very recently, served as Schlumberger's Deputy General Counsel for Intellectual Property) would recommend that Acacia sue Schlumberger for patent infringement, then that infringement claim likely has merit and could lead to the discovery of information adverse to Schlumberger.

44.      Based on the foregoing, Mr. Collins and the Collins Edmonds law firm had to have known that Ms. Rutherford was not timely screened from anything to do with

Schlumberger and the '319 Patent because Mr. Collins was communicating and dealing with Ms. Rutherford about acquiring the '319 Patent and filing this Lawsuit against Schlumberger.

45.    Based on the standards for disqualification of co-counsel adopted by the Texas Supreme Court in the *American Home Products Corporation* case, it is my opinion that the facts and circumstances described in Paragraphs 34, 41, and 43 satisfy the standard that there have been: (1) substantive conversations between Ms. Rutherford and Mr. Collins, as well as between Ms. Rutherford, Mr. Fischman and Michael Collins; (2) joint preparation for trial between Mr. Fischman (who is responsible for the strategy and conduct of the '319 litigation on behalf of Acacia) and Michael Collins; and (3) as a result, the apparent receipt by co-counsel of Schlumberger's confidential information.

46.    Moreover, the direct contacts and communications between Ms. Rutherford and Mr. Collins do not involve or require any "double imputation" of confidential information or conflict of interest to disqualify Michael Collins and the Collins Edmonds law firm.

    a.    Those direct contacts and communications between Ms. Rutherford and Michael Collins, coupled with the fact that Acacia's lawyer Gary Fischman, who reports to Ms. Rutherford and is himself disqualified, is actively working with the Collins Edmonds firm in prosecuting the Lawsuit, do, in my opinion, require the disqualification of Michael Collins and the Collins Edmonds law firm if the Court finds:

        i.    Ms. Rutherford and co-counsel have worked so closely together or the nature of their communications was such that there is a substantial likelihood that confidential information was shared, and co-counsel cannot then offer evidence that there was no reasonable prospect that Schlumberger's confidential information was disclosed; or

ii.      There has been an actual disclosure of confidential information by Ms. Rutherford to Mr. Collins or other attorneys at the Collins Edmonds firm.

b.      Given the fact that Ms. Rutherford expressly concurred with Mr. Collins' recommendation that Acacia sue her former client, Schlumberger, and communicated that to the Collins Edmonds firm, it is my opinion that it will, at a minimum, be extremely difficult for Plaintiff and the Collins Edmonds firm to rebut the presumption.

47.    I reserve the right to make modifications or supplement these opinions based on any additional documents and information subsequently provided to me related to the Lawsuit.

48.    I declare under penalty of perjury that the foregoing is true and correct.

Executed in _____*Austin*_____, Texas on this 15th day of August, 2014.

_____
W. Amon Burton, Jr.

53